## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1776 AND PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND, on behalf of itself and all others similarly situated,<br><br>                Plaintiff,<br><br>     v.<br><br>DAVITA INC.; FRESENIUS MEDICAL CARE AG; FRESENIUS MEDICAL CARE HOLDINGS, INC. d/b/a FRESENIUS MEDICAL CARE NORTH AMERICA; and FRESENIUS USA MANUFACTURING, INC. d/b/a FRESENIUS MEDICAL CARE NORTH AMERICA,<br><br>                Defendants. | Civil Action No.: _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

*"For me, it's not about the patients . . . If I had 1,400 Taco Bells and 32,000 people who worked in them, I would be doing all the same stuff."*[1]

*"Death rates go up, hospitalization rates go up, transplant rates fall, and so on. Any measure that could get worse pretty much got worse, after [DaVita and Fresenius] acquired independent facilities."*[2]

*"[DaVita and Fresenius are] not really competing for patients, as far as we can tell: they just carve up these markets and live a happy life. For many patients, life is less happy."*[3]

United Food and Commercial Workers Local 1776 and Participating Employers Health and Welfare Fund ("UFCW 1776" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this class action for damages and injunctive relief against Defendants DaVita Inc. ("DaVita"); Fresenius Medical Care AG; Fresenius Medical Care Holdings, Inc. d/b/a Fresenius Medical Care North America; and Fresenius USA Manufacturing, Inc. d/b/a Fresenius Medical Care North America (collectively "Fresenius") (collectively, with DaVita, "Defendants"), for violations of Sections 1 & 3 of the Sherman Act (15 U.S.C. §§ 1 & 3), pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 & 26).

## I.    INTRODUCTION

1.    More than 800,000 Americans live with end-stage renal disease ("ESRD"). For the vast majority of ESRD patients, the only cure is a kidney transplant from a suitable donor, which often takes years. For the thousands of patients waiting for a transplant, or who are ineligible for one, dialysis treatment is literally a matter of life and death. In order to stay alive, most ESRD

---

[1] Former DaVita CEO Kent Thiry, "Energizing a Firm with Mission & Values," speech at UCLA Anderson School of Management (April 10, 2009), https://www.youtube.com/watch?v=JowmBdx4nFw (quotation starts at 1:10:10).
[2] Tom Mueller, *How to Make a Killing: Blood, Death and Dollars in American Medicine*, W. W. NORTON & COMPANY, 2023 ("Tom Mueller, *How to Make a Killing*"), p. 119 (quoting Prof. Ryan McDevitt).
[3] Tom Mueller, *How to Make a Killing*, p. 120 (quoting Prof. Ryan McDevitt).

patients require dialysis treatment three times per week for life—unless or until they are lucky enough to receive a successful transplant.

2.      Defendants DaVita and Fresenius are the two largest dialysis providers in the United States; together they control more than 90% of this essential medical service. They have conspired with one another to corner the United States dialysis industry by allocating territories, fixing prices, and otherwise restraining competition, all to the detriment of patients and payers.

3.      Defendants' conspiracy has been devastating. Patients in the United States have little to no choice of dialysis provider, and the options they do have—clinics run by the Defendants—provide substandard care that puts lives at risk. The death rate of ESRD patients in the United States is two to four times higher than in other developed countries.[4] Compared to independent clinics, Defendants' patients have worse health outcomes and are less likely to receive a kidney transplant, ensuring Defendants higher profits from ongoing dialysis treatment.[5]

4.      According to ProPublica, of the 100,000 Americans that start dialysis each year, one in four will die within 12 months—a fatality rate among the worst in the industrialized world.[6] The high fatality rates are partly due to the poor conditions of the clinics. ProPublica examined inspection records of over 1,500 U.S. dialysis clinics. There were "filthy or unsafe conditions in almost half the units they checked," including some with "blood encrusted in the folds of patients' treatment chairs or spattered on walls, floors or ceiling tiles."[7] Further, "[h]undreds of clinics were cited for infection-control breaches that exposed patients to hepatitis, staph, tuberculosis and

---

[4] Tom Mueller, *How to Make a Killing*, p. 11.
[5] Jennifer Gander, et al., *Association Between Dialysis Facility Ownership and Access to Kidney Transplantation,* 322 JAMA 957-973 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6737748/#:~:text=Conclusions%20and%20Relevance,the%20mechanisms%20behind%20this%20association.
[6] Robin Fields, *In Dialysis, Life-Saving Care at Great Risk and Cost*, PROPUBLICA (Nov. 9, 2010), https://www.propublica.org/article/in-dialysis-life-saving-care-at-great-risk-and-cost.
[7] *Id.*

HIV."[8]

5.      Defendants have engaged in numerous anticompetitive activities that have raised costs and reduced the quality of patient care. As described more fully below, Defendants have engaged in a concerted and years-long strategy of acquiring small, independent clinics in uncontested takeovers, and have divided territories among themselves such that they do not have to compete with each other.

6.      According to an industry expert, DaVita and Fresenius do not compete. Rather, "they just carve up these markets and live a happy life."[9] As a result, Defendants now own about 80% of facilities, treat 85% of patients and earn more than 90% of industry revenue in the United States. According to Axios, DaVita and Fresenius's combined share based on revenue is now 92%.[10]

7.      One example of coordination between DaVita and Fresenius is shown through analysis of certificate of need applications for dialysis facilities. In about a dozen states, dialysis providers must obtain a certificate of need to open a new facility or expand an existing facility. The certificate of need process entails an initial application from the dialysis provider that wants to enter a new area, followed by public comment, including objections from incumbent dialysis providers.

8.      DaVita and Fresenius rarely object to one another's entry—despite the fact that they are each other's primary (and only significant) competitor. During the past four years, Defendants have objected to one another's entry on just 10% of applications, while objecting to the entry of other providers 50% of the time. In other words, over the past four years, DaVita and

---

[8] *Id.*
[9] Tom Mueller, *How to Make a Killing*, p. 120 (quoting Prof. Ryan McDevitt).
[10] Sam Baker, *The U.S. Health Care System is Full of Monopolies*, Axios (Jun. 10, 2019), https://www.axios.com/2019/06/10/health-care-costs-monopolies-competition-hospitals.

Fresenius are *five times* more likely to object to a non-defendant provider than to each other, as reflected in Figure 1, below.

**FIGURE 1: COMPARISON OF DEFENDANT OBJECTION RATES FOR DEFENDANT AND NON-DEFENDANT APPLICANTS OVER LAST FOUR YEARS**



Sources: Dialysis provider CON application information collected from Washington State Department of Health, Illinois Department of Public Health, and North Carolina Department of Health and Human Services.

9.    Because Defendants choose not to object to each other's entry nearly 90% of the time, it is unsurprising that at least one government antitrust enforcer launched an antitrust investigation into market allocation. On January 3, 2023, Fresenius received a subpoena from the Attorney General for the District of Columbia related to an antitrust investigation that included an investigation of "market allocation within the District of Columbia."[11] DaVita similarly received

---

[11] *Annual Report (Form 20-F)*, Fresenius Medical Care AG & Co. KGaA, SEC File No. 001-32749, 2022, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001333141/000110465923024168/fms-20221231x20f.htm.

a subpoena from the Attorney General for the District of Columbia.[12]

10.    Data from the Centers for Medicare & Medicaid Services ("CMS") further confirm that Defendants have chosen not to compete with each other—against their respective unilateral economic self-interests. The CMS dataset, which tracks every Medicare-funded dialysis facility in the country, including its location and corporate affiliation (e.g., DaVita or Fresenius), shows that out of 2,990 U.S. cities with at least one facility operated by either Defendant, only 674 cities (23%) have both.[13] In contrast, 1,211 cities (40%) have only a Fresenius facility, and 1,104 cities (37%) have only a DaVita facility. As shown in Figure 2, in 77% of cities, one of the two dominant dialysis providers has left the city entirely to the other—an unmistakable pattern of avoiding head-to-head competition.

**FIGURE 2: U.S. CITIES WITH AND WITHOUT COMPETITION BETWEEN DAVITA AND FRESENIUS BASED ON CMS DATA**



11.    Defendants also have engaged in lockstep parallel pricing, which is at least double

---

[12] *Annual Report (Form 10-K)*, DaVita Inc., SEC File No. 1-14106, 2022, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000927066/000092706623000011/dva-20221231.htm#ib228226ec511491b87b183c6d217a21a_247.
[13] *Medicare Dialysis Facilities*, Centers for Medicare & Medicaid Services (last accessed: May 8, 2025), https://data.cms.gov/quality-of-care/medicare-dialysis-facilities/data.

that of their competitors. Plaintiff UFCW 1776 directly pays for dialysis services on behalf of its members. As documented by Plaintiff's data of payments for services provided by DaVita and Fresenius, Defendants charge roughly the same supra-competitive rates—and Defendants' rates are each about **two times** the rates charged by non-defendant providers.

12.    Although Defendants purportedly are competitors, they "collaborate" frequently. Fresenius uses DaVita's pharmacy services, DaVita RX.[14] DaVita purchases substantial amounts of dialysis equipment from Fresenius.[15] In announcing an agreement to sell in-home machines to DaVita, a senior Fresenius executive stated Fresenius was "excited to expand our **longstanding collaboration with DaVita.**"[16] DaVita's website currently promotes just two home dialysis machines available: NxStage-System One and Fresenius-K at Home,[17] **both of which are sold by Fresenius**.[18] Last year, Defendants announced a $300 million deal whereby Fresenius sold 154 dialysis clinics across Latin America to DaVita, a deal which resulted in a net book loss estimated at EUR 200 million for Fresenius,[19] and which made DaVita the largest dialysis services provider in Latin America.[20]

13.    Defendants have engaged in other forms of parallel conduct that, in the absence of collusion, is against each Defendant's unilateral economic self-interest. For example, both DaVita

---

[14] *DaVita Announces Partnership with Fresenius Medical Care*, DaVita (Jan. 8, 2013), https://investors.davita.com/2013-1-8-DaVita-Announces-Partnership-with-Fresenius-Medical-Care.

[15] *DaVita Kidney Care Expands Use of NxStage Home Hemodialysis Machines from Fresenius Medical Care*, PR NEWSWIRE (Mar. 23, 2021), https://www.prnewswire.com/news-releases/davita-kidney-care-expands-use-of-nxstage-home-hemodialysis-machines-from-fresenius-medical-care-301253249.html.

[16] *Id.* (emphasis added).

[17] *Home Hemodialysis Equipment Options*, DaVita (last accessed: May 8, 2025), https://www.davita.com/treatment-services/home-hemodialysis/equipment-options.

[18] Fresenius Medical Care (last accessed: May 8, 2025), https://freseniusmedicalcare.com/en/healthcare-professionals/home-therapies/home-hemodialysis/nxstage-system-one/.

[19] Natashya Angelica, *Fresenius sells Latin American clinics to DaVita for $300M*, INVESTING (Mar. 5, 2024), https://www.investing.com/news/stock-market-news/fresenius-sells-latin-american-clinics-to-davita-for-300m-93CH-3325049.

[20] RTTNews Staff Writer, *DaVita to Expand International Operations in Brazil, Colombia and Entry Into Chile, Ecuador*, RTTNEWS (Mar. 5, 2024), https://www.rttnews.com/3429930/davita-to-expand-international-operations-in-brazil-colombia-and-entry-into-chile-ecuador.aspx?refresh=1.

and Fresenius fund through so-called "donations" the American Kidney Foundation (the "AKF"), a nominally independent and ostensibly charitable organization. In 2016, 80% of the AKF's funding came from Defendants—$265 million combined. The AKF, though, uses these funds to keep patients off government-funded insurance programs like Medicare and Medicaid by steering them toward private insurance, promising to reimburse patients for cost-sharing fees they would otherwise be required to pay (*e.g.*, copays). Defendants are able as a result to collect outsized reimbursement rates from private insurance providers like Plaintiff that are nearly ***1000% higher*** than the rates offered by government-funded insurance.[21] An investigation by the Office of Congresswoman Katie Porter stated there was "troubling evidence suggesting that these providers [*i.e.*, DaVita and Fresenius] and AKF have ***collaborated*** to implement practices that benefit their bottom line at the expense of patients with kidney disease."[22]

14.    The agreement between AKF and Defendants is documented in AKF's previous Health Insurance Premium Program ("HIPP") guidelines. Those guidelines explicitly stated AKF's expectation that "each referring dialysis provider should make equitable contributions to the HIPP pool," and that providers should "reasonably determine [their] 'fair share' contribution to the pool [*i.e.*, the funds available for premium assistance] by considering the number of patients [they] refer to HIPP." AKF underscored that all providers have an "ethical obligation to contribute their respective 'fair share' to ensure that the HIPP pool is adequately funded." It further advised that "[i]f your company cannot make fair and equitable contributions, we respectfully request that

---

[21] David Migoya, *DaVita steered poor dialysis patients to private insurers to pump up profits, lawsuit says*, THE DENVER POST (Mar. 3, 2017), https://www.denverpost.com/2017/02/22/davita-dialysis-patients-lawsuit/; Riley J. League, et al., *Variability in Prices Paid for Hemodialysis by Employer-Sponsored Insurance in the US from 2012 to 2019*, 5 JAMA e220562 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC8886517/.

[22] Report by the Office of Congresswoman Katie Porter (CA-45), *Dying on Dialysis: Inside an Industry Putting Profits Over Patients* (last accessed: May 8, 2025), https://web.archive.org/web/20240918194848/https://porter.house.gov/uploadedfiles/dialysis_staff_report_final.pdf (emphasis added).

your organization not refer patients to the HIPP program." In effect, the HIPP pool operates as a "pay-to-play" system—one in which solely the dominant providers DaVita and Fresenius can afford to participate. In the absence of an unlawful agreement to steer patients to their clinics, it would make no economic sense for the Defendants to contribute hundreds of millions of dollars each year to a charity. Using a "charitable" organization to coordinate fixed contributions—and excluding rival dialysis providers who cannot afford to pay—amounts to anticompetitive conduct.

15.     The conspiracy between DaVita, Fresenius, and AKF led California lawmakers to propose a bill to curb these abuses. The rationale for this bill was explained by former California assembly member, Jim Wood:

> "When unscrupulous dialysis companies, through a third party, steer patients away from Medicare or Medi-Cal by indirectly paying a patient's premiums, for the company's own financial benefit, these companies are price gouging and it's a scam," said Wood. "It doesn't improve care for patients and increases the cost of health care premiums for everyone."

> This scam reveals itself when companies that provide dialysis treatment, like DaVita and Fresenius, donate $265 million, as they did in 2016, to the nonprofit American Kidney Fund (AKF). In turn, AKF, which gets approximately 80 percent of its funding from these two companies, steers kidney dialysis patients into private health insurance by paying for the patients' monthly premiums.[23]

16.     There is also extensive evidence of "plus factors" that establish that Defendants colluded to fix prices and allocate territories. First, by choosing not to compete with one another, as noted above, Defendants acted contrary to their individual economic interests in the absence of collusion.

17.     Second, Defendants regularly communicate with one another and thus have the opportunity to collude. Among other opportunities to communicate and collude, Defendants have

---

[23] *Asm Jim Wood Introduces AB 290 to prevent dialysis companies from scamming the health care system*, (Jan. 28, 2019), https://web.archive.org/web/20190223070500/https://a02.asmdc.org/press-releases/20190128-asm-jim-wood-introduces-ab-290-prevent-dialysis-companies-scamming-health.

engaged in multiple joint partnerships and deals, including the before mentioned and recent sale of Fresenius's dialysis clinic networks in South America to DaVita for $300 million and their joint, *de facto* ownership of the AKF. Further, Fresenius is the second largest U.S. provider of dialysis equipment,[24] and DaVita is one of Fresenius's largest customers.[25]

18.    Third, Defendants have a motive to collude. Their collective domination of 90% of the industry has ensured that their collusion would be successful in generating increased revenue. Through the joint scheme, both Defendants were able to reap enormous profits—collectively generating tens of billions per year in revenue—and charge supra-competitive prices while dominating the industry.

19.    Fourth, Defendants engaged in abrupt changes in behavior without any business explanation. For example, Fresenius sold its entire Latin American dialysis business to DaVita for $300 million (at a recorded loss) in early 2024. This sale by Fresenius to its only ostensible competitor resulted in DaVita becoming the largest provider of dialysis services in Latin America and its share price reaching all-time highs.

20.    Other well-recognized economic factors increase the likelihood of collusion. First, the industry is concentrated with few competitors. Fresenius and DaVita control 49% and 43% of U.S. dialysis services, respectively, and have maintained those shares with remarkable consistency.[26] This stability over multiple years reflects their unlawful agreement. In some regions, Defendants control 100%.

21.    Second, there are high barriers to entry, including large start-up costs and a dearth

---

[24] Open Market Institute, Dialysis Equipment Manufacturing (last accessed: May 8, 2025), https://concentrationcrisis.openmarketsinstitute.org/industry/dialysis-equipment-manufacturing/.

[25] "FMC has been one of our largest suppliers of dialysis products and equipment over the last several years." *DaVita Annual Report* (2023), https://investors.davita.com/financial-reports?cat=4.

[26] Open Market Institute, Dialysis Centers (last accessed: May 8, 2025), https://concentrationcrisis.openmarketsinstitute.org/industry/dialysis-centers/.

of nephrologists to serve as medical directors overseeing clinics. Defendants' scheme includes non-compete provisions with nephrologists, barring them from working for competitors in the same area. This anticompetitive practice—which prohibits nephrologists who work in Defendants' clinics to leave for rivals, start new businesses, or offer in-home dialysis treatment to patients—is currently being investigated by the Federal Trade Commission.[27]

22.    Third, demand for outpatient dialysis treatment is completely inelastic with no viable substitutes. For patients with ESRD, they must receive dialysis to live. Even a single missed treatment can create major health problems. If a patient "were to miss two treatments, she could be dead before the third, as fluid would accumulate in her body and make it hard to breathe."[28]

23.    While a kidney transplant can remove the need for dialysis, long wait times and difficulty finding suitable donor kidneys mean that dialysis is a necessity.

24.    Moreover, troubling evidence suggests that DaVita and Fresenius decline to provide their patients with information about joining the waitlist for a kidney transplant, despite the fact a transplant is considered the optimal choice for a patient with kidney disease. Indeed, kidney transplants extend a patient's lifespan by about 10 years on average, relative to remaining on dialysis, while avoiding exhausting, time-consuming treatment that makes maintaining steady and gainful employment or traveling extremely difficult.[29] A study of 1,478,564 patients with kidney disease showed between 6.6% and 7% of patients at for-profit clinics were placed on the

---

[27] Josh Sisco, *Feds tackle dialysis giants with antitrust probe*, POLITICO (Jul. 13, 2024), https://www.politico.com/news/2024/07/13/feds-dialysis-giants-antitrust-probe-00167857.
[28] Carrie Arnold and Larry C. Price, *Kidney Dialysis is a Booming Business –Is it Also a Rigged One?*, SCIENTIFIC AMERICAN (Dec. 14, 2020), https://www.scientificamerican.com/article/kidney-dialysis-is-a-booming-business-is-it-also-a-rigged-one1/.
[29] Dylan Matthews, *John Oliver targets dialysis, a procedure that's exhausting, deadly, and very profitable*, VOX (May 15, 2017), https://www.vox.com/policy-and-politics/2017/5/15/15641064/john-oliver-kidney-transplant-dialysis-davita.

transplant waitlist.[30] The study also found that physicians at for-profits clinics often decline to have detailed discussions with patients about the benefits of transplantations.[31] Worse still, there is evidence that DaVita **actively discourages** patients from joining the waitlist.[32] As a result of Defendants' conduct, a staggering number of dialysis patients eligible for a kidney transplant are not on the waiting list for one.[33]

25.    Fifth, DaVita and Fresenius's combined share of U.S. dialysis services has remained steady for years. Based on the number of dialysis clinics each operates in the United States, DaVita and Fresenius have controlled over 70% of all active clinics since 2018—with steady divisions between the two of them as shown in Figure 3.[34] Defendants' combined share measured by revenue is even higher—upwards of 90%[35]—because of their supra-competitive prices.

---

[30] *Study evaluates influence of for-profit dialysis centers on access to transplantation*, HEALIO (Nov. 1, 2019), https://www.healio.com/news/nephrology/20191017/study-evaluates-influence-of-forprofit-dialysis-centers-on-access-to-transplantation.

[31] *Id.*

[32] Dylan Matthews, *John Oliver targets dialysis, a procedure that's exhausting, deadly, and very profitable*, VOX, (May 15, 2017), https://www.vox.com/policy-and-politics/2017/5/15/15641064/john-oliver-kidney-transplant-dialysis-davita.

[33] *Id.*

[34] Figures calculated using CMS.gov archived data 2017 through 2024, *Dialysis facilities archived data snapshots*, Centers for Medicare & Medicaid Services (last accessed: May 8, 2025), https://data.cms.gov/provider-data/archived-data/dialysis-facilities.

[35] Sam Baker, *The U.S. health care system is full of monopolies*, AXIOS (Jun. 10, 2019), https://www.axios.com/2019/06/10/health-care-costs-monopolies-competition-hospitals.

**FIGURE 3: UNITED STATES DIALYSIS CLINICS, 2018 – 2024**



26.     In this District, where DaVita is headquartered, Defendants' dominance is even more pronounced—DaVita operates 45% of all dialysis facilities, while Fresenius controls 33%.[36]

27.     Additionally, DaVita and Fresenius are under investigation by government regulators. There are at least two ongoing government investigations into Defendants' conduct: an FTC investigation of anti-competitive use of non-compete agreements and an investigation by the District of Columbia's attorney general over their improper relationship with AKF and market allocation in the District of Columbia.

28.     Notably, DaVita and its then-CEO Kent Thiry previously were indicted for knowingly entering into multiple illegal "no-poach" agreements with competing healthcare providers, including Surgical Care Affiliates ("SCA").[37]

29.     The alleged conspiracy with SCA included an email in which an employee of SCA

---

[36] *Medicare Dialysis Facilities*, Centers for Medicare & Medicaid Services (last accessed: May 8, 2025), https://data.cms.gov/quality-of-care/medicare-dialysis-facilities/data.
[37] Office of Public Affairs, *DaVita Inc. and Former CEO Indicted in Ongoing Investigation of Labor Market Collusion in Health Care Industry*, U.S. DEP'T OF JUSTICE (Jul. 15, 2021), https://www.justice.gov/archives/opa/pr/davita-inc-and-former-ceo-indicted-ongoing-investigation-labor-market-collusion-health-care.

wrote that "I thought there was a ***gentlemen's agreement between us and DaVita*** re: poaching talent." An executive for SCA replied: "There is. Do you mind if I share with [Individual 1], who has most recently addressed with Kent [Thiry]." Individual 1 relayed the instance of recruitment to Thiry, who replied, "Will check it out." Thiry forwarded the communication to a co-conspirator with the comment: "Pls put it on our next agenda." In a second DaVita no-poach conspiracy, a co-conspirator emailed Thiry that "***You also have my commitment*** we discussed that I'm going to make sure everyone on my team knows to ***steer clear of anyone at DVA*** and that I'll come back to you and talk before ever get anywhere near a point that could contemplate someone else."[38]

30.    Because of Defendants' conspiracy and DaVita and Fresenius's excessive industry dominance, they have had the ability to charge—and actually have charged—supra-competitive prices for dialysis services, forcing Plaintiff and Class members to bear these excessive costs.[39] These overcharges represent billions in damages.

## II.    JURISDICTION, VENUE, AND COMMERCE

31.    This action arises under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

32.    This Court has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§ 1331 & 1337.

33.    This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

34.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton

---

[38] Consolidated Amended Class Action Complaint, *In Re Outpatient Med. Ctr. Emp. Antitrust Litig.*, No. 21-00305 (N.D. Ill. Aug. 9, 2021), https://f.hubspotusercontent30.net/hubfs/6398037/0057%20-%202021-08-09%20Consolidated%20Amended%20Complaint.pdf (emphasis added).

[39] Marcia M. Boumil & Gregory D. Curfman, *Reining in Costs of Kidney Dialysis: US Supreme Court Offers Hope to End Predatory Pricing*, 45 CLINICAL THERAPEUTICS 267-271 (2023), https://pubmed.ncbi.nlm.nih.gov/36586768/.

Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d). All Defendants reside, transact business, are found, or have agents in this District. Further, Defendant DaVita is headquartered in this District.

35.    Defendants' acts at issue here were within the flow of interstate commerce, used the instrumentalities of interstate commerce, and were intended to have, and did, in fact, have a substantial effect on the interstate commerce of the United States.

36.    Billions of dollars of transactions in dialysis treatment are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce.

37.    Defendants' anticompetitive conduct had a direct, substantial, and reasonably foreseeable effect on the domestic commerce of the United States and its territories, and such effect gives rise to Plaintiff's claim.

38.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for dialysis treatment.

39.    Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy, the prices of outpatient dialysis services would have been determined by competitive forces—and would have been significantly lower.

## III.    PARTIES

### A.    Plaintiff

40.    Plaintiff UFCW 1776 is an employee benefit plan headquartered in Plymouth

Meeting, Pennsylvania. Plaintiff is a self-funded benefit plan that provides benefits for thousands of members across Pennsylvania and the United States.

41.    As a self-funded benefit plan, UFCW 1776 pays directly for dialysis services provided to its members through its administrator, Independence Blue Cross. Independence Blue Cross allows UFCW 1776 members to access their networks of providers. Throughout the Class Period, UFCW 1776 paid DaVita and Fresenius for dialysis services provided to its beneficiaries.

**B.    Defendants**

42.    DaVita Inc. ("DaVita") is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 2000 16th Street, Denver, Colorado 80202.

43.    DaVita is the second largest provider of dialysis services in the United States. DaVita owns and manages outpatient dialysis facilities throughout the United States and provides acute inpatient dialysis services within hospitals.

44.    DaVita claims to serve more than 1.7 million patients in 13 countries and to have more than 70,000 employees.

45.    Fresenius Medical Care AG ("FMC") is a German *aktiengesellschaft* (stock corporation) located at Else-Kröner-Strasse 1, Bad Homburg, DE 61352.

46.    FMC issues shares for trading in the United States (ADRs) on the New York Stock Exchange. FMC has designated as its transfer agent Bank of New York Mellon Shareholder Services, Providence, RI 02940.

47.    Defendant Fresenius Medical Care Holdings, Inc. ("FMC-H") is a New York corporation located at 920 Winter St., Waltham, MA 02451.

48.    Defendant Fresenius USA Manufacturing, Inc ("FMC-USA") is a Delaware

corporation located at 920 Winter St., Waltham, MA 02451.

49.     FMC is the parent corporation of FMC-H and FMC-USA and does business in the United States and in this District, including through FMC-H and FMC-USA. FMC and other of its German and U.S. affiliates are the owners of numerous U.S. Trademarks for doing business in the United States, including, by way of example, the following live registered trademarks: *Fresenius* (79050568, Fresenius SE & Co. KGaA); *Fresenius Kidney Care* (87682350, Fresenius SE & Co.); *Fresenius Medical Care Foundation* (88632488, Fresenius Medical Care Holdings, Inc.); and *Fresenius Medical Care* (85635128, Fresenius Medical Care Deutschland GmbH).

50.     FMC-USA is registered to do business in the State of Colorado (Entity No. 19991211013). Its registered agent for service of process is CT Corporation located at 7700 E. Arapahoe Rd. Ste 220, Centennial, CO 90112.

51.     FMC, FMC-H and FMC-USA are corporate affiliates with operations integrated under the Fresenius multi-national group of companies' corporate umbrella and its "global operating model."[40] Together, FMC, FMC-H and FMC-USA are referred to herein as "Fresenius."

52.     Fresenius does business in the United States and in this District as Fresenius Medical Care North America. Through FMC-USA, Fresenius has registered "Fresenius Medical Care North America" as a trade name for doing business in the State of Colorado (I.D. No. 19991211013). Through FMC-H, Fresenius has registered "Fresenius Medical Care North America" as an assumed name (Assumed Name ID 139099).

53.     Fresenius is the largest provider of dialysis services in the United States. Fresenius is also the second largest manufacturer and distributor of dialysis equipment and related products

---

[40] Fresenius Medical Care AG, Form 20-F for year ending Dec. 31, 2023 (Feb. 20, 2023) (FMC referring to itself constituting, *inter alia*, Fresenius Medical Care AG and "Fresenius Medical Care Holdings, Inc., the holding company for our North American operations").

in the United States, including the largest distributor of dialysis equipment to DaVita.

### C.  Third Party Co-Conspirator

54.    The American Kidney Fund ("AKF") is a qualified 501(c)(3) tax-exempt organization located at 11921 Rockville Pike, Suite 300, Rockville, MD 20852. During the Class Period, AKF conspired with and otherwise aided and abetted Defendants' violations of law, as alleged herein.

### D.  Agents, Affiliates, and Other Coconspirators

55.    "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries, predecessors, successors, affiliates, employees, officers, and directors.

56.    Whenever reference is made to any act, deed, or transaction of any corporation or partnership, the allegation means that the corporation or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parent, predecessors or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

## IV.    ALLEGATIONS OF FACT SUPPORTING THE CLAIM FOR RELIEF

### A.    History of the Dialysis Industry

57.    The kidneys are vital organs that perform two primary functions in the human body: they filter wastes and toxins out of the blood and produce erythropoietin, a hormone that stimulates red blood cell production. Two healthy kidneys can filter about one liter of blood every minute. This means that in just five minutes, they clean all the blood in the body of an adult weighing around 150 pounds.[41]

---

[41] Tom Mueller, *How to Make a Killing*, p. 7.

58.     Chronic kidney disease (CKD) is a condition in which your kidneys can no longer filter your blood effectively. As the condition worsens over time, patients will inevitably suffer chronic kidney failure. When kidney function becomes less than 15% of typical level, wastes and excess fluid begin to build and this begins the final stage of the disease known as end stage renal disease (ESRD). The incidence of ESRD has skyrocketed. According to the United States Renal Data System, there have been over 800,000 ESRD patients diagnosed in the United States every year since 2019.[42]

**FIGURE 4: NUMBER OF U.S. ESRD PATIENTS, 2001 – 2021**



59.     To survive, ESRD patients must undergo dialysis or receive a kidney transplant. A kidney transplant is often not possible, due to either a lack of available kidneys or the patient's poor health condition, as many patients are not viable transplant candidates. Even for viable transplant candidates, the majority of patients receive dialysis treatment before the transplant. About 20% of transplant candidates have to spend significant time on a kidney waitlist, during which time they must continue to receive dialysis treatments. The wait time, with a median of over

---

[42] *Annual Data Report*, United States Renal Data System (last accessed: May 8, 2025), https://usrds-adr.niddk.nih.gov/2023/end-stage-renal-disease/1-incidence-prevalence-patient-characteristics-and-treatment-modalities.

three-and-a-half years, can exceed five years. Those that do not receive a kidney transplant have to undergo dialysis treatment for the rest of their lives. As of February 2025, nearly 555,000 patients are currently receiving dialysis treatment in the United States.[43]

60.     There are two types of dialysis treatments: hemodialysis and peritoneal dialysis. Hemodialysis, the most common form of dialysis, which works by circulating and filtering a patient's blood through a dialyzer machine to remove toxins, effectively replaces the function of a kidney. A hemodialysis treatment typically lasts three to four hours and is administered three to four times per week, or 150-200 times per year. Peritoneal dialysis, on the other hand, uses the lining of the patient's abdomen to filter blood inside the body. For various reasons, hemodialysis is the dominant form and is used to treat roughly 90% of American ESRD patients. Accordingly, references to "dialysis" in this Complaint refer to hemodialysis.[44]

61.     Dialysis patients primarily receive treatments in one of three settings: (1) at an outpatient facility, (2) at home, or (3) inpatient at a hospital. Recent advancements in dialysis technology have increased the ability of dialysis patients to conduct their treatments at home. Home dialysis is similar to outpatient dialysis but with a slightly different process and requires patient training at a provider facility. By comparison, inpatient dialysis occurs at a hospital or an inpatient facility for patients who need dialysis while hospitalized.

62.     Home treatment requires the patient to have a permanent catheter, fistula or graft

---

[43] *Quick kidney disease facts and stats*, American Kidney Fund (Feb. 11, 2025), https://www.kidneyfund.org/all-about-kidneys/quick-kidney-disease-facts-and-stats#:~:text=CKD%20in%20the%20United%20States,555%2C000%20Americans%20are%20on%20dialysis; *All about the kidneys*, American Kidney Fund (Feb. 11, 2025), https://www.kidneyfund.org/all-about-kidneys/quick-kidney-disease-facts-and-stats#:~:text=CKD%20in%20the%20United%20States&text=More%20than%20557%2C000%20Americans%20are,with%20kidney%20failure%20in%202021.

[44] *Types of Dialysis*, University of Maryland Medical System (last accessed: May 8, 2025), https://www.umms.org/ummc/health-services/kidney/dialysis/types; *Dialysis*, Cleveland Clinic (last accessed: May 8, 2025), https://my.clevelandclinic.org/health/treatments/14618-dialysis.

and the patient will most likely need someone to help them administer the treatment.[45] For those reasons, home dialysis is not a viable alternative for outpatient dialysis treatment for most dialysis patients.

63.    The vast majority of dialysis patients—over 90%—receive treatment at outpatient dialysis facilities.[46] After an ESRD diagnosis, nephrologists (*i.e.*, physicians that specialize in treating patients with kidney disease) typically refer patients to an outpatient dialysis facility.

64.    In the first instance, nephrologists affiliated with hospitals typically diagnose ESRD. At that point, the nephrologist will refer the patient to a treatment center. A nephrologist's referral plays an important role in a patient's choice of outpatient clinic. Indeed, patients often start dialysis treatment at their nephrologists' primary facilities (*i.e.*, where nephrologists spent the most time) even when they were low quality.[47]

65.    On average, patients receive 156 treatments per year (*i.e.*, three times per week for 52 weeks or 312 one-way trips annually). Because patients often also suffer from multiple health problems and may require assistance traveling to and from the dialysis clinic, these patients are generally unwilling or unable to travel long distances to receive dialysis treatment. In light of the time-consuming and repetitive nature of kidney dialysis, the vast majority of patients travel less than 30 miles or 30 minutes from their homes to receive dialysis treatment.

## B.    Medicare's Unique Coverage of ESRD

66.    In 1972, in response to a historic lack of available private health coverage for ESRD

---

[45] *Hemodialysis Catheters: How to Keep Yours Working Well*, NATIONAL KIDNEY FOUNDATION (last accessed: May 8, 2025), https://www.kidney.org/kidney-topics/hemodialysis-catheters-how-to-keep-yours-working-well.

[46] *A Brief History of Dialysis*, Dialysis Patient Citizens Education Center (last accessed: May 8, 2025), https://www.dpcedcenter.org/news-events/news/a-brief-history-of-dialysis/#:~:text=Nowadays%2C%20over%2090%20percent%20of,and%20nocturnal%20in%2Dcenter%20treatment.

[47] Eugene Lin et al., *Care Continuity, Nephrologists' Dialysis Facility Preferences, and Outcomes*, JAMA HEALTH FORUM (April 11, 2025), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2832436.

patients, Congress passed legislation providing coverage under Medicare for dialysis services to individuals suffering from ESRD, regardless of their age or whether they would otherwise qualify for Medicare. Over the years, private insurers increasingly added dialysis coverage to their plans to cover gaps in Medicare's dialysis coverage.

67.     In the 1980s and 90s, Congress passed a series of amendments to the Social Security Act that made Medicare the secondary payer for dialysis services for individuals with ESRD covered by other types of insurance.[48]

68.     Although ESRD patients are eligible to drop out of their group health plans and begin receiving Medicare coverage immediately after the "waiting" or "qualification" period, many patients opt to stay with their private group health plans through the entire 30-month coordination period and beyond rather than switching to Medicare coverage. For example, members with ESRD who are enrolled in employer group plans may receive treatments in network and thus benefit from lower deductibles, co-payments, and coinsurance.

69.     Medicare provides coverage for the majority of ESRD patients in the United States, as compared to other potential providers. However, a significant number of patients have private insurance. For example, the following chart (Figure 5) from the Congressional Research Service shows the payer make-up from 2004-15:[49]

---

[48] According to the 1995 final Rule preamble discussing amendments to the Medicare Secondary Payer Act, the "intent of the MSP provisions is to ensure that Medicare does not pay primary benefits for services for which a [group health plan] . . . is the proper primary payer and that beneficiaries covered under these plans are not disadvantaged vis-à-vis other individuals who are covered under the plan but are not entitled to Medicare." 60 Fed. Reg. 45344 (Aug. 31, 1995).
[49] *Medicare Coverage of End-Stage Renal Disease (ESRD)*, EveryCRSReport (Aug. 16, 2018), https://www.everycrsreport.com/reports/R45290.html.

**FIGURE 5: COMPOSITION OF U.S. DIALYSIS PAYERS, 2004 – 2015**



70.    Private insurance plans make up around 30% of DaVita's payer mix and generate the vast majority of DaVita's profits, according to internal DaVita documents:[50]

**FIGURE 6: COMPOSITION OF DAVITA'S PAYERS**



71.    Further, DaVita's documents show that 10% of its patients (*i.e.*, those on private insurance plans) generate 100% of its profits.[51]

---

[50] Fourth Amended Complaint, *U.S. v. DaVita*, 2:18-cv-05528-MRP (E.D. Pa. Nov. 8, 2023), ECF No. 61 at 77.
[51] *Id.*

FIGURE 7: COMPOSITION OF DAVITA'S PROFITS BY PAYER



72.    Many health plans and commercial insurers establish network plans for their beneficiaries where they negotiate contracts with providers to participate. Typically, those preferred provider contracts give beneficiaries of the plans and insurers discounts relative to non-insured patients when they use the in-network providers, and the plans and insurers give their beneficiaries incentives, such as lower deductibles and copayments, to use the in-network providers. Although out-of-network providers may still treat beneficiaries of these plans and insurers, they would expose the beneficiaries to higher payments to healthcare providers.

73.    Today, federal law provides that ESRD patients who are enrolled in group health plans have the right to choose to retain coverage through their employer-based plans for an additional 30 months after they become eligible for Medicare because of a diagnosis of ESRD.[52]

---

[52] *Medicare Secondary Payer*, CMS (last accessed: May 8, 2025), https://www.cms.gov/medicare/coordination-benefits-recovery/overview/secondary-payer#:~:text=The%20MSP%20provisions%20have%20protected,beneficiary%27s%20primary%20health%20insurance%20coverage.

The patient's existing plan, in turn, is obligated to pay as the primary insurer for dialysis treatment until Medicare becomes the primary payer. The 30-month coordination period begins, in most cases, after a 3-month "waiting" or "qualification" period that precedes the inception of Medicare coverage. During the 30-month coordination period, the group health plan pays as the primary insurer and Medicare functions as the secondary payer.

74.     Medicare covers dialysis treatment for all patients for whom it is medically necessary.[53] Therefore, Medicare's conditions for coverage are rules for all dialysis providers, including Defendants, which treat Medicare dialysis patients.

75.     One Medicare requirement is that all dialysis facilities have a medical director—often one or more nephrologists—who oversees the delivery and quality of care provided at a given dialysis facility.[54] Without a medical director, a facility cannot be a Medicare-approved provider of dialysis services. Because nephrologists receive specialized training in ESRD, they often serve as medical directors for dialysis facilities.

76.     Physicians are "gatekeepers" for patients. They educate patients and advise them on their healthcare purchases, including dialysis services. Dialysis providers and the nephrologists that serve as medical directors are thus interdependent on one another in providing care to patients. Patients rely on physicians to decide where to receive dialysis treatments, and physicians are in turn dependent on providers for their livelihoods. And patients rely on providers, such as Defendants, to administer the dialysis treatments under the mandatory auspices of a medical director for the dialysis facility.

---

[53] *See generally* Susan M. Kirchhoff, *Medicare Coverage of End-Stage Renal Disease (ESRD)*, Congressional Research Service (Aug. 16, 2018), https://fas.org/sgp/crs/misc/R45290.pdf (discussing Medicare coverage of dialysis treatment).
[54] 42 C.F.R. § 494.150; *see also* Centers for Medicare & Medicaid Services, *State Operations Manual*, App. H, § 405.2161, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/som107ap_h_esrd.pdf.

77.     The provider-medical director relationship for dialysis is protected by federal law. First, the Social Security Act's Patient Freedom of Choice provides that Medicare patients may obtain dialysis services from any dialysis provider qualified under the Medicare program if the dialysis provider undertakes to provide patients with dialysis services.[55] Second, the Anti-Kickback Statute's regulatory safe harbors require that the aggregate compensation paid by dialysis providers to their medical directors not be determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between parties under Medicare.[56] Put simply, dialysis providers and nephrologists cannot dictate the dialysis facility a patient uses and dialysis providers cannot financially reward patients or physicians for referrals.

78.     Payment rates for dialysis treatment under Medicare generally are lower than rates paid by commercial insurance plans by significant amounts. Defendants are able as a result to collect outsized reimbursement rates from private insurance providers like Plaintiff that are nearly *ten times higher* than the rates offered by government-funded insurance.[57]

79.     Thus, Defendants stand to gain enormous windfalls from treating patients covered through commercial insurance as opposed to Medicare.

## C.     Industry Consolidation

80.     According to Rohit Chopra, former Commissioner of the FTC, "Fresenius and DaVita dominate the market, essentially as a duopoly."[58]

81.     As of December 31, 2024, there were over 7,500 dialysis centers in the United

---

[55] *See* 42 U.S.C. § 1395a(a).

[56] *See* 42 C.F.R. § 1001.952(d)(5).

[57] David Migoya, *DaVita steered poor dialysis patients to private insurers to pump up profits, lawsuit says*, THE DENVER POST (Mar. 3, 2017), https://www.denverpost.com/2017/02/22/davita-dialysis-patients-lawsuit/; Riley J. League, et al., *Variability in Prices Paid for Hemodialysis by Employer-Sponsored Insurance in the US from 2012 to 2019*, 5 JAMA e220562 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC8886517/.

[58] Dissenting Statement of Comm'r Rohit Chopra, *In re Fresenius Med. Care AG & Co. KGaA & NxStage Med., Inc.*, FTC File No. 171-0227 (Feb. 19, 2019).

States.[59] Total U.S. revenue for the industry was estimated to be around $30 billion per year by the end of 2023.[60]

82.    The industry has consolidated rapidly over the last two decades following thousands of acquisitions by large dialysis providers, particularly Defendants.[61] Today, dialysis is provided primarily by Defendants—multi-establishment, for-profit firms—with the share of independently owned and operated dialysis facilities falling over the past three decades from 86% to 21%.[62]

83.    Defendants' dominance is the result, in part, of their joint decades-long strategy of acquiring small, independent clinics in uncontested mergers, which have otherwise been referred to as "stealth" or "creeping" acquisitions. Defendants now own about 80% of facilities and treat 85% of patients. Together, Defendants earn more than 90% of industry revenue in the United States. The industry is thus considered a "duopoly".[63]

84.    Thousands of "stealth" or "creeping" acquisitions are one part of Defendants' scheme. One commentator noted that "[b]etween 1996 and 2017, dialysis companies attempted 4,000 acquisitions, half of which were never reported to antitrust watchdogs because their dollar amounts were below the threshold for mandatory disclosure to the Federal Trade Commission (FTC)."[64] In other words, mergers and acquisitions in the dialysis industry routinely escape

---

[59] *National ESRD Census Data*, THE NATIONAL FORUM OF ESRD NETWORKS (Dec. 31, 2024), https://esrdnetworks.org/resources-news/national-esrd-census-data/.
[60] *Global dialysis equipment market size in 2023 and a forecast for 2032*, STATISTA (last accessed: May 8, 2025), https://www.statista.com/statistics/1107824/global-dialysis-devices-and-equipment-market-valuation/.
[61] Thomas G. Wollmann, *How to Get Away with Merger: Stealth Consolidation and Its Effects on U.S. Healthcare*, NAT'L BUREAU OF ECON. RESEARCH, Working Paper No. 27274 (May 2020, rev. Mar. 2024), https://www.nber.org/system/files/working_papers/w27274/w27274.pdf.
[62] Eliason, P.J., Heebsh, B., McDevitt, R.C., & Roberts, J.W. (2020). *How Acquisitions Affect Firm Behavior and Performance: Evidence from the Dialysis Industry*, QUARTERLY JOURNAL OF ECONOMICS, 1351, 221-267, 230. https://people.duke.edu/~rcm26/ESRD_mergers.pdf.
[63] Report by the Office of Congresswoman Katie Porter (CA-45), *Dying on Dialysis: Inside an Industry Putting Profits Over Patients* (last accessed: May 8, 2025), https://web.archive.org/web/20240918194848/https://porter.house.gov/uploadedfiles/dialysis_staff_report_final.pdf.
[64] Tom Mueller, *How to Make a Killing*, p. 91 (citing Prof. Thomas Wollmann).

regulatory enforcement because they tend to fall below the Hart-Scott-Rodino reporting threshold.[65] Such "stealth consolidation" occurs as large firms progressively buy up smaller firms, absorbing them into their organizations and resulting in greater industry concentration. While the industry accounts for tens of billions of dollars in annual healthcare expenditures, individual facilities are valued at only about $4 million on average.[66] By contrast, the reporting transaction threshold is currently $126.4 million, meaning one can acquire a substantial chain without reporting it to the agency.[67] According to a commentator, "had these deals been reviewed by regulators, most would have been blocked on monopoly grounds: given the highly regional nature of dialysis, where patients require a facility near their home, many such acquisitions produced *de facto* monopolies in local markets."[68]

85.    The ultimate outcome of this extended period of consolidation is that Defendants today are a duopoly, with Fresenius and DaVita controlling 49% and 43% of U.S. dialysis services, respectively. They both dwarf the next-largest competitor, U.S. Renal Care, which has a roughly 5% share. Together, of the 7,500 clinics scattered around the 3,100 counties in America, Defendants run more than 80% of them and account for approximately 92% of the industry's total net revenues.[69]

86.    This consolidation has eliminated actual, direct, and substantial competition for

---

[65] The original jurisdictional threshold for required premerger notification of transaction value was $50 million. That amount is adjusted annually based on the change in the level of gross national product. *See* Federal Trade Commission, *Steps for Determining Whether an HSR Filing is Required*, FTC (last accessed: May 8, 2025), https://www.ftc.gov/enforcement/premerger-notification-program/hsr-resources/steps-determining-whether-hsr-filing.
[66] Thomas G. Wollmann, *How to Get Away with Merger: Stealth Consolidation and Its Effects on U.S. Healthcare*, Nat'l Bureau of Econ. Research, Working Paper No. 27274 (May 2020, rev. Mar. 2024), https://www.nber.org/system/files/working_papers/w27274/w27274.pdf.
[67] Federal Trade Commission, *New HSR thresholds and filing fees for 2025,* FTC (Feb. 6, 2025), https://www.ftc.gov/enforcement/competition-matters/2025/02/new-hsr-thresholds-filing-fees-2025.
[68] Tom Mueller, *How to Make a Killing*, p. 91 (citing Prof. Thomas Wollmann).
[69] Open Market Institute, *Dialysis Centers* (last accessed: May 8, 2025), https://concentrationcrisis.openmarketinstitute.org/industry/dialysis-centers/.

outpatient dialysis services, increasing Defendants' ability to unilaterally raise prices for outpatient dialysis services and reducing incentives to improve service or quality. As shown in Figure 8, Defendants' shares have been remarkably consistent for years. Dividing the spoils has provided each Defendant with a common incentive to maintain their anticompetitive agreement.

**FIGURE 8: DAVITA AND FRESENIUS U.S. DIALYSIS REVENUE, 2021 – 2024**[70]



87.    As a result of Defendants' anticompetitive agreement and overt acts in furtherance thereof, prices for private insurance companies have skyrocketed.[71] Between 2012 and 2019, the

---

[70] DaVita figures for 2024 based on DaVita Inc., 4th Quarter 2024 Results, INVESTORS (Feb. 13, 2025), available at https://investors.davita.com/2025-02-13-DaVita-Inc-4th-Quarter-2024-Results; for 2023 based on DaVita Inc., 4th Quarter 2023 Results, INVESTORS (Feb. 13, 2024), available at https://investors.davita.com/2024-02-13-DaVita-Inc-4th-Quarter-2023-Results; for 2022 based on DaVita Inc., 4th Quarter 2022 Results, INVESTORS (Feb. 22, 2023), available at https://investors.davita.com/2023-02-22-DaVita-Inc-4th-Quarter-2022-Results; and for 2021 based on DaVita Inc., 4th Quarter 2021 Results, INVESTORS (Feb. 10, 2022), available at https://investors.davita.com/2022-02-10-DaVita-Inc-4th-Quarter-2021-Results. Fresenius figures for 2024, 2023, and 2022 based on Fresenius Medical Care AG, Annual Report (Form 20-F) (Dec. 31, 2024), available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001333141/000110465925016784/fms-20241231x20f.htm; Fresenius figures for 2021 based on Fresenius Medical Care AG, Annual Report (Form 20-F) (Dec. 31, 2023), available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001333141/000110465924025293/fms-20231231x20f.htm.
[71] *See* Eliason, P.J., Heebsh, B., McDevitt, R.C., & Roberts, J.W. (2020). *How Acquisitions Affect Firm Behavior and Performance: Evidence from the Dialysis Industry*, QUARTERLY JOURNAL OF ECONOMICS, 1351, 221-267, 230. https://people.duke.edu/~rcm26/ESRD_mergers.pdf.

median price paid by private insurers for dialysis rose from $1,349 to $1,655—a 22.7% increase.[72] In contrast, the Medicare base rate for dialysis grew by only 0.3% over the same period. This means private insurance rates increased at a pace **75 times faster** than Medicare, a disparity driven by the Defendants' actions.

88.     Independent clinics typically charge private insurers two to three times the cost of Medicare. As a result of the unlawful scheme, Defendants can and do charge private insurers nearly ten times the cost of Medicare,[73] which based on Plaintiff's payment data and upon information and belief can be **double or triple** the rate that would otherwise exist absent Defendants' conspiracy.

89.     In addition to increasing prices, the lack of competition has reduced the quality of care.[74] In acquiring their would-be competitors, Defendants also have reduced incentives to improve service. Were Defendants to face meaningful competition, substitution away from low quality providers would exert competitive pressure on Defendants to improve their quality of care.

90.     Upon acquiring an entity, thereby removing a competitor, Defendants imbue their operational strategies onto that acquired clinic with a focus on increasing the amount of money collected for dialysis treatments while reducing the quality of care. Facilities acquired by Defendants change their behavior in three broad ways, each of which either increases their revenue or decreases their operating costs.

---

[72] Riley J. League, et al., *Variability in Prices Paid for Hemodialysis by Employer-Sponsored Insurance in the US from 2012 to 2019*, 5 JAMA e220562 (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789455.
[73] David Migoya, *DaVita steered poor dialysis patients to private insurers to pump up profits, lawsuit says*, THE DENVER POST (Mar. 3, 2017), https://www.denverpost.com/2017/02/22/davita-dialysis-patients-lawsuit/; Riley J. League, et al., *Variability in Prices Paid for Hemodialysis by Employer-Sponsored Insurance in the US from 2012 to 2019*, 5 JAMA e220562 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC8886517/.
[74] *See* Eliason, P.J., Heebsh, B., McDevitt, R.C., & Roberts, J.W. (2020). *How Acquisitions Affect Firm Behavior and Performance: Evidence from the Dialysis Industry*, QUARTERLY JOURNAL OF ECONOMICS, 1351, 221-267, 230. https://people.duke.edu/~rcm26/ESRD_mergers.pdf.

91.     First, facilities acquired by Defendants shift to capturing higher per-session reimbursements from Medicare by increasing drug doses and otherwise relying on more lucrative drugs.[75] Second, such facilities "stretch their resources by treating more patients relative to the number of staff and stations at the facility."[76] Finally, upon Defendants' acquisition, facilities reduce their costs "by replacing high-skill nurses with lower-skill technicians."[77]

92.     Defendants have routinely implemented a one-size-fits-all approach to dialysis that emphasizes getting patients in and out quickly. A comprehensive study of dialysis-facility acquisitions concluded that, following acquisitions by DaVita or Fresenius, "[a]long almost every dimension we measure, patients fare worse at the target facility after acquisition, most prominently in terms of fewer kidney transplants, more hospitalizations, and lower survival rates."[78] Meanwhile, profit margins increase substantially, as clinics assign more patients to each machine and staff member while increasing administration of drugs and procedures with high reimbursement rates.[79]

93.     DaVita's former CEO, Kent Thiry, has said DaVita's business is "not about the patients."[80] DaVita's focus is on profit. Mr. Thiry has equated Defendants' dialysis with fast food: "If I had 1,400 Taco Bells and 32,000 people who worked in them, I would be doing all the same stuff."[81] Thiry continued leading DaVita for another decade following this coldhearted analogy reflecting DaVita's approach to patient care.

94.     Further, due to Defendants' intentional misconduct, patients at Defendants' clinics

---

[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] Tom Mueller, *How to Make a Killing*, p. 26; Katherine Ellen Foley, *John Oliver Ripped into a CEO Who Proudly Compared His Healthcare Business to Taco Bell*, QUARTZ (May 15, 2017), https://qz.com/983716/john-oliver-rips-into-fresenius-fms-and-davita-dva-whose-ceo-proudly-compared-kidney-dialysis-to-taco-bell-yum.
[81] Tom Mueller, *How to Make a Killing*, p. 27.

are less likely to receive a kidney transplant than patients at independent clinics.[82] Following a successful kidney transplant, patients no longer need regular dialysis treatment. Defendants are thus financially motivated to keep patients on dialysis and discourage (or otherwise not encourage) them to receive a transplant.[83] Indeed, Defendants' workers ***"actively discourage patients from obtaining transplants"*** and ***"bump patients off the list as a form of reprisal,"*** further reflecting a corporate culture insulated from competition.[84]

95.    In facilities that Defendants acquired, patients receive fewer kidney transplants, more hospitalizations, and otherwise have lower survival rates.[85]

96.    Consider one illustrative example:

DaVita concluded the acquisition of Gambro in 2005, and took over the management of [Dr. Leonard] Stern's facility. The results Stern says he witnessed should by now be familiar: fewer skilled [Registered Nurses], more low-wage techs, more patients per caregiver. Workloads grew overwhelming, employee turnover rampant. The firm's efforts, Stern says, seemed directed more at recruiting new staff than caring for patients; he sometimes didn't recognize any of the workers who were treating his patients, because they had all been hired since his last visit to the clinic. To increase profits, DaVita managers instituted four shifts of dialysis per day, with strict thirty-minute transition periods between shifts—hardly enough time to get one group of patients off their machines and stabilized, sterilize the dialysis station, cannulate the next shift of patients, and resume dialyzing.[86]

97.    Compared to patients in other developed countries, dialysis patients in the United States have higher mortality rates.[87] Defendants' cost-cutting and profit-boosting strategies are at least partially to blame, and the results are grim. The mortality rate measures the percentage of

---

[82] Eliason, P.J., Heebsh, B., McDevitt, R.C., & Roberts, J.W. (2020). *How Acquisitions Affect Firm Behavior and Performance: Evidence from the Dialysis Industry*. QUARTERLY JOURNAL OF ECONOMICS, 135(1), 221-267. https://people.duke.edu/~rcm26/ESRD_mergers.pdf.
[83] Tom Mueller, *How to Make a Killing*, p. 123.
[84] Tom Mueller, *How to Make a Killing*, p. 123.
[85] Eliason, P.J., Heebsh, B., McDevitt, R.C., & Roberts, J.W. (2020). *How Acquisitions Affect Firm Behavior and Performance: Evidence from the Dialysis Industry*. QUARTERLY JOURNAL OF ECONOMICS, 135(1), 221-267. https://people.duke.edu/~rcm26/ESRD_mergers.pdf.
[86] Tom Mueller, *How to Make a Killing*, p. 100.
[87] Dissenting Statement of Comm'r Rohit Chopra, *In re Fresenius Med. Care AG & Co. KGaA & NxStage Med., Inc.*, FTC File No. 171-0227 (Feb. 19, 2019).

dialysis patients that die each year. In Japan, the mortality rate is 5-6%. In Western Europe, the figure is around 10%. In the United States, 22% of dialysis patients die each year—the highest mortality rate in the developed world.[88]

### D.    Defendants' Scheme Stifled Innovation

98.    Defendants' overwhelming dominance has also suppressed innovation.[89] In a dissenting statement opposing the FTC's approval of Fresenius's acquisition of dialysis device maker NxStage Medical, former Commissioner Rohit Chopra warned that Fresenius and DaVita operate as a *de facto* duopoly—strangling competition and squelching innovation. As Chopra put it, "new ideas and new firms that disrupt their dominance may never see the light of day."[90] With virtually no competition, the dialysis industry remains stagnant, with innovation suffering as a direct result.[91]

99.    Take one innovation: in-home dialysis. In-home dialysis in the United States lags behind other developed countries, making up a tiny percentage of the total dialysis population. Of the over half a million dialysis patients in the United States, less than two percent are performed in-home.[92] Many developed countries have much higher rates of in-home dialysis.[93] For example, in New Zealand, almost one in five dialysis patients receive treatment in-home—*i.e.*, ten times the rate of in-home dialysis in the United States.[94]

---

[88] Tom Mueller, *How to Make a Killing*, p. 11.

[89] Eugene Lin, Ge Bai & Erin Trish, *How Regulatory Failures Have Crippled Dialysis Care*, HEALTH AFFAIRS FOREFRONT (Apr. 9, 2025), https://schaeffer.usc.edu/research/how-regulatory-failures-have-crippled-dialysis-care/#:~:text=The%20current%20dialysis%20market%20is,by%20one%20or%20two%20corporations ("Dialysis in the US has become an ossified industry, experiencing little innovation over the past three decades, with in-center, brick-and-mortar hemodialysis the mainstay of treatment.").

[90] Dissenting Statement of Comm'r Rohit Chopra, *In re Fresenius Med. Care AG & Co. KGaA & NxStage Med., Inc.*, FTC File No. 171-0227 (Feb. 19, 2019).

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.* (citing National Renal Advisory Board, *About Dialysis Care in New Zealand*, 2014, https://www.health.govt.nz/system/files/documents/pages/patientsummary-dialysis-2014.pdf).

100.     In-home dialysis would be beneficial for a larger portion of the patient population in the United States, too. Clinical evidence suggests that in-home dialysis has benefits over in-clinic dialysis and is an effective treatment for many eligible patients. For example, in-home dialysis can often be completed during sleep, giving patients more opportunity to find full-time employment to support themselves and their families and live a more engaged life.[95] Additionally, a longer dialysis session (*i.e.*, eight hours while a patient sleeps) is correlated with better health outcomes. In contrast, outpatient dialysis treatment is limited to 3-4 hours. Further, Defendants have an incentive to cap treatment length—despite the benefits of longer treatment times—as it allows Defendants to boost revenue by getting more patients through the door.

### E.     Defendants Coordinated Parallel Pricing During the Class Period

101.     Defendants acted in concert to fix, raise, maintain, and stabilize the price of dialysis treatment in the United States. This unlawful agreement in restraint of trade began as early as May 9, 2021 and continues through the present. Defendants' conduct constitutes a horizontal price-fixing conspiracy and violates Sections 1 and 3 of the Sherman Act.

102.     Since at least May 9, 2021, Defendants have coordinated price increases to increase their profits. The justifications offered by Defendants—that their price increases were due primarily to individual negotiations with private parties and to offset losses associated with treating Medicare patients[96]—are pretextual and do not fully account for the significant increases in price prior to and continuing throughout the Class Period. These price increases—which are two to three times the competitive rate—are not adequately explained by market forces.

103.     Defendants' prices also are not explained by Defendants' own business practices.

---

[95] Dissenting Statement of Comm'r Rohit Chopra, *In re Fresenius Med. Care AG & Co. KGaA & NxStage Med., Inc.*, FTC File No. 171-0227 (Feb. 19, 2019).
[96] Complaint, *Fresenius Medical Care Orange County, LLC et al v. Xavier Becerra et al*, 8:19-cv-02130 (C.D. Cal. Nov 05, 2019), Dkt. 1.

Defendants institute a number of cost-slashing measures when they acquire clinics. In a competitive environment, Defendants' lower costs would allow them to charge less to attract new patients.

104.    In a competitive market, increasing prices and declining quality should result in customer churn, loss of volume, and loss of profits. Contrary to these basic economic principles, Defendants have repeatedly touted their ability to maintain high prices while increasing market share.

105.    Upon information and belief, Defendants charge around the same price and increase their rates around the same—a clear signal of price coordination.

106.    According to expert analysis of Plaintiff's private insurance payment data, Defendants' conduct has exhibited parallel and supra-competitive pricing. Plaintiff's data demonstrates that, since 2020, Plaintiff paid nearly double the amount per treatment to Defendants as it paid to non-defendant providers.

107.    After a sharp increase in DaVita's prices from 2019 to 2020, Defendants' rates have remained in the range of 150% to over 200% of the rates charged by non-defendants. Further, Defendants' rates tend to be closely aligned, typically varying by only a few percentage points.

108.    Per-treatment payments from Plaintiff to DaVita and Fresenius have been similar since at least 2020. While the per-treatment payments were not identical—which cartel members often avoid as identical prices can be a red flag for regulators—the difference between the payments to DaVita and Fresenius were *de minimis*. The data shows that the prices paid only differed between 1% and 5%, despite the fact that Fresenius and DaVita are supposed to compete on price (among other things).

109.    Since at least 2010, DaVita has published financial information in its annual reports that enables calculation of revenue per treatment for commercial payers. With simple arithmetic, researchers determined that DaVita's "commercial revenues averaged $148 722 per patient-year or $1041 per treatment."[97] In the absence of collusion, it is difficult to explain DaVita's decision to publish sensitive per-payer revenue information. Indeed, per-payer health prices are often considered trade secrets as this information could inform competitor's pricing.[98] For example, a competitor could lower its price in response in order to capture additional customers. Other than serving as a price-signaling device to its co-conspirator Fresenius, DaVita's publication of this information makes little sense.

### F.    Defendants Acted Contrary to Their Individual Economic Self-Interests by Choosing Not to Compete Directly With One Another

110.    In addition to parallel pricing, Defendants have allocated and divided territories between them. According to a professor of economics at Duke University, Professor Ryan McDevitt, Defendants are "not really competing for patients, as far as we can tell: they just *carve up these markets* and live a happy life. For many patients, life is less happy."[99]

111.    Certificate of need data confirms that Defendants "carve up markets." In roughly a dozen states,[100] dialysis providers must obtain a certificate of need (CON) to open a new facility

---

[97] Christopher P. Childers, et al., *A Comparison of Payments to a For-profit Dialysis Firm From Government and Commercial Insurers*, 179 JAMA Intern Med. 1136-1138 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6515566/#:~:text=Commercial%20payers%20represented%2010.5%25%20of,year%20or%20%241041%20per%20treatment.

[98] Katherine L. Gudiksen, et al., *The Secret of Health Care Prices: Why Transparency Is in the Public Interest*, CHCF (Jul. 2019), https://www.chcf.org/wp-content/uploads/2019/06/SecretHealthCarePrices.pdf ("Many health care providers and payers seek to maintain the confidentiality of these paid amounts as trade secrets, claiming their secrecy provides a competitive advantage.").

[99] Tom Mueller, *How to Make a Killing*, p. 120 (quoting Prof. Ryan McDevitt) (emphasis added).

[100] Matthew D. Mitchell, *Certificate of Need Laws in Health Care: Past, Present, and Future*, 61 Inquiry 1-11 (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11088301/.

or expand an existing facility. In general, CON laws "block any new firms from operating unless they can prove [. . .] that new competition is in 'the public interest,' or some similar criterion."[101] While they are purportedly intended to "prevent 'destructive' competition," such laws "are better explained as a tool existing firms use to block competition for their own profit."[102]

112.    The CON process often involves public comment, including objections from incumbent competitors. Competitor objections reduce the likelihood that a CON application will be approved. Indeed, in some states, an objection can trigger a hearing requirement, which is "a barrier to entry that in practice is often insurmountable to the applicant."[103] In light of the impact of an incumbent's objection, CON laws have been called the "Competitor's Veto"—*i.e.*, they "enable[] existing firms to disallow their potential competition."[104]

113.    A profit-maximizing incumbent provider would be expected to jealously guard its territory. It thus would be rational for an incumbent dialysis provider—and in the firm's best interest—to object to a competitor's proposed entry. Defendants are, first and foremost, for-profit, public entities that seek to maximize profit for their shareholders. Where DaVita is the incumbent dialysis provider in a given area, it would make economic sense to object to the entry of its primary competitor, Fresenius (and *vice versa*).

114.    Based on a review of 286 certificate of need applications, DaVita and Fresenius ***rarely objected*** to each other's entry. As shown in Figure 9, DaVita and Fresenius objected to each other's entry only 19% of the time, a token amount that is far lower than would be expected had Defendants truly competed with one another. For comparison, DaVita and Fresenius objected to

---

[101] Timothy Sandefur, *State "Competitor Veto" Laws and the Right to Earn a Living: Some Paths to Federal Reform*, Mercatus Working Paper (Jun. 7, 2018), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3191388.
[102] *Id.*
[103] *Id.*
[104] *Id.*

the entry of non-defendant dialysis providers in 55% of applications. Thus, DaVita and Fresenius were ***nearly three times more likely*** to object to the entry of non-defendant dialysis providers than to each other.

FIGURE 9: COMPARISON OF DEFENDANT OBJECTION RATES FOR DEFENDANT AND NON-DEFENDANT APPLICANTS



Sources: Dialysis provider CON application information collected from Washington State Department of Health, Illinois Department of Public Health, and North Carolina Department of Health and Human Services.

115.    DaVita and Fresenius's objection rates were also remarkably similar. In Figure 10, DaVita and Fresenius's objection rates are separated to evaluate if the two Defendants' behaviors are parallel with each other. As shown in Figure 10, the two Defendants exhibit similar behaviors: DaVita objected to 18% (23 out of 129) of Fresenius' applications and Fresenius objected to 20% (20 out of 99) of DaVita's applications. By objecting to only a small minority of each other's applications, Defendants maintain a veneer of competition while not impeding their collusion. In contrast, the two Defendants objected nearly three times more often—55% of the applications—

when the applicant is a non-defendant.

**FIGURE 10: COMPARISON OF DEFENDANT OBJECTION RATES FOR DAVITA, FRESENIUS, AND NON-DEFENDANT APPLICANTS**



Sources: Dialysis provider CON application information collected from Washington State Department of Health, Illinois Department of Public Health, and North Carolina Department of Health and Human Services.

116.    The results are even more stark during the Class Period. As shown in Figure 1 (reproduced below), over the past four years, Defendants have objected to each other's entry in around 10% of applications, while objecting to non-defendant providers 50% of the time. In other words, DaVita and Fresenius are ***nearly five times*** more likely to object to a non-defendant provider than to each other.

**FIGURE 1: COMPARISON OF DEFENDANT OBJECTION RATES FOR DEFENDANT AND NON-DEFENDANT APPLICANTS OVER LAST FOUR YEARS**



Sources: Dialysis provider CON application information collected from Washington State Department of Health, Illinois Department of Public Health, and North Carolina Department of Health and Human Services.

117.    During the Class Period, DaVita and Fresenius's objection rates were also similar. In Figure 11, DaVita and Fresenius's objection rates are shown separately over the past four years. As shown in Figure 11, the two Defendants exhibit similar behaviors: DaVita and Fresenius objected to one another around 10% of the time, while objecting to non-defendants nearly five times more often.

**FIGURE 11: COMPARISON OF DEFENDANT OBJECTION RATES FOR DAVITA, FRESENIUS, AND NON-DEFENDANT OVER LAST FOUR YEARS**



Sources: Dialysis provider CON application information collected from Washington State Department of Health, Illinois Department of Public Health, and North Carolina Department of Health and Human Services.

118.    Defendants' low objection rates to each other's entry—contrasted with their significantly higher objections to non-defendant providers—strongly suggest collusion. Economically and strategically, one would expect direct competitors to challenge each other more aggressively. Yet, DaVita and Fresenius behave in the opposite manner. Even if they were simply indifferent to the applicant's identity, their objection rates should be roughly equal across all competitors. Instead, their objections to non-defendants are three to five times higher than their objections to each other, highlighting a pattern inconsistent with normal competitive behavior.

119.    CMS data confirm that Defendants have avoided competing with each other, contrary to their economic self-interest. Of 2,990 U.S. cities with a DaVita or Fresenius facility, only 674 (23%) have both. As shown in Figure 2 (reproduced below), DaVita and Fresenius avoid

direct competition in 77% of cities—another clear sign of unlawful territorial division.

FIGURE 2: U.S. CITIES WITH AND WITHOUT COMPETITION BETWEEN DAVITA AND FRESENIUS BASED ON CMS DATA



120.    The certificate of need data and the CMS data tell the same story: DaVita and Fresenius deliberately avoid competing with one another in 77% to 90% of cases—strongly counter to their individual economic interests. Their behavior also runs contrary to fundamental economic theory, including Hotelling's Law, which posits that the most profitable strategy is often to locate near a competitor.[105] This principle explains why businesses such as CVS and Walgreens, car dealerships, and hotels frequently cluster together—it's a proven, profit-maximizing approach. DaVita and Fresenius, however, do the opposite: they systematically avoid proximity, steering clear of each other's turf.

---

[105] *See generally* Harold Hotelling, *Stability in Competition*, 39 THE ECONOMIC JOURNAL, 153, at 41-57 (1929).

### G.   Defendants Are Regularly in Communication With One Another and Thus Have Opportunities to Collude

121.   Defendants have engaged in multiple joint partnerships and deals that enable ongoing communication between them. In 2013, DaVita announced an agreement to provide pharmacy services to Fresenius.[106] According to a DaVita press release from January 2013, Fresenius agreed to "use DaVita Rx® prescription drug services for its Medicare patients in the United States."[107] In the same press release, DaVita and Fresenius made a separate announcement: that DaVita would be "extending its **long-standing vendor relationship** with [Fresenius] for certain dialysis supplies including hemodialysis machines and disposable products."[108] Ronald Kuerbitz, then-CEO of Fresenius Medical Care North America, said, "We are pleased to continue our long relationship as a supplier to DaVita."[109]

122.   In March 2021, Fresenius "announced an expanded agreement to provide home dialysis technology—including NxStage home hemodialysis (HHD) machines, dialysis supplies, and a connected health platform—to DaVita patients across the United States."[110] In announcing the agreement, a senior Fresenius executive stated Fresenius was "excited to expand our **longstanding collaboration with DaVita**."[111]

123.   In March 2024, Fresenius "announced the sale of its dialysis clinic networks in Brazil, Colombia, Chile and Ecuador to DaVita Inc. for a total transaction price of USD 300

---

[106] *DaVita Announces Partnership with Fresenius Medical Care*, DaVita (Jan. 8, 2013), https://investors.davita.com/2013-1-8-DaVita-Announces-Partnership-with-Fresenius-Medical-Care.
[107] *Id.*
[108] *Id.* (emphasis added).
[109] *Id.*
[110] *DaVita Kidney Care Expands Use of NxStage Home Hemodialysis Machines from Fresenius Medical Care*, PR NEWSWIRE (Mar. 23, 2021), https://www.prnewswire.com/news-releases/davita-kidney-care-expands-use-of-nxstage-home-hemodialysis-machines-from-fresenius-medical-care-301253249.html.
[111] *Id.* (emphasis added).

million."[112] This deal resulted in a net book loss estimated at EUR 200 million for Fresenius.[113] In contrast, the deal made DaVita the largest dialysis services provider in Latin America.[114]

124.    Additionally, Fresenius—the second largest supplier of dialysis supplies and technology—provides dialysis and equipment to DaVita, its biggest customer (and purportedly its largest competitor in outpatient dialysis).[115]

125.    DaVita and Fresenius also have ample opportunities to collude through their sponsorship of the "non-profit" organization, the American Kidney Fund ("AKF"). *See* Section IV. I, *infra*.

### H.    Defendants Are Motivated to Collude

126.    Defendants have a motive to collude. Through the joint scheme, both Defendants were able to reap enormous profits and charge supra-competitive prices. Their collective domination of 90% of the industry has ensured that their collusion would be successful in generating increased revenue.

### I.    Defendants Have Coordinated Through the "Charitable" Organization, AKF

127.    DaVita and Fresenius collude within a purportedly charitable organization, the American Kidney Fund (AKF), to steer patients away from government insurance programs to private insurance programs that are much more lucrative. The AKF assists kidney dialysis and transplant patients in paying their health insurance premiums and other out-of-pocket treatment

---

[112] *Fresenius Medical Care Achieves Next Milestone in Portfolio Optimization Program, Announcing Sale of Dialysis Clinics in Brazil, Colombia, Chile, Ecuador*, Fresenius Medical Care (Mar. 5, 2024), https://freseniusmedicalcare.com/en/media/newsroom/fresenius-medical-care-achieves-next-milestone-in-portfolio-optimization-program--announcing-sale-of-dialysis-clinics-in-brazil--colombia--chile--ecuador/.

[113] Natashya Angelica, *Fresenius sells Latin American Clinics to DaVita for $300M*, INVESTING (Mar. 5, 2024), https://www.investing.com/news/stock-market-news/fresenius-sells-latin-american-clinics-to-davita-for-300m-93CH-3325049.

[114] RTTNews Staff Writer, *DaVita to Expand International Operations in Brazil, Colombia and Entry Into Chile, Ecuador*, RTTNEWS (Mar. 5, 2024), https://www.rttnews.com/3429930/davita-to-expand-international-operations-in-brazil-colombia-and-entry-into-chile-ecuador.aspx?refresh=1.

[115] *DaVita Annual Report* (2023), https://investors.davita.com/financial-reports?cat=4.

expenses.

128.    Defendants account for approximately 80% of AKF's funding. Defendants directly benefit from their "charitable" contributions to the AKF by having these patients stay on private insurance plans, which thereafter pay the providers for dialysis at a rate significantly higher than Medicare.[116]

129.    An investigation by the Office of Congresswoman Katie Porter stated there was "troubling evidence suggesting that these providers [*i.e.*, DaVita and Fresenius] and AKF have ***collaborated*** to implement practices that benefit their bottom line at the expense of patients with kidney disease."[117]

130.    AKF posted its HIPP Guidelines, which included a section describing the "HIPP Honor System" on its website. In that section, AKF set forth its requirement that "each referring dialysis provider should make equitable contributions to the HIPP pool" and that each provider should "reasonably determine its 'fair share' contribution to the pool [*i.e.*, the funds available for premium assistance] by considering the number of patients it refers to HIPP." AKF emphasized that all providers had an "ethical obligation to contribute their respective 'fair share' to ensure that the HIPP pool is adequately funded." And AKF instructed providers that "[i]f your company cannot make fair and equitable contributions, we respectfully request that your organization not refer patients to the HIPP program." In other words, the HIPP pool operates as a "pay-to-play" policy that only DaVita and Fresenius can afford. An excerpt of the AKF's guidelines is set forth below in Figure 12.

---

[116] Erin E. Trish, et al., *Congress should end dialysis companies' third-party games with insurance coverage*, STAT NEWS (Apr. 29, 2021), https://www.statnews.com/2021/04/29/dialysis-companies-reimbursement-gaming/.
[117] Report by the Office of Congresswoman Katie Porter (CA-45), *Dying on Dialysis: Inside an Industry Putting Profits Over Patients* (last accessed: May 8, 2025), https://web.archive.org/web/20240918194848/https://porter.house.gov/uploadedfiles/dialysis_staff_report_final.pdf (emphasis added).

**FIGURE 12: HIPP HONOR SYSTEM GUIDELINES**

**THE HIPP HONOR SYSTEM**

In order for this program to work for patients and dialysis providers, each referring dialysis provider should make equitable contributions to the HIPP pool. A facility can reasonably determine its "fair share" contribution to the pool by considering the number of patients it refers to HIPP. Without an effort on the part of all providers to contribute equitably to the program, HIPP cannot continue to help existing and newly qualified patients who need assistance. We believe all facilities share a common ethical obligation to contribute their respective "fair share" to ensure that the HIPP pool is adequately funded. This is essential in order for AKF to have the resources to help dialysis patients who need premium assistance in order to keep in force their health insurance. We regard this as a mutual honor system. It is the only way in which HIPP can continue to help patients in need.

We know that your focus, like ours, is on assisting patients. Working together and with your company making its fair and equitable share to the HIPP pool, we can assure that patients in need continue to receive the assistance that they need to obtain and maintain health insurance.  Please discuss this with your management and finance staff and contact us immediately if you require additional information.

All contributions are, of course, voluntary and there is no "earmarking" of contributions to specific patients within the HIPP pool. As you should be aware, AKF operates the HIPP program under the auspices of the Office of Inspector General's Opinion 97-1 and AKF focuses solely on patients' needs without considering the facility where they are receiving dialysis (reference the enclosed Guidelines).  Nonetheless, it should be obvious to all facilities that if each one does not contribute its fair share, the HIPP pool cannot continue to help all patients who need assistance.

If your company cannot make fair and equitable contributions, we respectfully request that your organization not refer patients to the HIPP program in order that we may preserve this important program for the tens of thousands of patients nationwide who are currently enrolled in HIPP to maintain their insurance coverage.

131.     Clinics that do not donate to AKF were previously placed on a "blocked list" by the AKF, unable to receive financial assistance for their needy patients.[118] According to the *New York Times*, when the AKF was criticized for its use of a "blocked list" of clinics, it changed the name to "training list." Using tactics typically associated with protection rackets, AKF "would contact these clinics to request donations in specific amounts, calculated by looking at the payments made to patients at these clinics."[119]

132.     Sometime after public reports emerged about this "fair share" requirement, AKF

---

[118] Reed Abelson & Katie Thomas, *Top Kidney Charity Directed Aid to Patients at DaVita and Fresenius Clinics, Lawsuit Claims*, N.Y. TIMES (Aug. 2, 2019), https://www.nytimes.com/2019/08/02/health/kidney-dialysis-kickbacks.html.
[119] *Id.*

removed this language from its guidelines. Yet it continues in practice. While this "fair share" practice is no longer formally included in the HIPP program guidelines, the Congresswoman Porter report states that "the *New York Times*, the *Los Angeles Times*, and social workers across the country assert that AKF continues to discriminate against patients at non-donor clinics."[120]

133.    Indeed, since removing the "fair share" language, the AKF has repeatedly faced accusations that it only funds patients who patronize dialysis companies that contribute to the AKF—i.e., the Defendants.

134.    Although it would violate the Anti-Kickback Statute (AKS) to pay patient premiums directly, Defendants found a workaround: they donate hundreds of millions to the AKF, which then pays patient premiums. DaVita and Fresenius then bill the private insurance companies multiples of what they donated to AKF.[121] In other words, "dialysis clinics donate to AKF and provide dialysis treatment for patients whose insurance premiums were paid by AKF and in return receive payments many times the size of their donations from the patients' insurance."[122]

135.    The report from Congresswoman Porter stated evidence in the public record and its own investigation "reveals practices that may interfere with patients' ability to receive kidney transplants, raise premiums, lead patients to enroll in plans that include less comprehensive coverage or higher out-of-pocket costs, and destabilize the private insurance market."[123]

136.    Defendants knew that their coordination with AKF would allow them to maintain their control over the U.S. dialysis industry. Specifically, the vast majority of AKF's funding

---

[120] Report by the Office of Congresswoman Katie Porter (CA-45), *Dying on Dialysis: Inside an Industry Putting Profits Over Patients* (last accessed: May 8, 2025),
https://web.archive.org/web/20240918194848/https://porter.house.gov/uploadedfiles/dialysis_staff_report_final.pdf.
[121] Tom Mueller, *How to Make a Killing*, pp. 124-26.
[122] Report by the Office of Congresswoman Katie Porter (CA-45), *Dying on Dialysis: Inside an Industry Putting Profits Over Patients* (last accessed: May 8, 2025),
https://web.archive.org/web/20240918194848/https://porter.house.gov/uploadedfiles/dialysis_staff_report_final.pdf.
[123] *Id.*

comes from DaVita and Fresenius. AKF then steers patients (and the corresponding dollars) to DaVita and Fresenius. At the same time, "patients and clinicians at dialysis clinics owned by providers other than DaVita and Fresenius have reported discriminatory practices by AKF."[124] Accordingly, the payments from DaVita and Fresenius ensure that nearly all patients are steered to DaVita and Fresenius clinics. Because patients on private insurance plans represent the sole profitable patient pool for dialysis providers, non-defendant providers are unable to gain a meaningful foothold.

137.   In DaVita's 10-K regulatory filing, the company stated that it received a Civil Investigative Demand from the Office of the Attorney General for the District of Columbia in January 2023 that "requests information on a number of topics, including but not limited to the company's communications with AKF, documents relating to donations to the AKF and communications with patients, providers and insurers regarding the AKF."[125]

138.   A separate legal disclosure listed in the filing outlines subpoenas sent by the California Department of Insurance in 2020 and 2021 seeking information including DaVita's communications with patients about insurance plans and financial assistance from AKF as well as related information on donations and patients' insurance provider selections.[126] DaVita said in the filing that it is continuing to cooperate on that investigation.

139.   Fresenius, meanwhile, disclosed in its annual 20-F filings that it had also received a subpoena from the D.C. Attorney General in January 2023 "related to the activities of the [AKF] and grounded in antitrust concerns, including *market allocation* within the District of

---

[124] *Id.*

[125] Dave Muoio, *DaVita, Fresenius' kidney care charity connections trigger another investigation*, Fierce Healthcare (Feb. 24, 2023), https://www.fiercehealthcare.com/providers/davitas-kidney-care-charity-connections-trigger-another-investigation.

[126] *Annual Report (Form 10-K)*, DaVita Inc., SEC File No. 1-14106, 2022, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000927066/000092706623000011/dva-20221231.htm#ib228226ec511491b87b183c6d217a21a_247.

Columbia."[127]

**J.    The Structure and Characteristics of the Dialysis Industry Support the Existence of a Conspiracy**

**1.    Defendants are the dominant firms in highly concentrated industry.**

140.    High concentration means high susceptibility to collusion and other anticompetitive practices.

141.    Outpatient dialysis services are highly concentrated, and Defendants dominate as a "duopoly."[128] Ownership has consolidated rapidly over the past two decades.

142.    Defendants operate more than 80% of the 7,500 clinics across 3,100 counties in the United States, accounting for over 90% of the industry's total net revenues. Fresenius and DaVita control 49% and 43% of the industry, respectively. Collectively and individually, they significantly surpass the next-largest competitor, U.S. Renal Care, which has about 5%.

**2.    Barriers to entry are high.**

143.    Defendants are shielded from competition because of high barriers to entry. Entry by new, independent businesses is a pillar of competition.[129] A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter, and entry into established areas is slow and expensive.

144.    The most significant, but not only, barrier to entry is locating a nephrologist with

---

[127] Dave Muoio, *DaVita, Fresenius' kidney care charity connections trigger another investigation*, FIERCE HEALTHCARE (Feb. 24, 2023), https://www.fiercehealthcare.com/providers/davitas-kidney-care-charity-connections-trigger-another-investigation (emphasis added).

[128] Dissenting Statement of Comm'r Rohit Chopra, *In re Fresenius Med. Care AG & Co. KGaA & NxStage Med., Inc.*, FTC File No. 171-0227 (Feb. 19, 2019).

[129] Dissenting Statement of Comm'r Rohit Chopra, *In re Fresenius Med. Care AG & Co. KGaA & NxStage Med., Inc.*, FTC File No. 171-0227 (Feb. 19, 2019).

an established referral base to serve as the clinic's medical director. By law, each dialysis clinic must have a nephrologist medical director. The medical director is essential to the competitiveness of the clinic because he or she is the clinic's primary source of referrals. Per the FTC, "locating and contracting with a nephrologist to serve as medical director is difficult because clinics typically enter into exclusive contractual arrangements with a nephrologist who is paid a medical director fee."[130] The lack of available nephrologists with an established referral stream is a significant barrier to entry.

145.    Finding patients may also be difficult if the nephrologist does not have local ties, as most nephrologists typically refer their patients to the clinic where they serve as medical director.

146.    Non-compete agreements also can make it difficult for new competitors to enter. Defendants' use and enforcement of anticompetitive non-compete agreements is under investigation by the Federal Trade Commission.[131]

147.    Entrants must also expend substantial additional effort and resources before they can begin operating a dialysis clinic. They must reach an agreement with a medical director, acquire trained staff, make substantial physical improvements, apply for and receive all required permits/authorizations from federal and local governments, and acquire and install necessary equipment such as dialysis machines, each costing up to $30,000, and other expenditures such as chairs, computers, dialysates, and water systems. Water systems at dialysis clinics must be tested to ensure patients may be safely dialyzed.

148.    Dialysis chains, such as Defendants' enterprises, enjoy advantages over

---

[130] *See, e.g.*, *In re DaVita Inc. & Total Renal Care, Inc.*, FTC File No. 2110013 (Oct. 25, 2021).

[131] Josh Sisco, *Feds tackle dialysis giants with antitrust probes*, POLITICO (Jul. 13, 2024), https://www.politico.com/news/2024/07/13/feds-dialysis-giants-antitrust-probe-00167857#xd_co_f=MWRiNzg0MTAtZDEzZS00YzBiLTg4MGQtZWQzZWFkNGEwNDAy~.

independent facilities.[132] Large chains, for example, may have lower average costs due to volume discounts for pharmaceuticals as well as centralized clinical laboratories.

149.     Regulation raises other site-specific sunk costs associated with entry as well. All facilities must be licensed by state-level health boards and establish a reimbursement relationship with CMS. In some areas, providers also need to prove that the surrounding community "needs" the additional capacity provided by the facility.

150.     Compounding these barriers, Defendants control an overwhelming share of the profitable patients in part due to their control over AKF, which steers patients to Defendants rather than competitors even though the quality of care available at Defendants' clinics is low.

### 3.     Dialysis treatment demand is inelastic.

151.     Economic theory recognizes that industries with inelastic demand are more susceptible to cartel behavior because consumers are less responsive to changes in price and are therefore more vulnerable to significant price increases by cartels. As noted by one commentator, dialysis patients are "about the most captive clients imaginable."[133] As an executive of one of Defendants put it, "knowing they will die without treatment, dialysis patients cling to their nephrologist and clinic staff as a sailor in stormy seas clings to a lifeline. Sign up a dialysis patient at one of your clinics, and she's normally yours for the rest of her life."[134]

### 4.     Lack of substitutes.

152.     Substitute goods or services can serve to restrain price increases and temper the effects of a price-fixing conspiracy. But absent a kidney transplant, dialysis patients must dialyze

---

[132] Eliason, P.J., Heebsh, B., McDevitt, R.C., & Roberts, J.W. (2020). *How Acquisitions Affect Firm Behavior and Performance: Evidence from the Dialysis Industry*, QUARTERLY JOURNAL OF ECONOMICS, 1351, 221-267, 230. https://people.duke.edu/~rcm26/ESRD_mergers.pdf.
[133] Tom Mueller, *How to Make a Killing*, p. 29.
[134] Tom Mueller, *How to Make a Killing*, p. 29.

three times per week for life to stay alive. According to one expert in the dialysis industry, "[t]here's really no hope for patients to shop around and switch to a better-quality provider."[135] In other words, there are no suitable substitutes for dialysis treatment that would restrain price increases.

153.    The lack of suitable alternatives is by design. Defendants use joint ventures to lock in local nephrologist such that they can only refer patients to their facilities. For example, Defendant DaVita has entered into lucrative joint ventures with independent nephrology clinics that led to nephrologists referring their patients to DaVita.[136] The Department of Justice has previously challenged the Defendants' joint ventures as violations of the Anti-Kickback Statute. Defendant DaVita ultimately paid $400 million to settle these allegations.[137]

### K.    Ongoing Governmental Investigations

154.    Since at least February 2023, in addition to territorial allocation and division, Defendants have been "under investigation from the District of Columbia's attorney general over relationship with and donations to the nonprofit American Kidney Fund (AKF)."[138]

155.    In July 2024, POLITICO reported that the FTC "is investigating the nation's two largest dialysis providers [*i.e.*, Defendants] over allegations they illegally thwart smaller competitors."[139] Part of the FTC's investigation focuses on how Defendants "make it difficult for the physicians who work in their clinics to leave for rivals and start new businesses."[140] The FTC is "investigating whether noncompete agreements the companies require doctors to sign snarl

---

[135] Tom Mueller, *How to Make a Killing*, p. 119 (quoting Prof. Ryan McDevitt).
[136] Tom Mueller, *How to Make a Killing*, p. 139.
[137] Tom Mueller, *How to Make a Killing*, p. 145.
[138] Dave Muoio, *DaVita, Fresenius' kidney care charity connections trigger another investigation*, FIERCE HEALTHCARE (Feb. 24, 2023), https://www.fiercehealthcare.com/providers/davitas-kidney-care-charity-connections-trigger-another-investigation.
[139] Josh Sisco, *Feds tackle dialysis giants with antitrust probe*, POLITICO (Jul. 13, 2024) , https://www.politico.com/news/2024/07/13/feds-dialysis-giants-antitrust-probe-00167857.
[140] *Id*.

efforts by rivals that want to make it easier for dialysis patients to be treated at home."[141]

### L.    Prior Misconduct by DaVita and Fresenius

156.    In 2000, Fresenius Medical Care pled guilty in a case brought by the Department of Justice for Medicare fraud and paid a $486 million fine. The company was accused of having ordered unnecessary tests to boost revenues.[142]

157.    In 2009, a relator filed a *qui tam* lawsuit under the False Claims Act and its state counterparts against DaVita. *See United States et al. ex rel. Barbetta v. DaVita Inc. et al.*, No. 09-cv-02175 WJM-KMT (D. Colo. 2009) ("*Barbetta*").

158.    The *Barbetta* case concerned DaVita's payment of kickbacks to physicians in exchange for referral to dialysis centers owned (at least in part) by DaVita. In *Barbetta*, the primary component of the kickback scheme was DaVita's agreement to enter into a joint venture with a physician either through (1) DaVita's paying an inflated price to acquire an ownership interest in a dialysis center owned by a physician or (2) DaVita's selling an ownership interest in a new or existing dialysis center owned by DaVita to a physician at a below fair market value. In sum, DaVita sold low or bought high to achieve the kickback.

159.    In *Barbetta*, the Department of Justice alleged that between March 2005 and February 2014:

> DaVita identified physicians or physician groups that had significant patient populations suffering renal disease and offered them lucrative opportunities to partner with DaVita by acquiring and/or selling an interest in dialysis clinics to which their patients would be referred for dialysis treatment. DaVita further ensured referrals of these patients to the clinics through a series of secondary agreements with the physicians, including entering into agreements in which the physician agreed not to compete with the DaVita clinic and non-disparagement agreements that would have prevented the physicians from referring their patients

---

[141] *Id.*

[142] Eric H. Holder, Jr., *Remarks on the Announcement of Criminal Please and Civil Settlements,* U.S. DEP'T OF JUSTICE (Jan. 19, 2000), https://www.justice.gov/archive/dag/speeches/2000/nmichaelhealthremarks.htm.

to other dialysis providers.[143]

160.    In October 2014, DaVita entered into a settlement agreement under which it agreed to pay $350 million to resolve the False Claims Act lawsuit.[144]

161.    Beyond *Barbetta*, DaVita has also been the subject of other False Claims Act lawsuits which led to substantial recoveries for the government.[145]

162.    In 2011, Fresenius failed to send a warning letter to its competitors that it sent to its own clinics about potential medical complications from Fresenius's GranuFlo dialysis concentrate product.[146] A Massachusetts state court later found Fresenius negligent for not distributing the warning to its competitors, and Fresenius subsequently settled over 10,000 lawsuits for $250 million.[147]

163.    In July 2014, Fresenius Medical Care was sued by a whistleblower for Medicare fraud, although the case was kept under seal. Fresenius was accused of pushing unnecessary and risky procedures on patients in order to bill Medicare and increase revenues. The case was unsealed and the Department of Justice filed a civil complaint in July 2022.[148]

164.    In June 2015, DaVita paid $450 million to settle allegations that it had defrauded Medicare by billing for unnecessarily disposed drugs. A whistleblower and the Department of

---

[143] Office of Public Affairs, *DaVita to Pay $350 Million to Resolve Allegations of Illegal Kickbacks*, U.S. DEP'T OF JUSTICE (Oct. 22, 2014), https://www.justice.gov/archives/opa/pr/davita-pay-350-million-resolve-allegations-illegal-kickbacks.

[144] *Id.*

[145] Office of Public Affairs, *DaVita Rx Agrees to Pay $63.7 Million to Resolve False Claims Act Allegations*, U.S. DEP'T OF JUSTICE (Dec. 14, 2017), https://www.justice.gov/opa/pr/davita-rx-agrees-pay-637-million-resolve-false-claims-act-allegations; Office of Public Affairs, *Medicare Advantage Provider to Pay $270 Million to Settle False Claims Act Liabilities*, U.S. DEP'T OF JUSTICE (Oct. 1, 2018), https://www.justice.gov/opa/pr/medicare-advantage-provider-pay-270-million-settle-false-claims-act-liabilities.

[146] Andrew Pollack, *Dialysis Company's Failure to Warn of Product Risk Draws Inquiry*, N.Y. TIMES (Jun. 14, 2012), https://www.nytimes.com/2012/06/15/health/fda-investigates-fresenius-for-failure-to-warn-of-risk.html.

[147] Andrew Pollack, *Dialysis Equipment Maker Settles Lawsuit for $250 Million*, N.Y. TIMES (Feb. 18, 2016), https://www.nytimes.com/2016/02/19/business/dialysis-equipment-maker-settles-lawsuit-for-250-million.html.

[148] Reed Abelson & Katie Thomas, *Top Kidney Charity Directed Aid to Patients at DaVita and Fresenius Clinics, Lawsuit Claims*, N.Y. TIMES (Aug. 2, 2019), https://www.nytimes.com/2019/08/02/health/kidney-dialysis-kickbacks.html.

Justice alleged that "DaVita devised and employed dosing grids and/or protocols specifically designed to create unnecessary waste of the drugs Venofer and Zemplar."[149]

165.    In 2016, a whistleblower filed a lawsuit accusing both DaVita and Fresenius of violating anti-kickback laws by using the American Kidney Fund (AKF) as a vehicle for generating patient referrals. The lawsuit was unsealed in 2019.[150]

166.    In July 2021, a federal grand jury indicted DaVita on charges of labor market collusion alleging participation in conspiracies with another outpatient dialysis clinic operator, Surgical Care Affiliates, to suppress wages.[151]

## V.    CLASS ACTION ALLEGATIONS

167.    Plaintiff brings this action on behalf of themselves and as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons in the United States and its territories that purchased outpatient dialysis services directly from a Defendant or its affiliate during the Class Period.

168.    Excluded from the Class are Defendants and their conspirators; the officers, directors, or employees of any Defendant or conspirator; any entity in which any Defendant or conspirator has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant or conspirator, and any person acting on their behalf. Also excluded from the Class are any judicial officer presiding over this action and the members of his/her immediate family and

---

[149] Office of Public Affairs, *DaVita to Pay $450 Million to Resolve Allegations That it Sought Reimbursement for Unnecessary Drug Wastage*, U.S. DEP'T OF JUSTICE (Jun. 24, 2015), https://www.justice.gov/archives/opa/pr/davita-pay-450-million-resolve-allegations-it-sought-reimbursement-unnecessary-drug-wastage#:~:text=This%20civil%20settlement%20resolves%20allegations,intended%20for%20one%2Dtime%20use.
[150] Bob Herman, *Whistleblower alleges DaVita, Fresenius paid kickbacks*, AXIOS (Aug. 2, 2019), https://www.axios.com/2019/08/02/whistleblower-davita-fresenius-kickbacks-charity-premiums.
[151] Office of Public Affairs, *DaVita Inc. and Former CEO Indicted in Ongoing Investigation of Labor Market Collusion in Health Care Industry*, U.S. DEP'T OF JUSTICE (Jul. 15, 2021), https://www.justice.gov/archives/opa/pr/davita-inc-and-former-ceo-indicted-ongoing-investigation-labor-market-collusion-health-care#:~:text=A%20federal%20grand%20jury%20in,on%20dialysis%20and%20kidney%20care.

judicial staff, and any juror assigned to this action. Also excluded from the Class is the United States government.

169.    The "Class Period" is the period from at least four years from May 9, 2025 through the date by which the anticompetitive effects of Defendants' violation of law shall have ceased, but in no case earlier than the present.

170.    While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the Class size is so numerous and geographically dispersed that joinder is impracticable given Defendants' substantial nationwide presence. Members of the Class are readily identifiable from information and records in Defendants' possession.

171.    Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, thereby making relief with respect to the Class as a whole appropriate. Such questions of law and fact common to the Class include, but are not limited to:

(a)    Whether Defendants engaged in a combination and conspiracy to fix, raise, maintain, or stabilize the prices of dialysis treatment;

(b)    Whether Defendants engaged in price fixing and territorial division;

(c)    The duration of the alleged conspiracy and the overt acts carried out by Defendants in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

(e)    Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class;

(f)    The effect of the alleged conspiracy on the price of outpatient dialysis services;

(g)    The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

(h)    The appropriate class-wide measure of damages.

172.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for outpatient dialysis services from Defendants.

173.    Plaintiff and undersigned counsel will fairly and adequately protect the interests of the Class. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

174.    Questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and aggregate damages.

175.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

176.    The prosecution of separate actions by individual members of the Class would

create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.    ANTITRUST INJURY

177.    By reason of the alleged violations of the antitrust laws, Plaintiff and members of the Class have suffered injury in their businesses or property, having paid higher prices for outpatient dialysis services than they would have paid in the absence of Defendants' violations of law, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

178.    Plaintiff is threatened with future such injury in the absence of appropriate injunctive relief.

179.    Defendants' antitrust conspiracy had the following anticompetitive effects, among others:

    a.    Price competition has been restrained or eliminated with respect to the pricing of outpatient dialysis services;

    b.    The prices of outpatient dialysis services have been fixed, raised, maintained, or stabilized at artificially inflated levels;

    c.    Purchasers of outpatient dialysis services have been deprived of the benefits of free and open competition, such as competition on price, quality, and innovation in the treatment of dialysis; and

    d.    Purchasers of outpatient dialysis services paid artificially inflated prices.

180.    The purpose of the conspiratorial and unlawful conduct of Defendants was to fix, raise, stabilize, and/or maintain the price of outpatient dialysis services.

181.    The precise amount of the overcharge impacting the prices of outpatient dialysis

services paid by Plaintiff and members of the Class can be measured and quantified using well-accepted models.

### VII.    CLAIM FOR RELIEF

**Violation of the Sherman Act, 15 U.S.C. §§ 1 & 3, brought under
Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26**

182.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

183.    Beginning at a time currently unknown to Plaintiff, but at least as early as May 9, 2021, and continuing through at least the present, Defendants engaged in a continuing agreement, understanding, and conspiracy, either express or tacit, in restraint of trade to fix prices, allocate territories, and artificially raise, fix, maintain, and/or stabilize prices for outpatient dialysis services in the United States, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 & 3.

184.    The conspiracy alleged herein is a *per se* violation of Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 3.

185.    Plaintiff and members of the Class directly purchased outpatient dialysis services from Defendants at supra-competitive prices, suffering antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

186.    Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' violation of Sections 1 and 3 of the Sherman Act, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

187.    Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Sections 1 and 3 of the Sherman Act, within the meaning of Section 16 of the Clayton Act, 15 U.S.C. § 26.

188.    Plaintiff and members of the Class are entitled to recover treble damages for the injury caused by Defendants' wrongful conduct and to an injunction against Defendants, preventing and restraining the violations alleged herein.

## VIII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class respectfully request the following relief:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as representative of the Class and the undersigned as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.    The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants be adjudged to have been a *per se* violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 & 3);

C.    The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.    That judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the actual damages sustained by Plaintiff and members of the Class as allowed by law, together with costs of the action, including reasonable

attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.      That each of the Defendants, and their respective successors, assigns, parents, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

F.      That the Court award Plaintiff and members of the Class such other and further relief, including structural relief, as the Court may deem just and proper under the circumstances.

## IX.    JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: May 9, 2025                        Respectfully submitted,

                                          */s/ Andrew M. Ellis*

                                          Stephen M. Tillery
                                          stillery@koreintillery.com
                                          Andrew M. Ellis
                                          aellis@koreintillery.com
                                          **KOREIN TILLERY LLC**
                                          505 North 7th Street, Suite 3600
                                          St. Louis, MO 63101
                                          Tel.: (314) 241-4844

                                          Vincent Briganti
                                          Raymond P. Girnys
                                          Roland St. Louis, III
                                          Peter A. Barile III
                                          **LOWEY DANNENBERG, P.C.**
                                          44 South Broadway, Suite 1100
                                          White Plains, NY 10601

Tel.: (914) 997-0500
vbriganti@lowey.com
rgirnys@lowey.com
rstlouis@lowey.com
pbarile@lowey.com

Eric L. Young, Esquire
**YOUNG LAW GROUP, P.C.**
3031C Walton Road, Suite 301
Plymouth Meeting, PA 19462
Tel.: (215) 260-5493
eyoung@young-lawgroup.com

*Counsel for Plaintiff and Proposed Class*

61