## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1776 AND PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND; A.F. OF L. - A.G.C. BUILDING TRADES WELFARE PLAN, on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>         v.<br><br>DAVITA INC.; FRESENIUS MEDICAL CARE AG; FRESENIUS MEDICAL CARE HOLDINGS, INC. d/b/a FRESENIUS MEDICAL CARE NORTH AMERICA; and FRESENIUS USA MANUFACTURING, INC. d/b/a FRESENIUS MEDICAL CARE NORTH AMERICA,<br><br>                              Defendants. | Case No.: 1:25-cv-01478-SKC-STV<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.    INTRODUCTION. ........................................................................................ 2

II.   JURISDICTION, VENUE, AND COMMERCE. ............................................ 14

III.  PARTIES. ................................................................................................ 15

    A.    Plaintiffs. ...................................................................................... 15

    B.    Defendants. ................................................................................... 16

    C.    Third Party Co-Conspirator. .......................................................... 19

    D.    Agents, Affiliates, and Other Co-conspirators. ............................... 19

IV.   BACKGROUND ON THE DIALYSIS INDUSTRY. ....................................... 20

    A.    History of the Dialysis Industry. .................................................... 20

    B.    Medicare Coverage Compared to Private-Pay Coverage. .................. 24

    C.    Industry Consolidation. ................................................................. 30

V.    AVAILABLE EVIDENCE SUPPORTS THE INFERENCE THAT
      DEFENDANTS HAVE CONSPIRED IN RESTRAINT OF TRADE. ............. 32

    A.    The objects of Defendants' conspiracy. ........................................... 32

        1.    Defendants have conspired to fix and maintain prices on
             outpatient dialysis services for private payers. ......................... 33

        2.    Defendants have conspired to reduce the quality of dialysis
             services and to not compete on quality. ..................................... 47

        3.    Defendants have conspired to divide and allocate less densely
             populated markets among each other. ....................................... 56

    B.    Defendants incentivize, reward, and coordinate with each other in
      furtherance of their conspiracy. ....................................................... 68

        1.    Defendants repeatedly transact with each other in ways and on
             terms that indicate agreement to maintain prices. .................... 68

        2.    Defendants routinely acquiesce to each other's entry into
             geographic markets while objecting to the entry of other
             competitors. ............................................................................. 88

        3.    Defendants jointly use the American Kidney Fund to keep their
             patients on private insurance at monopoly prices. .................... 95

        4.    Defendants Coordinate Their Litigation and Lobbying Efforts.
             ................................................................................................ 103

VI.   DEFENDANTS HAVE HAD KNOWLEDGE OF EACH OTHER'S
      OPERATIONS AND MYRIAD OPPORTUNITIES TO COLLUDE. ............ 105

A.  Defendants Frequently Hire Each Other's Managers. ....................... 107

B.  Defendants' Participation in and Control of Key Trade Organizations
    Provides Ample Opportunities to Collude. ........................................... 112

    1.  Kidney Care Partners. .................................................................. 112

    2.  Renal Physicians Association. ..................................................... 118

    3.  Annual Dialysis Conference. ....................................................... 122

    4.  Kidney Care Council. .................................................................. 123

    5.  California Kidney Care Alliance. ................................................ 125

    6.  California Dialysis Council. ........................................................ 126

    7.  American Society of Nephrology. ............................................... 127

    8.  Diality. ......................................................................................... 129

VII.  THE STRUCTURE AND CHARACTERISTICS OF THE DIALYSIS
      INDUSTRY ARE CONDUCIVE TO COLLUSION. ..................................... 130

    A.  Defendants Are the Dominant Firms in a Highly Concentrated
        Industry. ........................................................................................ 130

    B.  Barriers to Entry are High. ........................................................... 130

    C.  Demand for Dialysis Treatment is Highly Inelastic. .......................... 133

    D.  There are Often Few, if Any, Available Substitutes. .......................... 134

VIII.  DEFENDANTS' HISTORY OF REPEATEDLY VIOLATING THE LAW AND
       COMMITTING FRAUD MAKE THE ALLEGED CONSPIRACY MORE
       LIKELY. ................................................................................................ 135

    A.  Defendants Have Repeatedly Demonstrated Disregard for the Law. 135

    B.  Government Regulators are Actively Investigating Defendants for
        Similar Misconduct. ...................................................................... 139

IX.   FRAUDULENT CONCEALMENT. ............................................................ 140

X.    CLASS ACTION ALLEGATIONS. ............................................................ 142

XI.   ANTITRUST INJURY. ............................................................................ 145

XII.  CLAIM FOR RELIEF. ............................................................................. 146

XIII. REQUESTED RELIEF. ............................................................................ 147

XIV.  JURY DEMAND. .................................................................................... 149

*"There was a 'gentleman's agreement' between DaVita and Fresenius to not step on each other's toes."*[1]

*"[DaVita and Fresenius are] not really competing for patients, as far as we can tell: they just carve up these markets and live a happy life. For many patients, life is less happy."*[2]

*"Death rates go up, hospitalization rates go up, transplant rates fall, and so on. Any measure that could get worse pretty much got worse, after [DaVita and Fresenius] acquired independent facilities."*[3]

*"For me, it's not about the patients . . . If I had 1,400 Taco Bells and 32,000 people who worked in them, I would be doing all the same stuff."*[4]

United Food and Commercial Workers Local 1776 and Participating Employers Health and Welfare Fund ("UFCW 1776") and A.F. of L. - A.G.C. Building Trades Welfare Plan ("AFL Plan"), on behalf of themselves and all others similarly situated, bring this action for damages and injunctive relief against Defendants DaVita Inc. ("DaVita"), Fresenius Medical Care AG, Fresenius Medical Care Holdings, Inc. d/b/a Fresenius Medical Care North America, and Fresenius USA Manufacturing, Inc. d/b/a Fresenius Medical Care North America (collectively, "Fresenius") (collectively with DaVita, "Defendants"), under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 & 26) for violations of Sections 1 & 3 of the Sherman Act (15 U.S.C. §§ 1 & 3).

---

[1] Former Fresenius employee in business development role.
[2] Tom Mueller, *How to Make a Killing: Blood, Death and Dollars in American Medicine*, W. W. NORTON, 2023 ("Tom Mueller, *How to Make a Killing*"), p. 120 (quoting Prof. Ryan McDevitt).
[3] Tom Mueller, *How to Make a Killing*, p. 119 (quoting Prof. Ryan McDevitt).
[4] Former DaVita CEO Kent Thiry, *Energizing a Firm with Mission & Values*, Speech at UCLA Anderson School of Management (April 10, 2009), https://www.youtube.com/watch?v=JowmBdx4nFw (at 1:10:10).

## I.    INTRODUCTION.

1.    Defendants DaVita and Fresenius are the two largest United States providers of outpatient dialysis services—an essential and life-sustaining medical treatment for the roughly 800,000 patients with end-stage renal disease ("ESRD"). Together, Defendants control approximately 80% of all outpatient dialysis clinics and more than 90% of the market by revenue. Defendants thus operate as a *de facto* duopoly, with each of them having virtually equal market shares of 40% by number of clinics and 45% by revenue. Their next-largest competitor, U.S. Renal Care, has a market share of only 5%. Such high market concentration is staggering and unprecedented in healthcare services.

2.    Dialysis patients must receive treatment three or four times a week in order to stay alive. In the United States, dialysis is covered by Medicare irrespective of patient age. Accordingly, Medicare pays for the treatment of most patients— between 80% and 90%. The remaining 10-20% of patients, referred to herein as "private-pay" patients, are covered by private insurance such as self-funded and fully insured health and welfare plans offered by employers and unions. Because Medicare pays what is essentially a cost-plus rate, Defendants' profit margins on Medicare dialysis patients are modest, with revenues sometimes approximating the break-even price. By contrast, Defendants' profit margins on private-pay patients are astronomical and likewise unprecedented in healthcare services.

3.    Defendants routinely charge private payers six to ten times what Medicare pays, generating profit margins of 500% or more compared to marginal costs. DaVita, for example, has publicly acknowledged that 10% of its patients

(those in private-pay plans) generate 100% of its profits in the provision of outpatient dialysis treatment. The figures for Fresenius are similar. Thus, as Defendants recognized long ago, Medicare patients pay the bills, but private-pay patients are where the real money is made.

4.     From a competition perspective, private-pay patients are the whole ballgame—they bring in billions in annual revenues and profits for both Defendants combined. Given Defendants' comparable size, scale, and profitability in outpatient dialysis treatment, both logic and economic theory predict that Defendants should compete fiercely for lucrative private-pay patients by lowering prices, improving treatment quality, and opening clinics in the same geographic regions whenever possible. But Defendants have done none of these things.

5.     Indeed, Defendants have done the opposite: they have consistently raised and maintained private-pay prices even as other providers lowered them and Medicare prices stayed the same; they have cut costs and reduced treatment quality by operating their clinics as commoditized fast-food chains, leading to abysmal treatment results that are among the worst in the developed world; and they have steadfastly avoided entering the same geographic territories outside of major metropolitan areas, routinely ceding such territories exclusively to the other and thereby carving up markets in roughly equal proportions.

6.     Rather than acting like competitors, Defendants have instead consistently acted like separate divisions of a single monopolistic entity, each charging monopoly prices and earning monopoly profits on private-pay patients

across the United States. These results are not the product of happenstance or mere

conscious parallelism. They are the intended outcomes of at least a decade-long

conspiracy and concerted course of dealing among Defendants to: (1) fix and

maintain private-pay prices, (2) reduce quality and refrain from competing on the

basis of quality, and (3) cede and thereby allocate to each other geographic

territories outside of densely populated metro areas. These are the three inter-

related pillars of Defendants' contract, combination, or conspiracy in restraint of

trade, which are in violation of U.S. antitrust law.

7.    Recent economic literature on the dialysis industry strongly supports

the inference of a collusive agreement or course of dealing among Defendants. Over

the course of 15 years, Defendants have systematically raised private-pay prices

across the United States (to an average of roughly $1,400 per treatment) even as

Medicare prices stayed essentially the same (below $300 per treatment on average).

The egregious nature of these price increases is confirmed by comparing the same

services in other geographic regions where neither Defendant operates. In such

regions, smaller chains and independent providers have actually lowered their

private-pay prices on average over the same period (charging $500 less per

treatment than Defendants).

8.    Perhaps most striking, recent economic literature reveals that when

one Defendant enters a geographic region previously occupied by the other, average

prices stay the same or even increase. Put differently: when one Defendant operates

alone, it charges the monopoly price for private-pay patients; when the other

4

Defendant enters the region, both charge the monopoly price, which is far greater than what other providers charge when neither Defendant is present. The findings in the economic literature are consistent with the experience of UFCW 1776. Its data shows that Defendants have charged essentially identical prices per treatment in the Philadelphia area in the past five years, have increased their prices at roughly the same time, and have charged up to twice as much per treatment compared to other providers.

9.      Defendants' pricing behavior flies in the face of all economic models of competition, including those in duopoly markets. Basic economic principles predict that when two large competitors operate in the same market and actually compete, prices should decrease to well below monopoly levels. Defendants' pricing behavior is instead consistent with economic models of collusion, which predict the monopoly prices observed for private-pay dialysis patients only when two large competitors have an agreement or understanding to fix and maintain those prices or otherwise avoid price-based competition.

10.     Economic literature and other evidence similarly confirm that Defendants do not compete on the basis of treatment quality or patient outcomes—critical competitive differentiators for vulnerable dialysis patients who often have significant comorbidities. That evidence reveals that Defendants employ a nearly identical operational strategy: they acquire clinics, replace skilled nurses with lower-skilled and lower-paid technicians, decrease treatment duration and time between treatment to maximize treatment volume, and discourage patients from

applying for life-saving kidney transplants. These cookie-cutter operational models decrease costs, increase revenues, and increase profits, which Defendants then use to lock nephrologists into lucrative and exclusive medical director positions and joint ownership arrangements that raise substantial barriers to entry and decrease competition from non-Defendant providers.

11.    Economic literature shows that in markets where both DaVita and Fresenius are present, there is no observable improvement in quality outcomes compared to single-chain markets; the presence of both firms does not lead to quality-based competition; and there exists a single, low national standard of quality maintained across Defendants' facilities. Indeed, the literature concludes that, after Defendants acquire independent clinics, "[a]long almost every dimension we measure, patients fare worse at the target facility after acquisition, most prominently in terms of fewer kidney transplants, more hospitalizations, and lower survival rates."[5]

12.    These outcomes likewise fly in the face of standard economic theory, which predicts that in the absence of collusion, firms will compete on service quality even when price competition is constrained. Instead, these findings provide strong evidence that DaVita and Fresenius both keep their quality-of-care low, suggesting they are deliberately choosing not to compete with each other despite the economic incentives to do so—further supporting the inference of collusion.

---

[5] Paul J. Eliason et al., *How Acquisitions Affect Firm Behavior and Performance: Evidence from the Dialysis Industry*, 135 Q.J. ECON. 221, 261 (2020), https://par.nsf.gov/servlets/purl/10180446 ("2020 QJE Study").

13.    The consequences of the single, low standard of quality imposed by Defendants have been devastating for dialysis patients in the United States. Since 2013, Defendants' clinics have collectively amassed nearly 80,000 citations for failing to meet federal performance standards—split roughly evenly between the two companies.[6] The mortality rates for U.S. patients are two to four times higher than patients in Japan and Western European countries. Not only do patients attending Defendants' clinics receive fewer life-saving kidney transplants, there is evidence Defendants' staff actively discourage patients from getting on transplant waiting lists. Defendants' patients also receive home dialysis at lower rates than their counterparts in other countries, despite home dialysis usually generating superior patient outcomes and significant quality-of-life improvements.

14.    Another way Defendants intentionally avoid competition is by ceding large swaths of less densely populated areas with fewer private-pay patients to one or the other exclusively. A former Fresenius employee in a business development role stated that the companies have a "gentleman's agreement" to "not step on each other's toes." Publicly available data from the Centers for Medicare & Medicaid Services ("CMS") confirms this statement. Of 2,990 U.S. cities with a DaVita or Fresenius facility, only 674 (23%) have both. This means that in approximately 77% of cities where DaVita or Fresenius operate, they do so without direct competition from the other.

15.    Geographic analysis of Defendants' clinic locations reveals a clear

---

[6] CBS Sunday Morning, *Kidney Dialysis Industry Accused of Maximizing Profits Over Patients*, YouTube (June 22, 2025), https://www.youtube.com/watch?v=ioJ0xb3w8nY.

pattern. DaVita and Fresenius tend to both operate only in densely populated metropolitan areas with larger numbers of private-pay dialysis patients. In less densely populated areas with smaller numbers of private-pay patients, Defendants largely cede territories to one another, making no effort at entry and competition once one of them gains a foothold by opening a clinic or acquiring an existing one. As a result, extended sections of states between large metropolitan areas are dominated by either DaVita or Fresenius, with the other having either few or no clinics in these areas.

16.    Here, too, Defendants' behavior runs counter to fundamental economic theory, which holds that in the absence of collusion, competing firms in a duopoly will tend to locate near one another geographically to maximize their access to market share. In market after market, Defendants display a pattern of strategic non-entry: where one firm enters first, the other refrains from establishing a presence, even when such entry would be economically rational under competitive conditions. Defendants' course of dealing in allocating and ceding certain geographic markets to one of them allows each Defendant to capture the bulk of private-pay patients in less densely populated areas, and to charge monopoly prices for those patients' treatment. The other Defendant also ultimately benefits in areas that it controls by being able to charge essentially the same monopoly prices without the risk of competitive discipline.

17.    The geographic market allocation scheme is corroborated by Defendants' own former employees. One former Fresenius employee confirmed that

DaVita and Fresenius "stay[ed] out of each other's territories and turfs." According to this employee, "When I was out looking for new Fresenius sites, I'd be told, 'Stay away from that area, that's DaVita territory.'" These directives to avoid DaVita's territory came from senior Fresenius executives, T.L.[7] and B.G., according to the former Fresenius employee. A former DaVita employee recounted a similar experience, observing that "where Fresenius market share was pretty high, we didn't push hard in that area. And where our market share was very high, Fresenius wouldn't push in either."

18.    Myriad additional evidence supports the inference that Defendants have conspired in restraint of trade as alleged herein. Contrary to their stand-alone economic interests, Defendants have a long history of incentivizing, rewarding, and coordinating with each other to further their common objectives and to maintain their non-competitive status quo.

19.    Defendants also repeatedly transact with each other in ways and on terms that indicate agreement to maintain prices. For example, despite Fresenius being its largest "competitor" in dialysis treatment—which requires substantial expenditures on dialysis machines, parts, and supplies—DaVita has chosen to reward its rival by buying the majority of its equipment from Fresenius's manufacturing subsidiary rather than from Fresenius's competitors. DaVita has even chosen to exclusively offer Fresenius's home dialysis equipment to its home dialysis patients. Thus, DaVita has assured and reinforced Fresenius's market

---

[7] To safeguard the privacy of current and former employees of Defendants, this Complaint generally identifies such individuals by their initials rather than by their full names.

dominance in equipment and supplies.

20.     Because DaVita's stand-alone economic interest is to constrain Fresenius's market power in equipment, which poses competitive threats in dialysis treatment in the form of fewer suppliers and higher prices, its choice to provide its competitor with a steady and lucrative revenue stream strongly suggests a quid-pro-quo. And indeed, Fresenius has reciprocated by giving DaVita—which is its largest equipment customer in the United States—substantial discounts and incentives. Industry participants have recognized that this relationship between supposed rivals is highly unusual. As one former Fresenius employee observed, "It's kind of strange that Fresenius's biggest competitor is also their biggest equipment purchaser, their biggest customer."

21.     Similarly, Fresenius has incentivized and rewarded DaVita by referring and encouraging its Medicare patients to use DaVita Rx's pharmacy fulfillment services, even though it was perfectly capable of providing such services itself. Indeed, Fresenius struck a deal with DaVita Rx years after Fresenius had established its own pharmacy service, FreseniusRX. This deal between Fresenius and DaVita Rx coincided with DaVita's long-term commitment to purchase Fresenius equipment and supplies. DaVita Rx's revenues quickly doubled as a result. According to a whistleblower lawsuit by DaVita's former executive that DaVita settled for nearly $35 million, this was part of an extended, collusive quid-pro-quo between the two companies, with terms negotiated directly between the companies' CEOs. Moreover, according to another whistleblower lawsuit that

DaVita settled for nearly $450 million, DaVita needlessly purchased and wasted an expensive dialysis drug from Fresenius, lining its so-called "competitor's" pockets, while fraudulently billing Medicare for large quantities of a drug it did not actually need.

22.     Further evidence of Defendants' quid-pro-quos include DaVita's multiple, large purchases of Fresenius's dialysis clinics at non-arm's-length prices. According to a whistleblower complaint that DaVita settled with the government, DaVita paid a premium for a number of Fresenius's dialysis clinics in Europe that no one else apparently wanted to buy. The deal coincided with the aforementioned arrangements for DaVita to buy Fresenius's equipment and for Fresenius to refer its patients to DaVita Rx. DaVita acknowledged that it would not have paid the price it did but for the companies' other agreements.

23.     Defendants have repeatedly chosen to avoid competition and instead pursue strategic entanglement, whereby their mutual ongoing business relationships incentivize and reward both entities for staying the course. At the same time, these ongoing business relationships on preferential terms also provide avenues for Defendants to deter and punish deviation from their conspiracy.

24.     Yet more evidence comes from Defendants' dealings with each other in the roughly dozen U.S. states that require a certificate of need ("CON") in order to open a new dialysis clinic. The CON process allows an incumbent provider to object to another provider's application and has been referred to as a "competitor's veto" because it often has the practical effect of foreclosing entry. Yet an analysis of

available CON data shows that Defendants rarely object to each other's entry or expansion, and both object at much higher rates to the proposed entry or expansion by other providers. For example, since 2020, Defendants have lodged objections to the other's entry only 7% of the time, whereas they have lodged objections to the entry of other providers 52% of the time—a seven-fold difference.

25.    Economically and strategically, economic principles predict that the two largest competitors in a market would challenge and compete with each other far more aggressively. Yet DaVita and Fresenius behave in the opposite manner. Defendants' behavior is best explained by their agreement to maintain supracompetitive prices for private-pay dialysis patients. If Defendants have an agreement to maintain monopoly prices, the entry of one into a densely populated geographic area occupied by the other presents much less of a competitive threat because both Defendants know, a priori, that such entry will not lead to price-based or quality-based competition.

26.    Defendants have also coordinated in furtherance of their conspiracy through their joint control of the supposedly independent charitable organization, the American Kidney Foundation (the "AKF"). AKF exists ostensibly to help needy dialysis patients afford insurance premiums and other treatment costs by subsidizing those costs. Defendants account for 80% or more of AKF's funding, jointly providing the organization several hundred million annually. In practice, the AKF exists primarily to steer Defendants' patients to private insurance and away from Medicare, as a result of which Defendants are able to charge their monopoly

prices to private payers. Defendants' donations are thus a vehicle to circumvent anti-kickback laws by effectively subsidizing their patients, albeit through a middleman, so that Defendants can charge private payers extortionate prices that dwarf Defendants' contributions to AKF. The relationship between Defendants and AKF has been the subject of much scrutiny and is currently being investigated by regulators.

27.    Defendants clearly have motive to collude because their non-competitive status quo, where they essentially split the market and jointly charge monopoly prices, is enormously profitable. But Defendants have also had virtually limitless opportunities to collude in the context of their extensive business dealings. A former DaVita employee observed that "[t]here are many opportunities for collusion between DaVita and Fresenius," particularly through the sale of equipment and clinics. Likewise, a former Fresenius employee confirmed that such collusion is not hypothetical, stating that "[t]here's a lot of collusion now."

28.    Moreover, Defendants often hire each other's management employees —without apparent pushback from the other based on selective non-enforcement of noncompete provisions in employment agreements—which gives each company access to competitively sensitive information of the other.

29.    Defendants also jointly dominate and control virtually every dialysis industry organization in the United States. Defendants' executives sit together on boards and committees, either sharing leadership positions or passing them back and forth. These industry organizations, which Defendants also jointly fund, give

their executives constant opportunities to meet in person, exchange competitively
sensitive information, and monitor each other for compliance with their
longstanding course of dealing.

30.    Finally, the structure and characteristics of the dialysis industry are
ripe for collusion of the kind alleged herein. Defendants are the two dominant firms
in a highly concentrated industry—each controlling a roughly equal share of the
market, with the next largest competitor being only a fraction of either Defendant's
size. Barriers to entry are high, and Defendants have only made them higher by
using their monopoly profits to lock nephrologists into exclusive employment and
joint venture agreements, thus foreclosing smaller rivals' access to patient referrals.
The demand for dialysis is as inelastic as it gets, and given Defendants' combined
market share, patients rarely have the option of using an alternative provider.
These are all characteristics that economic literature recognizes as being conducive
to cartel pricing behavior.

## II.    JURISDICTION, VENUE, AND COMMERCE.

31.    This action arises under Sections 1 and 3 of the Sherman Act, 15
U.S.C. §§ 1, 3, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

32.    This Court has subject matter jurisdiction over Sherman Act claims
pursuant to 28 U.S.C. §§ 1331 & 1337.

33.    This Court has personal jurisdiction over Defendants pursuant to
Section 12 of the Clayton Act, 15 U.S.C. § 22.

34.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of
the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d).

14

All Defendants reside, transact business, are found, or have agents in this District. Further, Defendant DaVita is headquartered in this District.

35. Defendants' acts at issue here were within the flow of interstate commerce, used the instrumentalities of interstate commerce, and were intended to have, and did, in fact, have a substantial effect on the interstate commerce of the United States.

36. Billions of dollars of transactions in dialysis treatment are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce.

37. Defendants' anticompetitive conduct had a direct, substantial, and reasonably foreseeable effect on the domestic commerce of the United States and its territories, and such effect gives rise to Plaintiffs' claim.

38. Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for dialysis treatment.

39. Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy, the prices charged for outpatient dialysis services would have been determined by competitive forces—and the prices paid would have been significantly lower.

III.    PARTIES.

    A.    Plaintiffs.

40. Plaintiff UFCW 1776 is an employee benefit plan headquartered in

15

Plymouth Meeting, Pennsylvania. UFCW 1776 is a self-funded benefit plan that provides benefits for thousands of members across Pennsylvania and the United States.

41.    As a self-funded benefit plan, UFCW 1776 pays directly for dialysis services provided to its members through its administrator, Independence Blue Cross. Independence Blue Cross allows UFCW 1776 members to access their networks of providers. Throughout the Class Period, UFCW 1776 paid DaVita and Fresenius for dialysis services provided to its beneficiaries. During the Class Period, UFCW 1776 suffered antitrust injury as a direct and proximate result of the anticompetitive conduct alleged in this Complaint. Plaintiff UFCW 1776 intends to continue paying directly for dialysis services provided to its members.

42.    Plaintiff AFL Plan is an employee benefit plan headquartered in Mobile, Alabama. The AFL Plan is a self-insured health and welfare benefit plan that provides benefits for participants across the United States.

43.    AFL Plan pays directly for dialysis services provided to its members through its administrator, Blue Cross Blue Shield of Alabama. Throughout the Class Period, AFL Plan paid Fresenius for dialysis services provided to its beneficiaries. During the Class Period, the AFL Plan suffered antitrust injury as a direct and proximate result of the anticompetitive conduct alleged in this Complaint. Plaintiff AFL Plan intends to continue paying directly for dialysis services provided to its members.

**B.    Defendants.**

44.    DaVita Inc. ("DaVita") is a corporation organized, existing, and doing

16

business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 2000 16th Street, Denver, Colorado 80202.

45.    DaVita is the second largest provider of dialysis services in the United States. DaVita owns and manages outpatient dialysis facilities throughout the United States and provides acute inpatient dialysis services within hospitals.

46.    DaVita claims to serve more than 1.7 million patients in 13 countries and to have more than 70,000 employees.

47.    Fresenius Medical Care AG ("FMC") is a German *aktiengesellschaft* (stock corporation) located at Else-Kröner-Strasse 1, Bad Homburg, DE 61352.

48.    FMC issues shares for trading in the United States (ADRs) on the New York Stock Exchange. FMC has designated as its transfer agent Bank of New York Mellon Shareholder Services, Providence, RI 02940.

49.    Defendant Fresenius Medical Care Holdings, Inc. ("FMC-H") is a New York corporation with its principal place of business at 920 Winter St., Waltham, MA 02451.

50.    Defendant Fresenius USA Manufacturing, Inc ("FMC-USA") is a Delaware corporation with its principal place of business at 920 Winter St., Waltham, MA 02451.

51.    FMC is the parent corporation of FMC-H and FMC-USA and does business in the United States and in this District, including through FMC-H and FMC-USA. FMC and other of its German and U.S. affiliates are the owners of numerous U.S. Trademarks for doing business in the United States, including, by

17

way of example, the following live registered trademarks: *Fresenius* (79050568,

Fresenius SE & Co. KGaA); *Fresenius Kidney Care* (87682350, Fresenius SE & Co.);

*Fresenius Medical Care Foundation* (88632488, Fresenius Medical Care Holdings,

Inc.); and *Fresenius Medical Care* (85635128, Fresenius Medical Care Deutschland

GmbH).

52.    FMC-USA is registered to do business in the State of Colorado (Entity

No. 19991211013). Its registered agent for service of process is CT Corporation

located at 7700 E. Arapahoe Rd. Ste 220, Centennial, CO 90112.

53.    FMC, FMC-H and FMC-USA are corporate affiliates with operations

integrated under the Fresenius multi-national group of companies' corporate

umbrella and its "global operating model."[8] Together, FMC, FMC-H and FMC-USA

are referred to herein as "Fresenius."

54.    Fresenius does business in the United States and in this District as

Fresenius Medical Care North America. Through FMC-USA, Fresenius has

registered "Fresenius Medical Care North America" as a trade name for doing

business in the State of Colorado (I.D. No. 19991211013). Through FMC-H,

Fresenius has registered "Fresenius Medical Care North America" as an assumed

name (Assumed Name ID 139099).

55.    Fresenius is the largest provider of dialysis services in the United

---

[8] Fresenius Medical Care AG, *Form 20-F*, at 1 (Feb. 20, 2024),
https://www.sec.gov/ix?doc=/Archives/edgar/data/1333141/000110465924025293/fms-20231231x20f.htm (referring to itself constituting, *inter alia*, Fresenius Medical Care AG and "Fresenius Medical Care Holdings, Inc., the holding company for our North American operations").

States. Fresenius is also the largest manufacturer and distributor of dialysis equipment and related products in the United States, including the largest distributor of dialysis equipment to DaVita.

### C.    Third Party Co-Conspirator.

56.    The American Kidney Fund ("AKF") is a qualified 501(c)(3) tax-exempt organization located at 11921 Rockville Pike, Suite 300, Rockville, MD 20852. During the Class Period, AKF conspired with and otherwise aided and abetted Defendants' violations of law, as alleged herein. AKF ranks 57 among the nation's top charities with a total revenue of $355 million.[9]

### D.    Agents, Affiliates, and Other Co-conspirators.

57.    "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries, affiliates, employees, officers, and directors.

58.    Whenever reference is made to any act, deed, or transaction of any corporation or partnership, the allegation means that the corporation or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parent, predecessors or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

---

[9] Forbes, *Top Charities 2024 List* (Dec. 10, 2024), https://www.forbes.com/lists/top-charities/; *see also* ProPublica, *American Kidney Fund Inc.*, https://projects.propublica.org/nonprofits/organizations/237124261 (last visited Sep. 12, 2025).

IV.    **BACKGROUND ON THE DIALYSIS INDUSTRY.**

    A.    **History of the Dialysis Industry.**

59.    The kidneys are vital organs that perform two primary functions in the human body: they filter wastes and toxins out of the blood and produce erythropoietin, a hormone that stimulates red blood cell production. Two healthy kidneys can filter about one liter of blood every minute. This means that in just five minutes, they clean all the blood in the body of an adult weighing around 150 pounds.[10]

60.    Chronic kidney disease ("CKD") is a condition in which your kidneys can no longer filter your blood effectively. As the condition worsens over time, patients will inevitably suffer chronic kidney failure. When kidney function becomes less than 15% of typical level, wastes and excess fluid begin to build and this begins the final stage of the disease known as end stage renal disease ("ESRD"). The incidence of ESRD has doubled from approximately 400,000 cases in 2001 to about 800,000 in 2019, and has remained at that number since.

61.    According to the United States Renal Data System, there have been over 120,000 ESRD patients diagnosed in the United States every year since 2019, and there have been over 800,000 ESRD patients at any given time.[11]

---

[10] European Renal Association, *Understanding Kidneys*, https://www.era-online.org/publications/understanding-kidneys/ (last visited Sep. 11, 2025); Tom Mueller, *How to Make a Killing*, p. 7.

[11] United States Renal Data System, *Annual Data Report*, https://usrds-adr.niddk.nih.gov/2023/end-stage-renal-disease/1-incidence-prevalence-patient-characteristics-and-treatment-modalities (last visited Sep. 12, 2025).

**FIGURE 1: NUMBER OF U.S. ESRD PATIENTS, 2001 – 2021**



62.     To survive, ESRD patients must undergo dialysis or receive a kidney transplant. A kidney transplant is often not possible, due to either a lack of available kidneys or the patient's poor health condition, as many patients are not viable transplant candidates. Even for viable transplant candidates, the majority of patients receive dialysis treatment before the transplant. About 20% of transplant candidates have to spend significant time on a kidney waitlist, during which time they must continue to receive dialysis treatments. The wait time, with a median of over three-and-a-half years, can exceed five years. Those that do not receive a kidney transplant have to undergo dialysis treatment for the rest of their lives. As of August 2025, nearly 555,000 patients were receiving dialysis treatment in the United States.[12]

---

[12] American Kidney Fund, *Quick kidney disease facts and stats* (Aug. 13, 2025), https://www.kidneyfund.org/all-about-kidneys/quick-kidney-disease-facts-and-stats#:~:text=CKD%20in%20the%20United%20States,555%2C000%20Americans%20are%20on%20dialysis; American Kidney Fund, *All about the kidneys* (Aug. 13, 2025),

63.    There are two types of dialysis treatments: hemodialysis and peritoneal dialysis. Hemodialysis, the most common form of dialysis, which works by circulating and filtering a patient's blood through a dialyzer machine to remove toxins, effectively replaces the function of a kidney. A hemodialysis treatment typically lasts three to four hours and is administered three to four times per week, or 150-200 times per year. Peritoneal dialysis, on the other hand, uses the lining of the patient's abdomen to filter blood inside the body. For various reasons, hemodialysis is the dominant form and is used to treat roughly 90% of American ESRD patients.[13]

64.    Dialysis patients primarily receive treatments in one of three settings: (1) at an outpatient clinic, (2) at home, or (3) inpatient at a hospital. Recent advancements in dialysis technology have increased the ability of dialysis patients to conduct their treatments at home. Home dialysis is similar to dialysis at an outpatient clinic but with a slightly different process that requires patient training at a provider facility. Inpatient dialysis occurs at a hospital or an inpatient facility for patients who need dialysis while hospitalized.

65.    Home treatment requires the patient to have a permanent catheter, fistula or graft, and the patient will most likely need someone to help them

---

https://www.kidneyfund.org/all-about-kidneys/quick-kidney-disease-facts-and-stats#:~:text=CKD%20in%20the%20United%20States&text=More%20than%20557%2C000%20Americans%20are,with%20kidney%20failure%20in%202021.
[13] University of Maryland Medical System, *Types of Dialysis*, https://www.umms.org/ummc/health-services/kidney/dialysis/types (last visited Sep. 12, 2025); Cleveland Clinic, *Dialysis*, https://my.clevelandclinic.org/health/treatments/14618-dialysis (last visited Sep. 12, 2025).

administer the treatment.[14]

66.    The vast majority of dialysis patients—80-90%—receive treatment at outpatient dialysis facilities.[15] After an ESRD diagnosis, nephrologists (i.e., physicians that specialize in treating patients with kidney disease) typically refer patients to an outpatient dialysis facility.

67.    In the first instance, nephrologists affiliated with hospitals typically diagnose ESRD. At that point, the nephrologist will refer the patient to a treatment center. A nephrologist's referral plays an important role in a patient's choice of outpatient clinic. Indeed, patients often start dialysis treatment at their nephrologists' primary facilities (i.e., where nephrologists spent the most time) even when they were low quality.[16]

68.    On average, patients receive 156 treatments per year (i.e., three times per week for 52 weeks or 312 one-way trips annually). Because patients often also suffer from multiple health problems and may require assistance traveling to and from the dialysis clinic, these patients are generally unwilling or unable to travel long distances to receive dialysis treatment. In light of the time-consuming and repetitive nature of kidney dialysis, the vast majority of patients travel less than 30

---

[14] National Kidney Foundation, *Hemodialysis Catheters: How to Keep Yours Working Well*, https://www.kidney.org/kidney-topics/hemodialysis-catheters-how-to-keep-yours-working-well (last visited Sep. 12, 2025).

[15] Dialysis Patient Citizens Education Center, *A Brief History of Dialysis*, https://www.dpcedcenter.org/news-events/news/a-brief-history-of-dialysis/#:~:text=Nowadays%2C%20over%2090%20percent%20of,and%20nocturnal%20in%2Dcenter%20treatment (last visited Sep. 12, 2025).

[16] Eugene Lin et al., *Care Continuity, Nephrologists' Dialysis Facility Preferences, and Outcomes*, JAMA HEALTH FORUM, at 1 (April 11, 2025), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2832436.

miles or 30 minutes from their homes to receive dialysis treatment.

**B. Medicare Coverage Compared to Private-Pay Coverage.**

69.    In 1972, in response to a historic lack of available private health insurance coverage for ESRD patients, Congress passed legislation providing coverage under Medicare for dialysis services to individuals suffering from ESRD, regardless of their age or whether they would otherwise qualify for Medicare. Over the years, private insurers increasingly added dialysis coverage to their plans to cover gaps in Medicare's dialysis coverage.

70.    In the 1980s and 90s, Congress passed a series of amendments to the Social Security Act that made Medicare the secondary payer for dialysis services for individuals with ESRD covered by other types of insurance.[17]

71.    Medicare coverage for ESRD patients begins after a three-month waiting period following the start of dialysis.[18] For the next 30 months, if the individual has an employer or group health plan, that plan remains the primary payer while Medicare provides secondary coverage.[19] This 30-month period is called the 30-month coordination period.[20] At the end of this combined 33-month period,

---

[17] According to the 1995 final Rule preamble discussing amendments to the Medicare Secondary Payer Act, the "intent of the MSP provisions is to ensure that Medicare does not pay primary benefits for services for which a [group health plan] . . . is the proper primary payer and that beneficiaries covered under these plans are not disadvantaged vis-à-vis other individuals who are covered under the plan but are not entitled to Medicare." 60 Fed. Reg. 45344 (Aug. 31, 1995).

[18] Medicare.gov, *End-Stage Renal Disease (ESRD)*, https://www.medicare.gov/basics/end-stage-renal-disease (last visited Sept. 9, 2025).

[19] Medicare Interactive, *The 30-Month Coordination Period for People with ESRD*, https://www.medicareinteractive.org/understanding-medicare/health-coverage-options/medicare-and-end-stage-renal-disease-esrd/the-30-month-coordination-period-for-people-with-esrd (last visited Sept. 9, 2025).

[20] *Id.*

Medicare becomes the primary payer for ESRD treatment and the group health plan provides secondary coverage.[21]

72.     Although ESRD patients are eligible to drop out of their group health plans and begin receiving Medicare coverage immediately after the "waiting" or "qualification" period, many patients opt to stay with their private group health plans through the entire 30-month coordination period and beyond rather than switching to Medicare coverage.

73.     Medicare provides coverage for the majority of ESRD patients in the United States, as compared to other potential payers. However, a significant number of patients have private insurance (commonly referred to as "private-pay" patients). For example, the following chart (Figure 2) from the Congressional Research Service shows the payer make-up from 2004-15:[22]

**FIGURE 2: COMPOSITION OF U.S. DIALYSIS PAYERS, 2004 – 2015**



[21] *Id.*
[22] EveryCRSReport, *Medicare Coverage of End-Stage Renal Disease (ESRD)* (Aug. 16, 2018), https://www.everycrsreport.com/reports/R45290.html.

25

74.     Patients on private insurance plans make up around 10% of DaVita's total patient population, generate roughly 30% of DaVita's total dialysis service revenue, and generate virtually 100% of DaVita's profits on outpatient dialysis services, according to internal DaVita documents:[23]

**FIGURE 3: COMPOSITION OF DAVITA'S PAYERS**



---

[23] Fourth Amended Complaint, *U.S. v. DaVita*, 2:18-cv-05528-MRP (E.D. Pa. Nov. 8, 2023), ECF No. 61 at 77.

**FIGURE 4: COMPOSITION OF DAVITA'S PROFITS BY PAYER**



75.    Commercial insurers establish network plans for their beneficiaries where they negotiate contracts with healthcare service providers to participate. Typically, those preferred provider contracts give discounts to the beneficiaries of the plans when they use the in-network providers compared to out-of-network providers.

76.    Today, federal law provides that ESRD patients who are enrolled in group health plans have the right to choose to retain coverage through their employer-based plans for an additional 30 months after they become eligible for Medicare because of a diagnosis of ESRD.[24] The patient's existing plan, in turn, is

---

[24] Centers for Medicare & Medicaid Services, *Medicare Secondary Payer*, https://www.cms.gov/medicare/coordination-benefits-recovery/overview/secondary-payer#:~:text=The%20MSP%20provisions%20have%20protected,beneficiary%27s%20primary%20health%20insurance%20coverage (last visited May 8, 2025).

obligated to pay as the primary insurer for dialysis treatment until Medicare

becomes the primary payer. The 30-month coordination period begins, in most

cases, after a 3-month "waiting" or "qualification" period that precedes the inception

of Medicare coverage. During the 30-month coordination period, the group health

plan pays as the primary insurer and Medicare functions as the secondary payer.

77.    Medicare covers dialysis treatment for all patients for whom it is

medically necessary.[25] Therefore, Medicare's conditions for coverage are rules for all

dialysis providers, including Defendants, which treat Medicare dialysis patients.

78.    One Medicare requirement is that all dialysis facilities have a medical

director—often one or more nephrologists—who oversees the delivery and quality of

care provided at a given dialysis facility.[26] Without a medical director, a facility

cannot be a Medicare-approved provider of dialysis services. Because nephrologists

receive specialized training in ESRD, they often serve as medical directors for

dialysis facilities.

79.    Physicians are "gatekeepers" for patients. They educate patients and

advise them on their healthcare decisions, including dialysis services. Dialysis

providers and the nephrologists that serve as medical directors are thus

interdependent on one another in providing care to patients. Patients rely on

physicians to decide where to receive dialysis treatments, and physicians are in

---

[25] *See generally* Susan M. Kirchhoff, *Medicare Coverage of End-Stage Renal Disease (ESRD)*, Cong. Research Serv. (Aug. 16, 2018), https://fas.org/sgp/crs/misc/R45290.pdf (discussing Medicare coverage of dialysis treatment).
[26] 42 C.F.R. § 494.150; *see also* Centers for Medicare & Medicaid Services, *State Operations Manual*, App. H, § 405.2161, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/som107ap_h_esrd.pdf.

turn dependent on providers for large portions of their income. And patients rely on providers, such as Defendants, to administer the dialysis treatments under the mandatory auspices of a medical director for the dialysis facility.

80.    Federal law addresses the relationship between dialysis providers and their medical directors to ostensibly allow patient choice free from financial incentives. First, the Social Security Act's Patient Freedom of Choice provides that Medicare patients may obtain dialysis services from any dialysis provider qualified under the Medicare program if the dialysis provider undertakes to provide patients with dialysis services.[27] Second, the Anti-Kickback Statute's regulatory safe harbors require that the aggregate compensation paid by dialysis providers to their medical directors not be determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between parties under Medicare.[28] In theory, dialysis providers and nephrologists cannot dictate the dialysis facility a patient uses, and dialysis providers cannot financially reward patients or physicians for referrals.

81.    As discussed in detail below, the prices that Medicare pays for dialysis treatment are far lower than the prices paid by private insurance for otherwise identical services. Defendants often charge private payers six to ten times more.[29]

---

[27] *See* 42 U.S.C. § 1395a(a).
[28] *See* 42 C.F.R. § 1001.952(d)(5).
[29] David Migoya, *DaVita Steered Poor Dialysis Patients to Private Insurers to Pump Up Profits, Lawsuit Says*, Denver Post (Mar. 3, 2017), https://www.denverpost.com/2017/02/22/davita-dialysis-patients-lawsuit/; Riley J. League et al., *Variability in Prices Paid for Hemodialysis by Employer-Sponsored Insurance in the US from 2012 to 2019*, 5 JAMA e220562 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC8886517/.

Thus, Defendants stand to generate enormous profits on private-pay patients as compared to modest profits on Medicare patients.

### C.    Industry Consolidation.

82.    As noted by Rohit Chopra, former Commissioner of the FTC, "Fresenius and DaVita dominate the market, essentially as a duopoly."[30]

83.    As of December 31, 2024, there were over 7,500 dialysis centers in the United States.[31] Total revenue for kidney dialysis centers in the United States was over $28 billion in 2022, according to the St. Louis Federal Reserve.[32]

84.    The industry has consolidated rapidly over the last two decades following thousands of acquisitions by large dialysis providers, particularly Defendants. Today, dialysis is provided primarily by Defendants—multi-establishment, for-profit firms—with the share of independently owned and operated dialysis facilities falling over the past three decades from 86% to 21% (as of 2020).[33]

85.    Defendants' dominance is thus the result, in part, of their decades-long strategy of acquiring small, independent clinics in uncontested mergers, which have been referred to as "stealth" or "creeping" acquisitions. Such "stealth consolidation"

---

[30] Dissenting Statement of Comm'r Rohit Chopra, *In re Fresenius Med. Care AG & Co. KGaA & NxStage Med., Inc.*, FTC File No. 171-0227, at 2 (Feb. 19, 2019), https://www.ftc.gov/system/files/documents/public_statements/1455733/171_0227_fresenius_nxstage_chopra_statement_2-19-19.pdf ("Chopra Dissenting Statement").

[31] National Forum of ESRD Networks, *National ESRD Census Data* (Dec. 31, 2024), https://esrdnetworks.org/resources-news/national-esrd-census-data/.

[32] FRED, Fed. Rsrv. Bank of St. Louis, *Total Revenue for Kidney Dialysis Centers, All Establishments, Employer Firms (REVEF621492ALLEST)*, https://fred.stlouisfed.org/series/REVEF621492ALLEST (last visited Sept. 9, 2025).

[33] 2020 QJE Study at 222.

occurs as large firms progressively buy up smaller firms, absorbing them into their
organizations, resulting in greater industry concentration.

86.    According to a commentator, "had these deals been reviewed by
regulators, most would have been blocked on monopoly grounds: given the highly
regional nature of dialysis, where patients require a facility near their home, many
such acquisitions produced *de facto* monopolies in local markets."[34]

87.    The ultimate outcome of this extended period of consolidation is that
Defendants now own about 80% of facilities and treat 85% of patients. Together,
Defendants earn roughly 92% of industry revenue in the United States.[35] The
industry is thus considered a "duopoly,"[36] with Fresenius and DaVita controlling
49% and 43% of dialysis services by revenue, respectively.[37] Defendants both dwarf
the next-largest provider, U.S. Renal Care, which has a roughly 5% share by
number of patients served.[38]

88.    This consolidation has facilitated collusion. As shown in Figure 5,
Defendants' revenues have been remarkably consistent for years.

---

[34] Tom Mueller, *How to Make a Killing*, p. 91 (citing Prof. Thomas Wollmann).
[35] Open Markets Institute, *Dialysis Centers*,
https://concentrationcrisis.openmarketsinstitute.org/industry/dialysis-centers/ (last visited
Sep. 12, 2025).
[36] Office of Congresswoman Katie Porter, *Dying on Dialysis: Inside an Industry Putting
Profits Over Patients*, at 4,
https://web.archive.org/web/20240918194848/https://porter.house.gov/uploadedfiles/dialysis_
staff_report_final.pdf (last visited Sep. 12, 2025).
[37] Open Markets Institute, *Dialysis Centers*,
https://concentrationcrisis.openmarketsinstitute.org/industry/dialysis-centers/ (last visited
Sep. 12, 2025).
[38] Mark E. Neumann, *Fresenius Exceeds 200,000-Patient Count in* Nephrology News &
Issues *Annual Ranking*, Healio (Sept. 4, 2018),
https://www.healio.com/news/nephrology/20180822/fresenius-exceeds-200000patient-count-
in-nephrology-news-issues-annual-ranking.

**FIGURE 5: DAVITA AND FRESENIUS U.S. DIALYSIS REVENUE, 2021 –
2024**[39]



## V.    AVAILABLE EVIDENCE SUPPORTS THE INFERENCE THAT DEFENDANTS HAVE CONSPIRED IN RESTRAINT OF TRADE.

### A.    The objects of Defendants' conspiracy.

89.    As discussed in detail below, the objects and common purposes of

Defendants' agreement and concerted action have been threefold: (1) to fix and

maintain supracompetitive prices on outpatient dialysis services for private payers;

(2) to reduce the quality of outpatient dialysis services and refrain from competing

on the basis of quality; and (3) to allocate geographic markets in less densely

populated areas and refrain from entering such markets occupied by the other.

---

[39] DaVita figures for 2021-24 are based on DaVita Inc., *4th Quarter Results, Investors* (Feb.
10, 2022; Feb. 22, 2023; Feb. 13, 2024; Feb. 13, 2025), https://investors.davita.com.
Fresenius figures for 2021-24 are based on Fresenius Medical Care AG, Annual Report
(Form 20-F) (Dec. 31, 2023; Dec. 31, 2024), https://www.sec.gov.

### 1. Defendants have conspired to fix and maintain prices on outpatient dialysis services for private payers.

90.     As noted earlier, 80-90% of dialysis patients are on Medicare, and Medicare pays what is essentially a cost-plus rate that allows dialysis providers to earn a modest profit margin, albeit a much smaller margin than earned from private payers. But on the roughly 10% of dialysis patients that are private-pay, the potential profit is enormous. Accordingly, in order to squeeze as much profit from private-pay patients as possible, Defendants have agreed and acted in concert to charge private payers what is essentially the monopoly price and to maintain that supracompetitive price through all means possible.

91.     As a result of Defendants' anticompetitive agreement and overt acts in furtherance thereof, prices for private payers have steadily increased. Between 2012 and 2019, the median price paid by private insurers for dialysis rose from $1,349 to $1,655—a 22.7% increase.[40] Over the same period, the Medicare base rate for dialysis grew by only 0.3%, and the maximum adjusted Medicare payment grew by only 1.4%.[41] Independent clinics typically charge private insurers three to four times the Medicare base rate.[42] As a result of the scheme described herein, Defendants can and often do charge private insurers six to ten times the Medicare

---

[40] Riley J. League et al., *Variability in Prices Paid for Hemodialysis by Employer-Sponsored Insurance in the US from 2012 to 2019*, 5 JAMA NETWORK OPEN e220562, at 3 (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789455.
[41] *Id.*
[42] Xuyang Xia et al., *Financial Ties, Market Structure, Commercial Prices, and Medical Director Compensation in Dialysis*, 6 JAMA HEALTH FORUM e252659, at 6 & fig. 3 (2025), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2835489 ("2025 JAMA Study").

base rate.[43] Based on UFCW 1776's payment data and upon information and belief, prevailing private-pay prices are double or triple the prices that would otherwise exist absent Defendants' conspiracy.

92.     A June 18, 2025 peer-reviewed study titled "Financial Ties, Market Structure, Commercial Prices, and Medical Director Compensation in Dialysis," published by the *Journal of the American Medical Association* (the "2025 JAMA Study"), assessed the impact that increased dialysis chain ownership—namely by DaVita and Fresenius—has had on pricing.[44] There, the economists who authored the study analyzed commercial payment records between 2005 and 2019.

93.     The 2025 JAMA Study found that by 2019, DaVita and Fresenius operated 77.1% of outpatient dialysis facilities in the U.S., up from 59.1% in 2005—reflecting rapid consolidation and market dominance by these two entities.[45] Although the study reported private-pay data for the top five "large" dialysis chains on an anonymized basis, the reported results effectively reveal the pricing behavior of DaVita and Fresenius. That is because, as noted earlier, DaVita and Fresenius combined receive more than 90% of total U.S. dialysis revenues, with the third-largest chain with a market share in the single-digits.

94.     The 2025 JAMA Study analyzed private-pay prices in geographic

---

[43] David Migoya, *DaVita Steered Poor Dialysis Patients to Private Insurers to Pump Up Profits, Lawsuit Says*, Denver Post (Mar. 3, 2017), https://web.archive.org/web/20171123181423/http://www.denverpost.com/2017/02/22/davita-dialysis-patients-lawsuit/; Riley J. League et al., *Variability in Prices Paid for Hemodialysis by Employer-Sponsored Insurance in the US from 2012 to 2019*, 5 JAMA NETWORK OPEN e220562 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC8886517/.
[44] 2025 JAMA Study, at 1.
[45] *Id.* at 3.

regions (defined by Hospital Service Areas, or "HSAs") with no large dialysis chains, one large dialysis chain, two large dialysis chains, three large dialysis chains, and so on. According to the study, the average price per treatment in regions served by a single large chain increased from $1,292 in 2005 to $1,362 in 2019.[46] This reflects the Defendants' average monopoly price, as it represents pricing in the absence of competition from other major providers.

95.    By contrast, the average price per treatment in regions without a large chain such as DaVita or Fresenius decreased from $929 in 2005 to $827 in 2019.[47] Notably, these could also reflect monopoly prices in certain regions without multiple providers, albeit monopoly prices charged by smaller providers—not DaVita or Fresenius. As of 2019, commercial prices for outpatient dialysis were on average $495.08 lower per treatment for regions without a large chain compared to regions where only one large chain such as DaVita or Fresenius operated.[48]

96.    The 2025 JAMA Study further found that contrary to economic expectations, when a second large chain operated in or newly entered a market— e.g., DaVita entering a previously Fresenius-only market or vice versa—prices did not decrease. In fact, two of three regression models from the study showed slight price increases on average when two chains operated in the same HSA, while the third showed a trivial decrease of just 49 cents.[49] Each of these price differences was statistically insignificant.

---

[46] *Id.* at 5.
[47] *Id.*
[48] *Id.*
[49] *Id.* at 7.

97.    In other words, over a period of nearly 15 years, the presence or entry
of DaVita into a Fresenius region (or vice versa) had no statistically significant
impact on private-pay prices. During the same period, private-pay prices steadily
increased overall (e.g., the median price increased by 23% from 2012 to 2019).[50]

### FIGURE 6: COMMERCIAL PRICES IN ONE CHAIN VS. TWO-CHAIN MARKETS

| | Coefficient (95% CI) | | |
| | Private claim price, \$ per single dialysis session[a] | | |
| Facility characteristic | Model 1 | Model 2 | Model 3 |
| In HSA with no top 5 chain[c] | −495.08 (−618.95 to −371.21) | −399.55 (−531.33 to −267.78) | −395.77 (−527.62 to −263.92) |
| In HSA with 1 top 5 chain[d] | 0 [Reference] | 0 [Reference] | 0 [Reference] |
| In HSA with 2 top 5 chains | 31.42 (−25.51 to 88.36) | 5.38 (−51.22 to 61.99) | −0.49 (−56.50 to 55.51) |

98.    In the absence of collusion, the data reported in the 2025 JAMA Study
is contrary to basic economic principles, which predict that entry into a market by a
large, well-capitalized competitor should result in price competition and thus a
decrease in prices. Yet the study confirms that DaVita and Fresenius have not
competed on price. Rather, these two dominant dialysis providers have jointly
maintained the monopoly price.

99.    Durable prices at or near monopoly levels are inconsistent with
competition, even when a market is dominated by just two firms. Prices that remain
stable, uniform, and elevated across multiple years despite ostensible "competition"

---

[50] Riley J. League et al., *Variability in Prices Paid for Hemodialysis by Employer-Sponsored Insurance in the US from 2012 to 2019*, 5 JAMA NETWORK OPEN e220562, at 3 (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789455.

between the two largest dialysis providers strongly suggests collusion given the large profit margins associated with private-pay patients.[51] At a minimum, such results reflect Defendants' concerted action and course of conduct with the common purpose of charging and maintaining supracompetitive prices for private payers.

100. An extensive literature in economics spanning several decades has consistently modeled, both theoretically and empirically, that prices fall when competition intensifies in well-functioning markets. When prices do not change following the entry of additional providers, as is the case for outpatient dialysis clinics, the market conduct that can be inferred is either perfect competition or collusion.[52] Yet with average commercial prices approximately six times greater than marginal costs, the data for dialysis rule out perfect competition, leaving collusion as the only possible explanation for the patterns observed in the 2025 JAMA Study.

---

[51] Timothy F. Bresnahan & Peter C. Reiss, *Entry and Competition in Concentrated Markets*, 99 J. POL. ECON. 977, 978-80, 1006-08 (1991), https://www.jstor.org/stable/2937655.
[52] *See id.*

**FIGURE 7: AVERAGE DIALYSIS PRICES RELATIVE TO MARGINAL
COST**[53]



101.    Payment data from UFCW 1776 is consistent with the findings in the
2025 JAMA Study. In 2020, DaVita and Fresenius clinics in the Philadelphia area
charged nearly identical prices, with differences as small as $1 per treatment. In
2021, the price differential was as low as $3 per treatment. In 2023 and again in
2024, the differential was as low as $4 per treatment. These virtually identical
prices are notable because reimbursement rates—even average reimbursement
rates—are represented to be a closely guarded secret. As DaVita's Chief Financial
Officer explained, "you can imagine us sitting across the table from an MA
[Medicare Advantage] Plan. And just not wanting them to know what the average

---

[53] 2025 JAMA Study, at 6 & fig. 3. The dashed lines in Figure 7 represent Medicare prices,
a conservative proxy for marginal costs as Defendants profit from Medicare patients.

rate is. So we're not going to comment on it."[54] And as the 2025 JAMA Study suggests, Defendants' average reimbursement rates across the country are also highly similar.[55]

102.    Moreover, Defendants have coordinated their price increases, as confirmed by the UFCW 1776 data cited above and the 2025 JAMA Study. The justifications offered by Defendants—that their price increases were due primarily to individual negotiations with private parties and to offset losses associated with treating Medicare patients[56]—are pretextual and do not account for the significant increases in price prior to and continuing throughout the Class Period. Indeed, even the earlier prices represented the highest markups over Medicare prices in the entire healthcare industry,[57] earning Defendants monopoly profits. Defendants' increased prices, which are at least twice the competitive rate, are not the product of natural market forces.

103.    Upon information and belief, across the United States, Defendants charge virtually the same price in comparable geographic regions and increase their rates around the same—a clear signal of price coordination. As noted above, UFCW 1776's payment data shows that Defendants have priced within a few dollars of one

---

[54] Joel Ackerman, Chief Fin. Officer, DaVita Inc., *Q4 2020 Earnings Call* (Feb. 11, 2021), https://earningscall.biz/e/nyse/s/dva/y/2020/q/q4.
[55] 2025 JAMA Study, at 6 & fig. 3.
[56] Complaint, *Fresenius Medical Care Orange County, LLC et al. v. Xavier Becerra et al.*, 8:19-cv-02130 (C.D. Cal. Nov 05, 2019), ECF No. 1 at 25-26.
[57] 2025 JAMA Study at 8 ("The limited choices for patients and payers in these markets, even when set against the highly concentrated insurance industry, allows chains such as **DaVita and Fresenius to command the highest markups over Medicare of all health care sectors**.") (emphasis added).

another per treatment in the Philadelphia area since 2020. The same data also shows that Defendants' pricing was supracompetitive: since 2020, UFCW 1776 paid nearly twice the amount per treatment to Defendants as it paid to non-Defendant providers.

104.    Consistently, the 2025 JAMA Study showed that the average prices charged by Defendants—whether operating in regions alone or together—are virtually indistinguishable. Such alignment is implausible in a genuinely competitive market with independent price negotiations. The 2025 JAMA Study likewise showed that Defendants' prices were supracompetitive: the average price charged by Defendants was roughly 60% higher than the average price charged by non-Defendant providers in regions without large chains, and six or more times higher than the average price paid by Medicare.

105.    Further indicative of collusion is the fact that, since at least 2010, DaVita has published financial information in its annual reports that enables calculation of revenue per treatment for private payers. With simple arithmetic, researchers determined that DaVita's "commercial revenues averaged $148[,]722 per patient-year or $1[,]041 per treatment."[58]

106.    In the absence of an agreement or understanding with its largest "competitor," it is difficult to explain DaVita's decision to publish sensitive per-payer revenue information. Indeed, per-payer prices are often considered trade

---

[58] Christopher P. Childers et al., *A Comparison of Payments to a For-Profit Dialysis Firm from Government and Commercial Insurers*, 179 JAMA INTERNAL MED. 1136 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6515566.

secrets as this information could inform a competitor's pricing.[59] For example, Fresenius could lower its price in response to these disclosures to capture additional customers. Other than serving as a price-signaling device to its co-conspirator Fresenius, DaVita's publication of this information makes little sense. Indeed, the practice of cartels signaling intentions through earnings calls and other public disclosures is extensively documented.[60]

107. Finally, Defendants' pricing behavior as revealed in the 2025 JAMA Study and elsewhere is starkly at odds with standard economic models of duopolies. Economists have long relied on three standard frameworks to understand pricing in two-firm markets: the Cournot, Bertrand, and Stackelberg models.[61] Each predicts different competitive outcomes but none of them can explain Defendants' conduct. Their conduct is consistent only with collusion.

108. ***Cournot model***. In non-cooperative oligopolies, firms compete to capture market share.[62] One way to do this is by increasing the number of goods sold.[63] Under the Cournot model—the most popular model of oligopoly and non-

---

[59] Katherine L. Gudiksen et al., *The Secret of Health Care Prices: Why Transparency Is in the Public Interest*, Cal. Health Care Found., at 3 (July 2019), https://www.chcf.org/wp-content/uploads/2019/06/SecretHealthCarePrices.pdf ("Many health care providers and payers seek to maintain the confidentiality of these paid amounts as trade secrets, claiming their secrecy provides a competitive advantage.").

[60] *See generally* Gaurab Aryal et al., *Coordinated Capacity Reductions and Public Communication in the Airline Industry*, 89 REV. ECON. STUD. 3055 (2022), https://academic.oup.com/restud/article-abstract/89/6/3055/6486432.

[61] *See* Patrick M. Emerson, *Models of Oligopoly: Cournot, Bertrand, and Stackelberg*, Intermediate Microeconomics ch. 18 (2019), https://open.oregonstate.education/intermediatemicroeconomics/chapter/module-18.

[62] Daniel Liberto, *What Is the Cournot Competition Economic Model?*, Investopedia, https://www.investopedia.com/terms/c/cournot-competition.asp (last visited Sept. 11, 2025).

[63] *Id.*

cooperative game theory[64]—firms compete by choosing how much to produce.[65] Market price is then set by total supply: the more output in the market, the lower the price.[66]

109.    Each firm faces a trade-off. Producing more means selling a larger quantity, but because the market price falls when total output increases, producing more can also reduce the revenue earned per unit. The equilibrium is reached when each firm produces the output that maximizes its profit given its rival's decision.[67]

110.    Cournot predicts the equilibrium will settle on a price that is above perfect competition but below the monopoly price.[68]

111.    If Defendants behaved like Cournot competitors, each would have a strong incentive to expand capacity and treat more patients, even though the equilibrium price would fall below monopoly levels. Defendants' observed conduct—charging sustained monopoly prices with sustained market shares that are nearly identical—is thus incompatible with the Cournot model.

112.    ***Bertrand model***. Another way for non-cooperating duopolists to capture additional market share is through lowering price. The Bertrand model

---

[64] Karl Aiginger, *Confronting the Implications of the Cournot Model with Industry and Firm Data*, 8 SMALL BUS. ECON. 365, at Abstract (1996), https://link.springer.com/article/10.1007/BF00389554.

[65] Simone Schotte, *Cournot Competition*, INOMICS, https://inomics.com/terms/cournot-competition-1525473 (last visited Sept. 11, 2025).

[66] *Id.*

[67] Xavier Vives, *Cournot and the Oligopoly Problem*, 33 EUR. ECON. REV. 503, 503 (1989), https://blog.iese.edu/xvives/files/2011/09/75.pdf.

[68] Github, *Cournot Competition*, Data 88: Economic Models Textbook, https://ds-connectors.github.io/econ-models-textbook/content/07-game-theory/cournot.html (last visited Sept. 11, 2025).

analyzes duopolies where firms set prices instead of quantities.[69] With identical products, each firm has an incentive to undercut the other to capture additional market share. Imagine two firms selling the same good, such as gasoline at two stations across the street from one another.[70] Because customers view the product as identical, they naturally buy from whichever firm offers the lower price. Each firm, therefore, has a strong incentive to undercut its rival by just a small amount to capture additional market share. But once one firm cuts, the other responds by cutting further, and this cycle continues until the price falls all the way down to the marginal cost of production, i.e., the minimum a firm can charge without losing money.[71]

113.    This outcome is what economists call the Bertrand equilibrium.[72] The equilibrium occurs when both firms set their prices equal to marginal cost, because at that point no firm can profit by changing its price alone.[73] If one firm were to raise its price, it would lose customers to the competitor; if it were to lower its price, it would be selling below cost and losing money. Thus, both firms settle on charging just enough to cover costs, and the market ends up looking as if it were perfectly competitive, even though only two firms are present.[74]

---

[69] Patrick M. Emerson, *Models of Oligopoly: Cournot, Bertrand, and Stackelberg*, Intermediate Microeconomics ch. 18 (2019), https://open.oregonstate.education/intermediatemicroeconomics/chapter/module-18.
[70] *Id.*
[71] Mirjam Sarah Salish, *Bertrand Competition*, INOMICS, https://inomics.com/terms/bertrand-competition-1504578 (last visited Sept. 11, 2025).
[72] *Id.*
[73] *Id.*
[74] *Id.*

114.    Defendants sell what is essentially an identical, commoditized service—at least as it is delivered by Defendants in the United States. The Bertrand model is therefore particularly informative. If Defendants behaved like Bertrand competitors, they would undercut one another's private-payer prices until markups were eliminated. Their conduct—sustained monopoly prices and no attempt to lower prices to capture additional market share—is thus flatly inconsistent with Bertrand.

115.    Indeed, it is apparent that Defendants have made no effort to capture market share (in the form of existing patients) at the expense of the other, through pricing strategies, quality differentiation, or otherwise. They have only attempted to gain market share at the expense of smaller competitors, and they have done so through clinic acquisitions and by erecting barriers to entry in the form of exclusive medical director and joint venture arrangements with nephrologists. Smaller providers that do not earn Defendants' monopoly profits on private payers cannot compete. As the 2025 JAMA Study found, Fresenius and DaVita pay the highest medical director compensation per patient—on average 15-20% higher than smaller chains and up to 25% higher than independents, with differences much greater than that in certain markets.[75]

116.    ***Stackelberg model***. Like the Cournot model, Stackelberg market participants attempt to gain market share by increasing quantity. The key difference with Cournot is that, under the Stackelberg model, firms do not choose

---

[75] JAMA Study, Supplement 1, at eTable 7.

output simultaneously, but instead move in sequence: a leader firm commits to its

production first, and then the follower firm selects its output in response.[76] Because

the follower observes the leader's decision, it reacts optimally to that choice, while

the leader anticipates this response when setting its own quantity. This dynamic

gives the leader a first-mover advantage, allowing it to capture a larger share of the

market and earn higher profits than the follower. At equilibrium, total industry

output is greater than in the Cournot model—where firms move simultaneously—

but still less than under perfect competition. As a result, the Stackelberg

equilibrium price falls below the Cournot price but remains above marginal cost.

117. ***Collusion***. Economists use the term collusion to describe situations

where rival firms coordinate their behavior instead of competing independently.

Collusion can take the form of an explicit cartel agreement, or it can result from an

implied agreement based on a course of dealing. In either case, the effect is the

same: firms agree not to undercut one another. Rather than chasing market share

through lower prices or greater output, each firm holds back, mimicking what a

single monopolist would do.

118. Under a collusion model, firms in a duopoly collectively act as a single

monopoly.[77] Each produces half of the monopoly quantity and charges the same

monopoly price.[78]

---

[76] Simone Schotte, *Stackelberg Competition*, INOMICS,
https://inomics.com/terms/stackelberg-competition-1526239 (last visited Sept. 5, 2025).
[77] Lumen, *The Collusion Model*, Lumen Learning, https://courses.lumenlearning.com/suny-microeconomics/chapter/the-collusion-model/ (last visited Sept. 5, 2025).
[78] *Id.*

119.    The collusion model describes precisely Defendants' conduct. As indicated in the 2025 JAMA Article and in other sources, Defendants charge roughly the same average monopoly price in markets where they operate alone and even in markets where they ostensibly compete with each other. *See* Figure 7 (above). Further, Defendants' quantities—as evidenced by market share—are very similar, with each Defendant earning more than 40% of market revenue and each operating nearly the same numbers of clinics. *See* Figure 8.

**FIGURE 8: UNITED STATES DIALYSIS CLINICS, 2018 – 2024**[79]



120.    In competitive models such as Cournot or Bertrand, firms acting in their independent self-interests push prices below monopoly levels—sometimes close to cost. By contrast, under collusion, firms either restrict output or maintain supracompetitive prices (or both), sustaining profit margins far higher than would

---

[79] This Figure likely substantially understates the percentage of clinics controlled by Defendants because the underlying data may not identify a clinic co-owned through a joint venture as a Defendant clinic.

be possible under genuine competition.

121.    Collusion is therefore the framework that best explains why two dominant dialysis providers—who together control nearly the entire market—consistently charge the highest markups over Medicare of any sector in healthcare. Rather than behaving like Cournot or Stackelberg competitors, who would expand capacity and drive prices down, or Bertrand competitors, who would undercut one another's prices, Defendants' sustained monopoly-level pricing is inconsistent with competition and consistent only with coordinated, collusive behavior.

### 2.    Defendants have conspired to reduce the quality of dialysis services and to not compete on quality.

122.    Because ESRD is a life-threatening condition absent routine dialysis treatment, and many vulnerable patients also have significant comorbidities, the quality of care in the outpatient dialysis setting is paramount and potentially serves as a key differentiator among competing providers.

123.    In markets where firms are not coordinating, standard economic theory predicts that firms will compete not only on price but also on quality of service.[80] However, as Defendants have acquired control over an ever-larger share of the market on the way to their current duopoly, they have engaged in the same, systematic efforts to maximize profit by cutting costs in areas essential to providing high quality of care.[81] They have thus not only reduced quality in a coordinated

---

[80] 2020 QJE Study at 255 ("In regulated markets, standard models of competition (e.g., Gaynor (2004) and the models discussed therein) with endogenous provider quality predict that quality will increase with the extent of competition in the market.").
[81] *Id.* at 260-61.

manner but also refrained from taking steps to differentiate themselves on quality as a competitive strategy.

124.    Upon acquiring an entity, thereby removing a competitor, Defendants imbue their operational strategies onto that acquired clinic with a focus on increasing the amount of money collected for dialysis treatments while reducing the quality of care. Facilities acquired by Defendants change their behavior in three broad ways, each of which either increases their revenue or decreases their operating costs (or both).

125.    First, prior to 2011,[82] facilities acquired by Defendants increased per-session Medicare reimbursements by raising drug dosages and substituting higher-priced drugs.[83] Second, such facilities "stretch their resources by treating more patients relative to the number of staff and stations at the facility."[84] Finally, such facilities reduce their costs "by replacing high-skill nurses with lower-skill technicians."[85]

126.    Defendants have routinely implemented the same, one-size-fits-all approach to dialysis that emphasizes getting patients in and out quickly. According to an analysis by Duke economist, Ryan McDevitt, quality scores across DaVita and

---

[82] In 2011, Medicare began bundling payments for certain drugs with dialysis services, thereby reducing providers' incentives to prescribe unnecessary medications. *See generally* Paul J. Eliason et al., *The Effect of Bundled Payments on Provider Behavior and Patient Outcomes: Evidence from the Dialysis Industry* (Feb. 2022), https://people.duke.edu/~rcm26/DialysisBundle.pdf.
[83] 2020 QJE Study at 260-61.
[84] *Id.*
[85] *Id.*

Fresenius facilities are statistically similar—and consistently poor.[86] This analysis found that neither firm outperforms the other in clinical metrics or patient outcomes.[87]

127.    A 2020 study published in the Quarterly Journal of Economics (the "2020 QJE Study") concluded that, following acquisitions by DaVita or Fresenius, "[a]long almost every dimension we measure, patients fare worse at the target facility after acquisition, most prominently in terms of fewer kidney transplants, more hospitalizations, and lower survival rates."[88] Meanwhile, profit margins increase substantially, as clinics assign more patients to each machine and staff member while increasing administration of drugs and procedures with high reimbursement rates.[89]

128.    The 2020 QJE Study and analysis by Prof. McDevitt further found that: (1) in markets where both DaVita and Fresenius are present, there is no observable improvement in quality outcomes compared to single-chain markets;[90] (2) this lack of differentiation suggests that the presence of both firms in a given market does not lead to quality-based competition;[91] and (3) there exists a single,

---

[86] Ryan McDevitt, *Quality of Care at Private Equity Providers: Some Past Results & Some Open Questions* (PowerPoint presentation, 2024 Annual Health Law Symposium), https://www.iahanet.org/events/EventDetails.aspx?id=1905951.
[87] *Id.*
[88] 2020 QJE Study at 261.
[89] *Id.* at 260-61.
[90] *Id.* 251-53.
[91] *Id.* at 255.

low national standard of quality, maintained across facilities and markets.[92]

129.    These findings are contrary to standard economic theory, which predicts that in the absence of collusion, firms will compete on service quality even when price competition is constrained.[93] Instead, these findings provide strong evidence that DaVita and Fresenius both keep their quality-of-care low, suggesting they are deliberately choosing not to compete with each other despite the economic incentives to do so—further supporting the inference of collusion.

130.    Given that Defendants control roughly 80% of outpatient dialysis clinics nationwide, and they choose not to compete on quality measures, Defendants are responsible for setting the single, low national standard of quality. Multiple independent investigations have confirmed that DaVita and Fresenius maintain alarmingly low-quality standards that jeopardize patient safety. A recent CBS News report revealed that since 2013, the two dialysis giants have collectively amassed nearly 80,000 citations for failing to meet federal performance standards—split roughly evenly between the two companies.[94]

---

[92] *Id.* at 231, 261; Ryan McDevitt, *Quality of Care at Private Equity Providers: Some Past Results & Some Open Questions* (PowerPoint presentation, 2024 Annual Health Law Symposium), https://www.iahanet.org/events/EventDetails.aspx?id=1905951.
[93] 2020 QJE Study at 224.
[94] CBS Sunday Morning, *Kidney Dialysis Industry Accused of Maximizing Profits Over Patients*, YouTube (June 22, 2025), https://www.youtube.com/watch?v=ioJ0xb3w8nY.

**FIGURE 9: DAVITA AND FRESENIUS DEFICIENCIES SINCE 2013**



131.    The 2020 QJE Study corroborates that Defendants are jointly

responsible for the decrease in quality. As shown in Figure 10, across nearly every

material metric, patient quality gets worse once DaVita or Fresenius acquire a

clinic.[95]

---

[95] More Perfect Union, *A CEO Wanted to Run Healthcare Like Taco Bell. Here's How His Patients Are Doing*, YouTube (July 18, 2025), https://www.youtube.com/watch?v=08eVXNsta4M.

**FIGURE 10: PATIENT QUALITY METRICS BEFORE AND AFTER
ACQUISITION**



132. DaVita's former CEO, Kent Thiry, has said DaVita's business is "not
about the patients."[96] DaVita's focus is on profit. Thiry has equated Defendants'
provision of life-saving dialysis treatment with fast food sales: "If I had 1,400 Taco
Bells and 32,000 people who worked in them, I would be doing all the same stuff."[97]
Thiry continued leading DaVita for another decade following this coldhearted
analogy reflecting DaVita's approach to patient care, which mimics that of
Fresenius.

133. Critically, due to Defendants' similar operational approaches, patients

---

[96] Tom Mueller, *How to Make a Killing*, p. 26; Katherine Ellen Foley, *John Oliver Ripped
into a CEO Who Proudly Compared His Healthcare Business to Taco Bell*, Quartz (May 15,
2017), https://qz.com/983716/john-oliver-rips-into-fresenius-fms-and-davita-dva-whose-ceo-
proudly-compared-kidney-dialysis-to-taco-bell-yum.
[97] Tom Mueller, *How to Make a Killing*, p. 27.

at Defendants' clinics are less likely to receive a kidney transplant than patients at

independent clinics.[98] Following a successful kidney transplant, patients no longer

need regular dialysis treatment. Defendants are thus financially motivated to keep

patients on dialysis and discourage them from receiving (or otherwise not encourage

them to receive) a transplant.[99] Indeed, there is evidence that Defendants' workers

"actively discourage patients from obtaining transplants" and "bump patients off

the list as a form of reprisal," further reflecting a corporate culture of non-

competition on patient outcomes.[100]

134.    Consider one illustrative example:

> DaVita concluded the acquisition of Gambro in 2005, and took over the
> management of [Dr. Leonard] Stern's facility. The results Stern says he
> witnessed should by now be familiar: fewer skilled [Registered Nurses], more
> low-wage techs, more patients per caregiver. Workloads grew overwhelming,
> employee turnover rampant. The firm's efforts, Stern says, seemed directed
> more at recruiting new staff than caring for patients; he sometimes didn't
> recognize any of the workers who were treating his patients, because they had
> all been hired since his last visit to the clinic. To increase profits, DaVita
> managers instituted four shifts of dialysis per day, with strict thirty-minute
> transition periods between shifts—hardly enough time to get one group of
> patients off their machines and stabilized, sterilize the dialysis station,
> cannulate the next shift of patients, and resume dialyzing.[101]

135.    It is therefore unsurprising that, compared to patients in other

developed countries, dialysis patients in the United States have higher mortality

rates.[102] Defendants' cost-cutting and profit-boosting strategies are at least partially

to blame, and the results are grim. The mortality rate measures the percentage of

---

[98] 2020 QJE Study at 261.
[99] Tom Mueller, *How to Make a Killing*, p. 123.
[100] Tom Mueller, *How to Make a Killing*, p. 123.
[101] Tom Mueller, *How to Make a Killing*, p. 100.
[102] Chopra Dissenting Statement at 2.

dialysis patients that die each year. In Japan, the mortality rate is 5-6%. In Western Europe, the figure is around 10%. In the United States, 22% of dialysis patients die each year—the highest mortality rate in the developed world.[103]

136.    Also reflective of Defendants' non-competition on quality is the fact that innovation in dialysis treatment in the United States has been effectively stagnant for decades. This is so despite the fact that the United States is the most financially lucrative dialysis market in the world, and notwithstanding the critical nature of the service and the availability of new technologies worldwide.

137.    Extensive research has found that the U.S. dialysis market has lagged behind international peers in key metrics, including the adoption of home dialysis[104] and survival rate.[105] By contrast, countries with more diversified provider markets—such as Australia, New Zealand, Japan, and certain EU nations—have seen meaningful innovation in care delivery.[106]

---

[103] Tom Mueller, *How to Make a Killing*, p. 11; Alan R. Hull*, Dialysis-Related Mortality in the United States*, 61 CLEV. CLIN. J. MED. 393, 393 (1994), https://www.ccjm.org/content/ccjom/61/5/393.full.pdf ("In the United States, the gross mortality rate for patients undergoing dialysis in 1992 was 23.6% per year, higher than in any other industrialized country."); The Kidney Project, Statistics, Univ. of Cal. S.F., https://pharm.ucsf.edu/kidney/need/statistics (last visited Sept. 11, 2025).
[104] Chopra Dissenting Statement at 2 ("In the U.S., uptake of in-home hemodialysis usage lags behind other developed countries, making up just a tiny percentage of the total hemodialysis population: out of the almost half a million hemodialysis patients in the U.S., less than two percent are performed in-home.").
[105] Mueller, *How to Make a Killing*, p. 11 ("The survival rate in the United States, where around 22 percent of patients die every year, is the lowest in the industrialized world") (quoting Dr. Leonard Stern).
[106] *See, e.g.*, Carl M. Kjellstrand et al.*, Differences in Dialysis Practice Are the Main Reasons for the High Mortality Rate in the United States Compared to Japan*, 7 HEMODIAL. INT'L 26, at Abstract (2003), https://www.researchgate.net/publication/24310231_Differences_in_Dialysis_Practice_Are_the_Main_Reasons_for_the_High_Mortality_Rate_in_the_United_States_Compared_to_Japan.

138.    In a non-collusive duopoly, if price competition is limited, firms are expected to turn to innovation as a competitive lever, offering improved modalities, patient experience, or operational efficiency.[107] Despite DaVita and Fresenius's dominant market positions and strong cash flows, which has not occurred in the U.S.

139.    Defendants' collusion has resulted in suppressed innovation.[108] In a dissenting statement opposing the FTC's approval of Fresenius's acquisition of dialysis device maker NxStage Medical, former Commissioner Rohit Chopra warned that Fresenius and DaVita operate as a *de facto* duopoly—strangling competition and squelching innovation. As Chopra put it, "new ideas and new firms that disrupt their dominance may never see the light of day."[109] With virtually no competition, the dialysis industry remains stagnant, with innovation suffering as a direct result.

140.    Take one innovation: in-home dialysis. In-home dialysis in the United States lags behind other developed countries, making up a small percentage of the total dialysis population. As of 2019, of the over half a million dialysis patients in the United States, less than two percent received treatment in-home.[110] Many developed countries have much higher rates of in-home dialysis.[111] For example, in

---

[107] 2020 QJE Study at 224.
[108] Eugene Lin, Ge Bai & Erin Trish, *How Regulatory Failures Have Crippled Dialysis Care*, Health Affs. Forefront (Apr. 9, 2025), https://schaeffer.usc.edu/research/how-regulatory-failures-have-crippled-dialysis-care ("Dialysis in the US has become an ossified industry, experiencing little innovation over the past three decades, with in-center, brick-and-mortar hemodialysis the mainstay of treatment.").
[109] Chopra Dissenting Statement at 1.
[110] *Id.* at 2.
[111] *Id.*

New Zealand, almost one in five dialysis patients received treatment in-home as of 2019—ten times the rate in the United States.[112]

141.    In-home dialysis would be beneficial for a larger portion of the patient population in the United States, too. Clinical evidence suggests that in-home dialysis has benefits over in-clinic dialysis and is an effective treatment for many eligible patients. For example, in-home dialysis can often be completed during sleep, giving patients more opportunity to find full-time employment to support themselves and their families and live a more engaged life.[113] Additionally, a longer dialysis session (i.e., eight hours while a patient sleeps) is correlated with better health outcomes. In contrast, outpatient dialysis treatment at Defendants' facilities is limited to 3-4 hours. Further, Defendants have an incentive to cap treatment length—despite the benefits of longer treatment times—as it allows Defendants to boost revenue by getting more patients through the door.

### 3.    Defendants have conspired to divide and allocate less densely populated markets among each other.

142.    Publicly available data from CMS reveals that in approximately 77% of cities where DaVita or Fresenius operate, they do so without direct competition from the other. Of 2,990 U.S. cities with a DaVita or Fresenius facility, only 674 (23%) have both. As shown in Figure 11, DaVita and Fresenius largely avoid each other's territories.

---

[112] *Id.*

[113] *Id.*

**FIGURE 11: U.S. CITIES WITH AND WITHOUT COMPETITION BETWEEN
DAVITA AND FRESENIUS**



143.    An analysis of the geographic locations where both DaVita and

Fresenius operate—and of where only one or the other does—reveals a clear

pattern. DaVita and Fresenius tend to both operate only in densely populated

metropolitan areas with larger numbers of private-pay dialysis patients. In less

densely populated areas with smaller numbers of private-pay patients (though not

exclusively in such areas), Defendants largely cede territories to one another,

making no effort at entry and competition once one of them gains a foothold by

opening a clinic or acquiring an existing one.

144.    As a consequence of the latter practice, extended sections of states between large metropolitan areas are dominated by either DaVita or Fresenius, with the other having either few or no clinics in these areas. Often, there are a series of adjacent clinics alongside interstate highways over stretches that are several hundred miles long that belong exclusively to either DaVita or Fresenius. This pattern repeats itself across the United States.

145.    Figures 12 through 20, below—compiled using CMS data on clinic ownership overlaid on Google Maps—provide several compelling examples of this pattern. Appendix A provides additional examples. In these figures, Fresenius facilities are reflected in purple, DaVita facilities in red, and non-Defendant facilities (independents and smaller chains) in dark grey.

**FIGURE 12: JACKSON, MS TO SHREVEPORT, LA**

**FIGURE 13: CLEVELAND, OH TO BUFFALO, NY**



**FIGURE 14: NORTHERN NEW HAMPSHIRE/SOUTHERN MAINE**



**FIGURE 15: SACRAMENTO, CA AREA**



**FIGURE 16: MOBILE, AL REGION**



## FIGURE 17: WILMINGTON, NC REGION



**FIGURE 18: RALEIGH, NC TO FAYETVILLE, NC**



**FIGURE 19: ROCKFORD, IL REGION**



**FIGURE 20: WACO, TX REGION**



146.    This practice of ceding entire regions to each other runs counter to

Defendants' individual economic interests absent a conspiracy. If both Defendants
entered these markets, they would have the opportunity to compete for and win
existing and new patients, including high-margin private-pay patients. And even if
some areas are too small to support more than one clinic, that does not explain
Defendants' pattern of ceding multiple adjacent regions and entire interstate
corridors to one another.

147.    Defendants' behavior also runs counter to fundamental economic
theory, which holds that in the absence of collusion, competing firms in a duopoly
will tend to locate near one another geographically to maximize their access to
market share. This principle—rooted in Hotelling's model of spatial competition—
predicts that duopolists will place their facilities in close proximity in order to
compete for the same customers, driving prices toward competitive levels.[114]

148.    A foundational concept in spatial economics, Hotelling's Law
demonstrates that when two or more firms compete in a market, the equilibrium
outcome is for the firms to locate at the center of the market—side by side—so as
not to cede any part of their territory to their rival. This model reflects a broader
principle: firms that are genuinely competing will position themselves to maximize
overlap with one another's customer base. Hotelling's Law, widely taught in
antitrust economics, has been confirmed and extended in numerous studies. This
pattern of direct location-competition has been observed in industries like retail
banks, fast food chains, hotels, drug stores, car dealerships, and gas stations—

---

[114] Harold Hotelling, *Stability in Competition*, 39 ECON. J. 41, 41-57 (1929).

where rivals often open locations close together to compete for the same customers.

149.    Contrary to economic theory, DaVita and Fresenius routinely choose not to co-locate their clinics outside of major metro areas, even in geographically adjacent markets where demand supports multiple providers. In market after market, Defendants display a pattern of strategic non-entry: where one firm enters first, the other refrains from establishing a presence, even when such entry would be economically rational under competitive conditions.

150.    This widespread geographic avoidance aligns with coordinated market division, as acknowledged by industry experts. According to a professor of economics at Duke University who has extensively researched the dialysis industry, Defendants are "not really competing for patients, as far as we can tell: they just **carve up these markets** and live a happy life. For many patients, life is less happy."[115]

151.    Former employees of Fresenius and DaVita have confirmed these practices. According to a former Fresenius employee, who had experience in a business development role, "When I was out looking for new Fresenius sites, I'd be told, 'Stay away from that area, that's DaVita territory.'" According to a former DaVita employee, who previously worked in its Mergers and Acquisitions Department, he had the impression that "where Fresenius market share was pretty high, we didn't push hard in that area." The former DaVita employee further observed that Fresenius appeared to reciprocate, stating "And where our market

---

[115] Tom Mueller, *How to Make a Killing*, p. 120 (quoting Prof. Ryan McDevitt) (emphasis added).

share was very high, Fresenius wouldn't push in either." The statements of former DaVita and Fresenius employees thus demonstrates that both Defendants avoided each other's turf and effectively ceded territories to their only major competitor.

152.    Such regional division is inconsistent with the behavior expected in a competitive market, where firms ordinarily seek to expand into rivals' territories to increase market share. Instead, DaVita and Fresenius's conduct reflects a mutual understanding to avoid competition and allow the other to grow and entrench its dominance in certain regions. In other words, DaVita and Fresenius's conduct aligns with what a former Fresenius employee described as a "gentleman's agreement."

153.    Defendants' course of dealing in allocating and ceding certain geographic markets to one of them only makes sense in the context of their broader conspiracy to increase and maintain supracompetitive prices on private-pay dialysis patients. If one of them is able to capture most or all of private-pay patients in less densely populated areas, and to charge monopoly prices for those patients' treatment, the other Defendant also ultimately benefits in areas that it controls by being able to charge essentially the same monopoly prices without the risk of competitive discipline.

154.    Part of Defendants' market allocation also involves avoiding solicitation of existing patients of the other. DaVita and Fresenius actively compete for patients treated by other dialysis providers, yet they refrain from targeting each other's. In *United States ex rel. Riddick v. DaVita Inc. et al.*, the whistleblower

complaint alleged that, "[a]t some point, Caryn McFee (DaVita Regional Operating Manager for the Tidewater area) notified Care Coordinators and other members of the CKCC team to stop calling non-DaVita patients, in particular Fresenius patients. Fresenius Medical Care sent DaVita a cease-and-desist letter regarding the solicitation of its patients.[116] Since then, Care Coordinators no longer knowingly recruit Fresenius patients, but continue to recruit non-DaVita patients receiving treatment at Veterans Health Administration facilities or Renal Advantage Inc. facilities."[117] This conduct aligns with the observation of the aforementioned Duke economist that DaVita and Fresenius are "not really competing for patients."[118]

## B. Defendants incentivize, reward, and coordinate with each other in furtherance of their conspiracy.

155.    Myriad circumstantial evidence supports the existence of an agreement or conspiracy among Defendants, or at a minimum a concerted course of dealing with the common purpose of advancing the mutual objectives described above.

### 1. Defendants repeatedly transact with each other in ways and on terms that indicate agreement to maintain prices.

#### i. Sales of equipment, parts, and supplies.

156.    Fresenius is vertically integrated and operates in the entire dialysis distribution chain, from manufacturing dialysis machines to operating thousands of

---

[116] It is not clear what basis Fresenius would have for such a cease-and-desist letter.
[117] Complaint, *United States ex rel. Riddick v. DaVita Inc. et al.*, No. 1:23-cv-06290, ECF No. 1 at 35 (N.D. Ill. Aug. 28, 2023).
[118] Tom Mueller, *How to Make a Killing*, p. 120 (quoting Prof. Ryan McDevitt).

outpatient dialysis clinics.[119] DaVita, on the other hand, focuses primarily on dialysis services, also operating thousands of outpatient dialysis clinics. For each, the only real competitive threat in outpatient dialysis services comes from the other. Indeed, Defendants now control 92% of the outpatient dialysis market by revenue, with all other providers collectively making up just 8%.[120]

157.    Providing outpatient dialysis services requires using various costly equipment and supplies, such as dialysis machines, dialyzers, and ancillary supporting products. For 2024, manufacturers in the dialysis machine market generated revenues from direct sales of over $800 million in the United States alone.[121]

158.    Dialysis machines are a critical input for dialysis facilities. Fresenius is a key supplier in that market—it is the largest manufacturer and distributor of dialysis equipment and supplies for outpatient clinics in the U.S. It controls over 50% of the market for dialysis machines: for 2024, Fresenius accounted for 57% of the revenues generated from direct sales of dialysis machines in the United States, as depicted in Figure 21 below.

---

[119] Fresenius, *Strategy*, https://freseniusmedicalcare.com/en/about-us/strategy/ (last visited Sep. 12, 2025).
[120] Open Markets Institute, *Dialysis Centers*, https://concentrationcrisis.openmarketsinstitute.org/industry/dialysis-centers/ (last visited Sep. 12, 2025).
[121] GlobalData United States Dialysis Machines Market Share.

**FIGURE 21: DIALYSIS MACHINES, U.S. MARKET SHARE**



159.    The most common form of treatment is hemodialysis, the machines for which accounted for over $714 million of the United States dialysis machines revenue; peritoneal machines accounted for the remaining $86 million.[122] For hemodialysis machines, too, Fresenius takes the lion's share of revenues. For 2024, Fresenius accounted for 54% of the revenues generated from direct sales of hemodialysis machines in the United States, as depicted in Figure 22 below.[123]

---

[122] GlobalData United States Dialysis Machine Market Share 2024.
[123] GlobalData United States Dialysis Machine Market Share 2024.

**FIGURE 22: HEMODIALYSIS MACHINES, U.S. MARKET SHARE**



160.    The next largest manufacturer of hemodialysis machines—and Fresenius's largest competitor—is Baxter International, which accounted for just 10% of revenues generated from direct sales for 2024 in the United States.[124]

161.    Global figures for hemodialysis machines are similar. According to Fresenius's 2024 Annual Report, hemodialysis machines are a "key component of our product business. Here, too, we are the market leader. Of the estimated 100,000 machines installed in 2024 (2023: 97.000), around 51,000, or around 50% (2023:

---

[124] GlobalData United States Dialysis Machines Market Share 2024.

49,000 or around 50%), were produced by us."[125]

162.    Fresenius dwarfs the remaining manufacturers of dialysis machinery, which include B. Braun Melsungen, Nipro, Nikkiso, and Outset Medical.[126] Prior to Fresenius acquiring it, NxStage described competition in machinery manufacturing as being pinned against "other dialysis equipment manufacturers with much greater financial resources and established products and customer relationships, which may make it difficult for us to penetrate the market and achieve significant sales of our products."[127]

163.    Fresenius jealously guards its market share for machinery. According to Fresenius's former CEO Ben Lipps, "we are very protective of our market share in the machine area which is . . . at an all-time high in North America."[128] Aside from Fresenius and Baxter (10%), each other manufacturer accounts for only low single-digit percentages of the hemodialysis machinery market share in the United States.[129]

164.    Success for would-be entrants in machinery depends largely on being

---

[125] Fresenius Medical Care, *2024 Annual Report*, at 31, https://freseniusmedicalcare.com/content/dam/fresenius-medical-care/global/en/04_media/pdf/publications/2024/FME_Annual_Report_2024_EN.pdf (last visited Sept. 5, 2025), at 31.

[126] GlobalData United States Dialysis Machines Market Share 2024.

[127] NxStage Med., Inc., *Annual Report (Form 10-K)*, at 33 (Mar. 15, 2011), https://www.sec.gov/Archives/edgar/data/1333170/000095012311015749/b84122e10vk.htm.

[128] Fresenius, *Q4 2008 Earnings Call Transcript*, Seeking Alpha, https://seekingalpha.com/article/123678-fresenius-medical-care-q4-2008-earnings-call-transcript (last visited Sept. 12, 2025).

[129] GlobalData United States Dialysis Machines Market Share 2024; Dialysis Machines Market Share in the U.S.: Recent Trends, *MedicalDeviceNetwork* (Nov. 1, 2024), https://www.medicaldevice-network.com/data-insights/market-share-analysis-dialysis-machines-the-us/.

able to sell to just two customers, DaVita and Fresenius, which are "highly consolidated, with concentrated buying power."[130] Fresenius, as "the leading manufacturer of dialysis equipment worldwide," may simply "choose to offer its dialysis patients only the dialysis equipment Fresenius manufactures."[131] For other machine manufacturers, DaVita is therefore the "most significant customer."[132] In short, the viability of dialysis equipment manufacturers depends on securing contracts with Defendants, as they can "choose to otherwise limit access to the equipment manufactured by competitors."[133]

165.    Aside from machinery, Fresenius enjoys considerable power in the market for sale of other inputs needed for dialysis, such as dialyzers. In its 2024 Annual Report, Fresenius stated that "Dialyzers for [Hemodialysis] are the largest product group in the dialysis market with a worldwide sales volume of around 425 M units in 2024 (2023: 410 M). Approximately 174 M (around 40%) of these were made by Fresenius Medical Care (2023: 165 M or around 40%), giving us the biggest market share, by far."[134]

166.    Taken together, sales of dialysis equipment, parts, and other inputs are highly lucrative. Fresenius's Care Enablement segment, which includes in-center hemodialysis machines, dialyzers, and other dialysis supplies, generated

---

[130] NxStage Med., Inc., *Annual Report (Form 10-K)*, at 32 (Mar. 15, 2011).
[131] *Id.*
[132] *Id.*
[133] *Id.*
[134] Fresenius, *2024 Annual Report,* at 281 https://freseniusmedicalcare.com/content/dam/fresenius-medical-care/global/en/04_media/pdf/publications/2024/FME_Annual_Report_2024_EN.pdf (last visited Sept. 5, 2025).

revenue of € 4.1 billion for 2024, € 3.9 billion for 2023, and € 3.8 billion for 2022.[135]

For 2024, Fresenius generated $452.83 million in revenues from direct sales of

dialysis machines in the United States alone.[136] DaVita coincidentally reported that

it had minimum purchase commitments under agreements with unnamed suppliers

of dialysis equipment of $430 million for 2024.[137] Previous DaVita reports indicate

that the unnamed supplier is Fresenius.[138]

167.    Because of DaVita's size and scale, Fresenius's equipment revenues

and status as market leader depend heavily on DaVita choosing to purchase its

equipment, as opposed to equipment manufactured by Baxter or other, smaller

manufacturers.

168.    By contrast, because Fresenius is its largest competitor in outpatient

dialysis services, it is in DaVita's stand-alone economic interest to restrain

Fresenius's market power in equipment. DaVita consistently recognizes these

dynamics in its annual reports, stating: "Our largest competitor, Fresenius Medical

Group (FMC), manufactures a full line of dialysis supplies and equipment in

addition to owning and operating outpatient dialysis centers worldwide. This may,

---

[135] *Id.*

[136] GlobalData United States Dialysis Machines Market Share 2024.

[137] DaVita Inc., *2021 Annual Report*, at F-32 (Feb. 11, 2022),
https://investors.davita.com/financial-reports.

[138] DaVita Inc., *2018 Annual Report*, at F-34 (Dec. 31, 2018),
https://www.sec.gov/Archives/edgar/data/927066/000009270661900025/dva-
123118x10k.htm ("The Company has an agreement with Fresenius Medical Care (FMC) to
purchase a certain amount of dialysis equipment, parts and supplies from FMC, which was
extended through December 31, 2020. During 2018, 2017 and 2016, the Company
purchased $[182,446,000], $[176,212,000] and $[164,766,000] respectively, of certain
equipment, parts and supplies from FMC.").

among other things, give FMC cost advantages over us because of its ability to

manufacture its own products."[139]

169.     In a competitive market for outpatient dialysis services, if Fresenius

were to become dominant in equipment, it could use its pricing power to raise

DaVita's costs and lower DaVita's profit margins. Thus, all else equal, DaVita

should want to purchase equipment from competing manufacturers such as Baxter.

170.     Despite these competitive dynamics, DaVita has nevertheless chosen

to make Fresenius its largest supplier of in-clinic dialysis equipment, thereby

cementing Fresenius's position as the market leader in the provision of equipment

and parts to dialysis clinics in the U.S. In turn, DaVita has become Fresenius's

largest external U.S. customer of equipment and parts. Thus, these ostensible

"competitors" are heavily reliant on and routinely transact business with each

other. Defendants' business dealings in equipment and supplies reinforce their

market power, entrench their duopoly, increase barriers to entry, shield one another

from competitive pressures, and lock out potential entrants.

171.     For example, in a January 2013 press release, DaVita and Fresenius

announced that DaVita would be "extending its *long-standing vendor relationship*

with [Fresenius] for certain dialysis supplies including hemodialysis machines and

disposable products."[140] Ronald Kuerbitz, then-CEO of Fresenius Medical Care

North America, said, "We are pleased to continue our long relationship as a supplier

---

[139] DaVita Inc., *2024 Annual Report*, at 20 (April 24, 2025),
https://investors.davita.com/financial-reports.
[140] DaVita Inc., *DaVita Announces Partnership with Fresenius Medical Care* (Jan. 8, 2013),
https://newsroom.davita.com/press-releases?item=122844.

to DaVita."[141]

172.    DaVita publicly acknowledges that Fresenius is "one of our largest suppliers of dialysis products and equipment" and that its agreement with Fresenius "typically requires us to purchase a certain amount of dialysis equipment, parts and supplies from [Fresenius] based upon a number of factors, including the operating requirements of our centers, the number of centers we acquire, and growth of our existing centers."[142]

173.    Moreover, in 2019, Fresenius sought FTC approval to acquire a leading manufacturer of home hemodialysis machines, NxStage Medical, Inc. Fresenius was already manufacturing and selling its own home hemodialysis machine, called Fresenius-K at Home. The acquisition would have entrenched Fresenius's dominance in this small but rapidly growing market segment.

174.    As a provider of home hemodialysis services itself, DaVita would have potentially been exposed to competitive harm from Fresenius's acquisition in the form of fewer suppliers and higher prices. But despite having an opportunity to object to the acquisition, which was eventually approved over the strong dissent of Commissioner Rohit Chopra, DaVita apparently chose not to.[143] Instead, contrary to its stand-alone economic interest, it chose to enter into a long-term agreement with

---

[141] *Id.*
[142] DaVita Inc., *2024 Annual Report (Form 10-K)*, at 20 (Feb. 13, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000927066/000092706625000012/dva-20241231.htm.
[143] Steven C. Salop, *Analyzing Vertical Mergers to Avoid False Negatives*, Georgetown Univ. Law Ctr. Faculty Publications, Working Paper No. 3169, at 21 (Apr. 5, 2019), https://scholarship.law.georgetown.edu/cgi/viewcontent.cgi?params=/context/facpub/article/3169/&path_info=3_vertical_mergers__ver_4_5_19_.pdf&utm_source=chatgpt.com.

Fresenius to use its home hemodialysis machines exclusively.

175.    Following the acquisition, one industry analyst observed that "[t]he two largest dialysis providers in the U.S. are teaming up to pursue a business proposition that might seem antithetical in nearly any other field or at any other time outside of a worldwide pandemic."[144] Under that "business proposition," DaVita would "expand its use of home hemodialysis machines supplied by Fresenius," and Fresenius would grant DaVita access to Fresenius's "platform that collects and shares individual treatment information with clinics and care teams,"[145] underscoring yet another avenue through which DaVita and Fresenius can cooperate rather than compete.

176.    In March 2021, Fresenius "announced an expanded agreement to provide home dialysis technology—including NxStage home hemodialysis (HHD) machines, dialysis supplies, and a connected health platform—to DaVita patients across the United States."[146] A senior Fresenius executive stated that Fresenius was "excited to expand our *longstanding collaboration with DaVita*."[147] To this day, DaVita promotes just two home dialysis machines: NxStage-System One and

---

[144] Conor Hale, *DaVita, Fresenius Team Up to Bring Dialysis Care Out of Their Clinics and into the Home*, Fierce Biotech (Mar. 23, 2021, 8:00 AM), https://www.fiercebiotech.com/medtech/davita-fresenius-team-up-to-bring-dialysis-care-out-their-clinics-and-into-home.

[145] *Id.*

[146] Fresenius, *DaVita Kidney Care Expands Use of NxStage Home Hemodialysis Machines from Fresenius Medical Care*, PR NEWSWIRE (Mar. 23, 2021), https://www.prnewswire.com/news-releases/davita-kidney-care-expands-use-of-nxstage-home-hemodialysis-machines-from-fresenius-medical-care-301253249.html.

[147] *Id.* (emphasis added).

Fresenius-K at Home, both of which are manufactured and sold by Fresenius.[148]

177.    DaVita and Fresenius's agreement ensures Fresenius's dominance in home dialysis machines. As FTC Commissioner Rohit Chopra cautioned, "patients do not purchase machines. Machines are purchased by hemodialysis clinics."[149] Indeed, "the market for in-home clinic supplies is close to a duopsony. Fresenius and DaVita make up roughly 85 percent of all hemodialysis patients (in-clinic and in-home); the third-largest provider has only 191 in-home patients."[150]

178.    More advanced portable dialysis machines made by other manufacturers have been approved in the United States in recent years. Yet despite the availability of higher-quality and affordable hemodialysis machines from other manufacturers, DaVita declines to offer non-Fresenius options to U.S. patients. By agreeing to purchase and use Fresenius's home hemodialysis equipment exclusively, DaVita has delivered a captive patient population and a significant recurring revenue stream to its largest "competitor" in dialysis services.

179.    DaVita has chosen to reward Fresenius with lucrative equipment revenues despite machines from competing manufacturers presenting many advantages over Fresenius's products. Consider for example Outset Medical's Tablo device, which was cleared by the FDA for use in an acute or chronic care facility in

---

[148] DaVita, *Home Hemodialysis Equipment Options*, archived July 29, 2025, https://web.archive.org/web/20250729042127/https://network.davita.com/main/treatment-options/articles/equipment-options/#expand.
[149] Chopra Dissenting Statement at 3 n.4.
[150] *Id.* at 3.

September 2014 and for patient use in the home on March 31, 2020.[151] Unlike the traditional hemodialysis dialysis machines, which "require connection to an industrial water treatment room to operate," or, when large water treatment rooms are unavailable, "to an additional piece of equipment that purifies water for dialysis and feeds it into the hemodialysis machine," the Tablo machine is an "all-in-one device with integrated water purification and on-demand dialysate production, eliminating the need for industrial water treatment rooms."[152] That machine benefits patients not only in minimizing the "steps, touch points, and connections," but also in being able to "accommodate a wide range of treatment modalities, durations and flow rates."[153]

180.    A case study conducted in a hospital with capacity for 7,200 annual dialysis treatments that had used a mix of NxStage and Fresenius machines in the dialysis unit found that implementing Tablo machines saved 45 minutes per treatment and eliminated the need for additional treatment delivery equipment by consolidating to a single platform.[154] Even so, DaVita's largest supplier of in-clinic dialysis equipment remains Fresenius.

---

[151] Outset Medical, Inc., *Registration Statement (Form S-1)* (Aug. 21, 2020), https://www.sec.gov/Archives/edgar/data/1484612/000119312520226746/d941853ds1.htm.

[152] *Id.* at 3.

[153] *Id.*

[154] *Id.* at 120 ("CCF demonstrated Tablo's ability to provide effective dialysis treatment to a critically ill patient population while reducing total costs associated with SLED (also known as PIRRT in the chart below). By using Tablo, CCF was able to reduce treatment set-up time by approximately 45-minutes as it eliminated the need to transport multiple machines and supplies to the ICU. CCF observed approximately 55% savings in the ICU with Tablo when compared to traditional treatment options. Approximately 30% of the savings were from labor cost reduction and 25% from supply cost reduction. CCF anticipates approximately $3 million in annual savings through improvements in labor productivity and reduced supply costs associated with Tablo.").

181.    Moreover, upon information and belief, Fresenius has sold equipment and parts to DaVita at below-market prices based on direct negotiations at the highest levels of both companies. A former DaVita and Fresenius executive alleged in a whistleblower complaint that Fresenius offers DaVita terms more favorable than those offered to other customers on Fresenius machines, supplies, drugs, and other equipment.

182.    Dennis Kogod—DaVita's former President of its Western Division, Chief Operating Officer of its Kidney Care division, and Chief Operating Officer of its HealthCare Partners—asserted that in negotiations between DaVita's Kent Thiry and Fresenius's CEO Rice Powell on the price for certain dialysis drugs, Fresenius "objected to giving DaVita a direct discount" but "offered to mask the drug discount by giving DaVita a steep discount on its purchases of Fresenius-manufactured dialysis equipment, such as machines, dialyzers, and bloodlines."[155] The result, according to Kogod: "Fresenius maintained an inflated price for dialysis drugs by subsidizing DaVita's drug purchases through the provision of discounts on equipment."[156] Kogod's lawsuit eventually resulted in DaVita agreeing to pay roughly $35 million to the United States in 2024.

183.    Absent a quid-pro-quo, DaVita's massive purchases of in-clinic equipment, parts, and supplies from Fresenius—as well as its near-exclusive sourcing of Fresenius in-home dialysis equipment and software—is contrary to its

---

[155] Complaint, *United States of America, ex rel. Dennis Kogod v. DaVita, Inc. et al*, 1:17-cv-02611-PAB (D. Co. October 31, 2017), ECF No. 1 at 44.
[156] *Id.*

stand-alone economic interests. DaVita's actions generate reliable and lucrative revenue streams for its largest competitor in outpatient dialysis services, thereby enhancing and entrenching Fresenius's market power at the expense of competing manufacturers such as Baxter and smaller, more innovative companies that are seeking to expand their reach in the equipment market. Fresenius, in turn, rewards DaVita with preferential pricing.

184.    But the true consideration underlying these symbiotic actions among should-be competitors is Defendants' agreement that both will maintain virtually identical monopoly prices for private-pay outpatient dialysis services throughout the country, and that neither will deviate from that pricing strategy even when one of them enters a geographic market previously occupied only by the other.

185.    Defendants have thus chosen to avoid competition and instead pursue strategic entanglement, whereby their mutual ongoing business relationships incentivize and reward both entities for staying the course. At the same time, these ongoing business relationships on preferential terms also provide avenues for Defendants to deter and punish deviation from their conspiracy. Accordingly, the private-pay data reported in the 2025 JAMA Study is not the product of happenstance or mere conscious parallelism; it is the intended result of Defendants' concerted actions taken at the highest levels of both companies.

### ii.    Sales of drugs and pharmacy services.

186.    Further evidence of Defendants' agreement comes from their transactions related to dialysis drugs and pharmacy services.

187.    In 2013, DaVita announced an agreement to provide pharmacy

services to Fresenius.[157] According to a DaVita press release, Fresenius agreed to

"use DaVita Rx® prescription drug services for its Medicare patients in the United

States."[158] Fresenius entered into this agreement despite the fact that it was

capable of providing these services itself—FreseniusRX launched in 2009, four

years before the agreement with DaVita Rx[159]—and that myriad other companies

were also able and willing to provide these services. In other words, Fresenius chose

to refer its patients to DaVita Rx and thereby generate a steady revenue stream for

its largest "competitor" in outpatient dialysis services.

188.    According to the whistleblower complaint filed by Dennis Kogod,

"DaVita and Fresenius entered into an arrangement whereby Fresenius agreed to

make DaVita Rx's non-dialysis drugs available to its dialysis patients and, in some

circumstances, to encourage or pressure its dialysis patients to use DaVita Rx."[160]

In return, "DaVita provided Fresenius with two significant financial inducements.

First, DaVita agreed to enter into longer contracts to purchase Fresenius dialysis

products, which are largely paid for by Medicare as part of the dialysis bundle.

Second, DaVita agreed to purchase nine of Fresenius's European dialysis clinics,"

given that Fresenius faced antitrust scrutiny yet "could not find anyone to purchase

---

[157] DaVita, *DaVita Announces Partnership with Fresenius Medical Care* (Jan. 8, 2013), https://investors.davita.com/2013-1-8-DaVita-Announces-Partnership-with-Fresenius-Medical-Care.

[158] *Id.*

[159] Fresenius, *Our History*, https://freseniusmedicalcare.com/en-us/company/our-company/our-history/ (last visited Sept. 9, 2025).

[160] Complaint, *United States of America, ex rel. Dennis Kogod v. DaVita, Inc. et al*, 1:17-cv-02611-PAB (D. Co. October 31, 2017), ECF No. 1 at 43.

its troubled clinics."[161] The result: "DaVita Rx's revenues nearly doubled due to increased referrals from Fresenius."[162]

189.    On May 6, 2024, DaVita agreed to pay $34,487,390 to settle Kogod's whistleblower claims. Multiple collusive acts between DaVita and Fresenius were specifically part of the "Covered Conduct"[163] in that settlement, including the following:

- DaVita and Fresenius "entered into a Pharmacy Services and Master Licensing Agreement" under which Fresenius "paid prescription, dispensing, and shipping fees to DaVita Rx to serve as" Fresenius's "'central fill pharmacy,' or prescription fulfillment provider."[164]

- In exchange for Fresenius "entering into the Pharmacy Agreement for the referral of its Medicare patients' prescriptions, DaVita agreed to purchase nine dialysis clinics in Portugal and Poland from" Fresenius, and "DaVita would not have entered into the European clinic purchase at the price it paid without" Fresenius's "return agreement to enter into the Pharmacy Agreement."[165]

- In exchange for Fresenius "entering into the Pharmacy Agreement for the referral of its Medicare patients' prescriptions, DaVita also agreed in

---

[161] *Id.*

[162] *Id.*

[163] U.S. Dep't of Justice, *Settlement Agreement Between the United States, DaVita Inc., and Dennis Kogod*, at 2 (May 6, 2024), https://www.justice.gov/archives/opa/media/1360946/dl?inline.

[164] *Id.*

[165] *Id.*

November 2012 to extend an existing agreement under which it purchased

certain products from [Fresenius's] subsidiary," and "DaVita would not have

entered into the Product Agreement extension at the purchase commitment

levels without" Fresenius's "return agreement to enter into the Pharmacy

Agreement."[166]

190.    Kogod alleged in his whistleblower action that the negotiations at

issue—i.e., "concerning the price DaVita paid Fresenius for certain dialysis drugs"—

occurred directly between DaVita's Kent Thiry and Fresenius's CEO Rice Powell.[167]

He also alleged that DaVita's business "collaboration" with Fresenius provided

cover for what was actually collusion.[168]

191.    In other instances, DaVita has chosen to use Fresenius dialysis drugs

on its patients despite other companies offering viable substitutes. For example,

DaVita paid $450 million to settle claims that it defrauded the United States in

intentionally wasting dialysis drugs—including an iron deficiency medication,

Venofer—and submitting false and fraudulent claims for Medicare reimbursement

for such drugs.[169] Fresenius has since 2008 had the "exclusive rights to manufacture

and distribute Venofer® to freestanding (non-hospital based) US dialysis

---

[166] *Id.*

[167] Complaint, *United States of America, ex rel. Dennis Kogod v. DaVita, Inc. et al*, 1:17-cv-02611-PAB (D. Co. October 31, 2017), ECF No. 1 at 44.

[168] *Id.* at 42 (section titled "Collusive Kickback Arrangement with Fresenius Concerning DaVita Rx and Dialysis Supplies").

[169] Settlement Agreement, *United States ex rel. Alon J. Vainer et al v. DaVita, Inc. et al*, 1:07-cv-2509-CAP, ECF No. 1099-1, at 5 (N.D. Ga. June 29, 2015).

facilities."[170]

192.    Before DaVita acquired 500+ Gambro dialysis facilities in 2005, Gambro had offered patients both Venofer and another option, Ferrlecit.[171] But after DaVita's acquisition, the former Gambro facilities could only offer the Fresenius drug, Venofer.[172] According to the relator action brought by a DaVita Medical Director that led to the $450 million settlement, DaVita's predecessor "had a purchasing agreement contract [for Venofer], which if it were met, would result in higher rebates for the company."[173]

193.    DaVita's leadership thus decided not only to purchase a greater volume of Venofer—thus increasing Fresenius's drug revenues at the expense of another drug supplier that did not compete with DaVita in outpatient dialysis services—but also to purchase more than it needed for the purpose of wasting the drug and bilking Medicare in the process. For the relator, these "changes were being made in order to bill the Government for the increased waste resulting from the changes."[174]

194.    Although DaVita profited from this fraudulent scheme by obtaining larger rebates, drug administration fees, and fraudulent Medicare reimbursements, it was also lining Fresenius's pockets on the government's dime. Fresenius kept the

---

[170] Fresenius, *Fresenius Medical Care Announces Closing of the U.S. License Agreement for Intravenous Iron Products* (Sept. 16, 2008), https://www.fresenius.com/node/4783.
[171] *United States ex rel. Alon J. Vainer et al v. DaVita, Inc. et al*, 1:07-cv-2509-CAP, ECF No. 36 at 44 (N.D. Ga. July 25, 2011).
[172] *Id.* at 38.
[173] *Id.* at 42.
[174] *Id. at* 38.

additional profits it earned on the Venofer that DaVita needlessly bought and then wasted.

195.    These are yet more examples of the routine quid-pro-quos between Defendants that are contrary to their stand-alone economic interests in the absence of collusion. They, too, evince concerted actions to incentivize and reward each other in business dealings for the purpose and in furtherance of jointly maintaining supracompetitive prices on outpatient dialysis services.

### iii.      Sales of clinics in other countries.

196.    Defendants have similarly used the sales of dialysis clinics outside the United States at non-arm's-length prices as a means of providing consideration for maintaining the conspiracy described herein.

197.    As noted earlier, the Kogod whistleblower complaint alleged that DaVita purchased Fresenius clinics in Europe at an inflated price as one part of a series of collusive actions related to the provision of dialysis services in the United States. When settling that lawsuit with the government, DaVita agreed that its "Covered Conduct"[175] included the following: In exchange for Fresenius "entering into the Pharmacy Agreement for the referral of its Medicare patients' prescriptions, DaVita agreed to purchase nine dialysis clinics in Portugal and Poland from" Fresenius, and "DaVita would not have entered into the European clinic purchase at the price it paid without" Fresenius's "return agreement to enter

---

[175] U.S. Dep't of Just., *Settlement Agreement Between the United States, DaVita Inc., and Dennis Kogod*, at 2 (May 6, 2024), https://www.justice.gov/archives/opa/media/1360946/dl?inline.

into the Pharmacy Agreement."[176]

198.    More recently, Fresenius and DaVita announced on March 5, 2024 that Fresenius would be selling "its dialysis clinic networks in Brazil, Colombia, Chile and Ecuador to DaVita Inc. for a total transaction price of USD 300 million."[177] That sale "in aggregate represent[ed] 154 dialysis clinics, more than 7,100 employees, more than 30,000 dialysis patients, and recorded pro-forma revenue of approx. EUR 370 million in 2023."[178]

199.    The deal, for Fresenius, resulted in a staggering net book loss—which occurs when an asset is sold for less than its net book value[179]—of "EUR 200 million in the full year 2024."[180] The result: DaVita not only secured substantial assets at a large discount, in doing so it also became "the largest dialysis services provider in the region, a substantial leap from serving 23,000 patients in 2017 to a projected 79,000 patients post-acquisition."[181]

200.    The clinic sales described above—one where DaVita paid above-market prices to benefit Fresenius and the other where Fresenius sold at below-market

---

[176] *Id.*

[177] Fresenius, *Fresenius Medical Care Achieves Next Milestone in Portfolio Optimization Program, Announcing Sale of Dialysis Clinics in Brazil, Colombia, Chile, Ecuador* (Mar. 5, 2024), https://freseniusmedicalcare.com/en/media/newsroom/fresenius-medical-care-achieves-next-milestone-in-portfolio-optimization-program--announcing-sale-of-dialysis-clinics-in-brazil--colombia--chile--ecuador/.

[178] *Id.*

[179] Bertram Cameron, *Asset Disposal*, Fin. Edge Training (Mar. 28, 2025), https://www.fe.training/free-resources/accounting/asset-disposal.

[180] Fresenius, *Fresenius Medical Care Achieves Next Milestone in Portfolio Optimization Program, Announcing Sale of Dialysis Clinics in Brazil, Colombia, Chile, Ecuador* (Mar. 5, 2024).

[181] Hospital Mgmt., *DaVita to Acquire Fresenius Entities in Latin America* (Mar. 2024), https://www.hospitalmanagement.net/news/davita-acquire-fresenius-entities/.

prices to benefit DaVita—were not isolated business transactions. Rather, they were part of a longstanding course of dealing where Defendants have used ancillary transactions to preferentially benefit one another as an incentive and a reward for maintaining their non-competitive status quo in the United States.

201.    Although the sums involved in the clinic transactions were significant, they pale in comparison to the profits that each Defendant earns annually from private payers for outpatient dialysis services in the United States. If Defendants were to compete on price and reduce their massive profit margins on U.S. private-pay patients by even 25%—still leaving both with extremely robust profit margins on such patients—the financial impact on each company would be much greater. Thus, when it comes to business dealings between Fresenius and DaVita, maintaining supracompetitive prices on U.S. private-pay patients is always the first and foremost consideration.

### 2. Defendants routinely acquiesce to each other's entry into geographic markets while objecting to the entry of other competitors.

202.     In roughly a dozen states,[182] dialysis providers must obtain a certificate of need ("CON") to open a new facility or expand an existing facility. In general, CON laws "block any new firms from operating unless they can prove [. . .] that new competition is in 'the public interest,' or some similar criterion."[183] While

---

[182] Matthew D. Mitchell, *Certificate of Need Laws in Health Care: Past, Present, and Future*, 61 INQUIRY 1, 1–11 (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11088301/.
[183] Timothy Sandefur, *State "Competitor Veto" Laws and the Right to Earn a Living: Some Paths to Federal Reform*, Mercatus Ctr., Working Paper, at 3 (June 7, 2018), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3191388.

they are purportedly intended to "prevent 'destructive' competition," such laws "are better explained as a tool existing firms use to block competition for their own profit."[184]

203.    The CON process often involves public comment, including objections from incumbent competitors. Competitor objections reduce the likelihood that a CON application will be approved. Indeed, in some states, an objection can trigger a hearing requirement, which is "a barrier to entry that in practice is often insurmountable to the applicant."[185] In light of the impact of an incumbent's objection, CON laws have been called the "Competitor's Veto"—i.e., they "enable[] existing firms to disallow their potential competition."[186]

204.    In a competitive market, a profit-maximizing incumbent provider would be expected to jealously guard its territory. It would therefore be rational for an incumbent dialysis provider to object to a competitor's proposed entry and to instead expand its existing facilities to meet excess demand. Defendants are, first and foremost, for-profit entities that seek to maximize profit for their shareholders. Where DaVita is the incumbent dialysis provider in a given area, it would make economic sense to object to the entry of its primary competitor, Fresenius, and vice versa.

205.    Contrary to this expectation, a review of 470 available certificate of need applications from three states reveals that DaVita and Fresenius have rarely

---

[184] *Id.* at 2.
[185] *Id.* at 19.
[186] *Id.*

objected to each other's entry or expansion. Plaintiffs' analysis of CON applications is limited to Illinois, Washington, and North Carolina. These states were selected because they had the highest volume of applications during the Class Period and maintained accessible online repositories with detailed information on both applications and objections. For other CON states, comparable data was not available: some lacked public repositories altogether (e.g., Alabama), some had no relevant applications during the period (e.g., Alaska, which reported zero dialysis facility applications since 2020), and others provided only partial information insufficient for analysis (e.g., the District of Columbia, which publishes summaries of granted and rejected applications but omits objections and other details).

206.    As shown in Figure 23, where DaVita or Fresenius was the incumbent provider in a given area, they only objected to each other's CON applications 15% of the time (33 objections out of 218 applications), a frequency that is far lower than would be expected had Defendants truly competed with one another. For comparison, where DaVita or Fresenius was the incumbent in an area, they objected to the CON applications of non-Defendant dialysis providers in 52% of applications (29 objections out of 56 applications). Thus, DaVita and Fresenius were over three times more likely to object to the entry or expansion of non-Defendant dialysis providers than to each other.

**FIGURE 23: COMPARISON OF DEFENDANT OBJECTION RATES FOR
DEFENDANT AND NON-DEFENDANT APPLICANTS**



207.    The results are even more stark since 2020. As shown in Figure 24,
since 2020, Defendants have objected to only 7% of each other's CON applications
where a Defendant incumbent is in the area (8 objections out of 109 applications),
while objecting to non-Defendant providers 52% of the time (12 objections to 23
applications). In other words, DaVita and Fresenius have objected to the entry or
expansion of non-Defendant providers over seven times more often than to each
other's entry or expansion.

**FIGURE 24: COMPARISON OF DEFENDANT OBJECTION RATES FOR DEFENDANT AND NON-DEFENDANT APPLICANTS SINCE 2020**



208.    DaVita and Fresenius's objection rates were remarkably similar. In Figure 25, DaVita and Fresenius's objection rates are separated and show that the two Defendants exhibit similar behaviors: since 2020, DaVita objected to 8% (5 out of 66) of Fresenius' applications and Fresenius objected to 7% (3 out of 43) of DaVita's applications. By objecting to only a small minority of each other's applications, Defendants maintain a veneer of competition while not impeding their collusion. In contrast, the two Defendants objected over seven times more often—52% of the applications—when the applicant was a non-Defendant.

**FIGURE 25: COMPARISON OF DEFENDANT OBJECTION RATES FOR
DAVITA, FRESENIUS, AND NON-DEFENDANT SINCE 2020**



209.    Economically and strategically, one would expect the two largest
competitors in a market to challenge each other more aggressively. Yet, DaVita and
Fresenius behave in the opposite manner. Even if they were simply indifferent to
the applicant's identity, their objection rates should be roughly equal across all
competitors. Instead, their objections to non-Defendants are over seven times higher
than their objections to each other since 2020, highlighting a pattern inconsistent
with normal competitive behavior.

210.    Defendants' low objection rates to each other's entry—contrasted with
their significantly higher objection rates to non-Defendant providers—are best
explained by their agreement to maintain supracompetitive prices for private-pay
dialysis patients.

211.    If Defendants have an agreement to maintain supracompetitive prices,
the entry of one into an area occupied by the other presents much less of a

competitive threat. That is because both Defendants know, a priori, that such entry
will not lead to price-based or quality-based competition, thus allowing both
Defendants to maintain their massive profit margins on private-pay patients. In
other words, Defendants' routine acquiescence to each other's entry reflects the
understanding that, if prices remain at supracompetitive levels, there is enough
profit margin to go around. By contrast, Defendants object to the entry of other
providers much more frequently because there is no similar agreement or
understanding about maintaining prices and avoiding competition.

212.    Notably, in at least one instance, counsel for Fresenius submitted a
letter regarding DaVita's certificate of need application affirmatively stating that
"***Fresenius does not oppose this project***."[187] Such an express declaration of non-
opposition to the market entry of your largest and most powerful "competitor" is
hard to rationalize in a truly competitive market and is instead consistent with a
conspiracy to maintain supracompetitive prices.

213.    When Defendants object to entry by non-Defendant providers, their
bases for objecting themselves exhibit anticompetitive conduct. For example,
DaVita objected to a CON application submitted by Dialysis Care Center Rockford,
LLC to establish a new 8-station dialysis clinic in Rockford, IL.[188] DaVita baselessly

---

[187] Holland & Knight LLP, *Comments and Concerns on Project No. 11-103*, Ill. Health
Facilities & Servs. Rev. Bd. (May 17, 2012),
https://hfsrb.illinois.gov/content/dam/soi/en/web/hfsrb/projects/olderapplicationdocuments/2
011/2012-05-17-11-103-comments-and-concerns-holland-and-knight.pdf (emphasis in
original).
[188] Illinois Health Facilities and Services Review Board, *Transcript of Public Hearing:
Project No. 19-044 (Dialysis Care Center Rockford)* (Feb. 7, 2020),

objected the CON application on grounds that the applicant had "hurried to submit an application," that the ownership of the site that the applicant was to build the clinic on was in doubt, and that the estimates on "the cost of the project" varied.[189]

214. The testimony provided during the public hearing made clear that DaVita was "the only dialysis provider in Rockford," that the "closest dialysis facility other than DaVita [was] about 40 to 50 miles from Rockford," and that DaVita aimed to "prevent another provider from coming to the Rockford market using the CON Board through the back door to prevent competition."[190]

215. According to a DaVita patient treated in the Rockford area, "DaVita ha[d] monopolized the market."[191] That patient described the experience at DaVita as "a cookie-cutter operation," and noted that DaVita had "never presented" that patient "with the opportunity to go do home dialysis."[192] That patient's experience differed starkly with an independent provider that sought to enter the Rockford area: "when I got here, the opportunity was presented to me, and when I went to home dialysis, . . . I loved it. I had my life back . . . and I work closely with the doctors and nurses, and I love it. It's the best thing that ever happened to me."[193]

### 3. Defendants jointly use the American Kidney Fund to keep their patients on private insurance at monopoly prices.

216. Further evidence of DaVita's and Fresenius's coordination and

---

https://hfsrb.illinois.gov/content/dam/soi/en/web/hfsrb/projects/projectdocuments/2019/19-044/2020-02-12-19-044-public-hearing-transcript.pdf (last visited Aug. 27, 2025).
[189] *Id.* at 7.
[190] *Id.* at 9.
[191] *Id.* at 32.
[192] *Id.*
[193] *Id.*

collusion with respect to private-pay dialysis patients comes from Defendants' joint control of a purportedly charitable organization, the American Kidney Fund (AKF). The AKF's Trustee Emeritus (G.W.) notably held a Vice President role at DaVita and multiple leadership roles at Fresenius.

217.    AKF exists ostensibly to help kidney dialysis and transplant patients in paying their health insurance premiums and other out-of-pocket treatment expenses. In reality, Defendants use the AKF as a means to circumvent anti-kickback laws and to steer patients away from government insurance programs to private insurance programs that are much more lucrative because of Defendants' conspiracy to maintain supracompetitive prices.

218.    Defendants "donate" massive sums to AKF—e.g., in 2016, they contributed $265 million combined, accounting for approximately 80% of AKF's funding. Those numbers have only increased since. Defendants' contributions for 2019-2024 are listed in Figure 26 below.

**FIGURE 26: AKF'S REPORTING OF UNUSUAL GRANTS RECEIVED AND
PERCENTAGE OF TOTAL SUPPORT AND REVENUE[194]**

| Year | AKF Form 990 "Unusual Grant" No. 1 ($) | AKF Form 990 "Unusual Grant" No. 2 ($) | AKF's Financial Disclosure: "AKF received public support from two corporations in the amount of" ($) | Percentage of the total support and revenue |
|------|------|------|------|------|
| 2019[195] | 148,500,000 | 125,004,183 | 273,641,183 | 85% |
| 2020[196] | 161,660,412 | 124,627,450 | 286,287,862 | 85% |
| 2021[197] | 170,088,000 | 132,012,092 | 302,100,092 | 86% |
| 2022[198] | 168,591,100 | 122,352,400 | 290,943,500 | 87% |
| 2023[199] | 173,078,997 | 128,015,000 | 301,094,000 | 86% |
| 2024[200] | 158,723,217 | 84,795,000 | 243,518,200 | 82% |

219.    Defendants directly benefit from their "charitable" contributions by

"referring" their patients to AKF and having AKF incentivize these patients to stay

---

[194] Am. Kidney Fund, Inc., *AKF 2022 Form 990 Public Disclosure*, at 23, https://www.kidneyfund.org/sites/default/files/media/documents/AKF%202022%20Form%20990%20Public%20Disclosure.pdf (last visited Sept. 8, 2025) ("Unusual Grants Received" for years 2019-22); Am. Kidney Fund, Inc., *2024 IRS Form 990 Public Disclosure*, at 21, https://www.kidneyfund.org/sites/default/files/media/documents/2024-AKF-IRS-Form-990.pdf (last visited Sept. 8, 2025) ("Unusual Grants Received" for years 2023-24).
[195] Am. Kidney Fund, Inc., *Financial Statements Together with Report of Independent Public Accountants for the Years Ended Dec. 31, 2022 and 2021*, at 20, https://www.kidneyfund.org/sites/default/files/media/documents/AKF%20FS2022.pdf (last visited Sept. 8, 2025).
[196] *Id.*
[197] Am. Kidney Fund, Inc., *AKF 2022 Form 990 Public Disclosure*, https://www.kidneyfund.org/sites/default/files/media/documents/AKF%202022%20Form%20990%20Public%20Disclosure.pdf (last visited Sept. 8, 2025).
[198] *Id.*
[199] Am. Kidney Fund, Inc., *Financial Statements Together with Report of Independent Public Accountants for the Years Ended Dec. 31, 2023 and 2022*, at 21, https://www.kidneyfund.org/sites/default/files/media/documents/akf-audit-2023.pdf (last visited Sept. 8, 2025).
[200] Am. Kidney Fund, Inc., *Financial Statements Together with Report of Independent Public Accountants for the Years Ended Dec. 31, 2024 and 2023*, at 20, https://www.kidneyfund.org/sites/default/files/media/documents/akf-audit-2024.pdf (last visited Sept. 8, 2025).

on private insurance plans, which thereafter pay Defendants prices that are
multiples of what Defendants would receive from Medicare for otherwise identical
treatment.[201]

220.    In other words, "dialysis clinics donate to AKF and provide dialysis
treatment for patients whose insurance premiums were paid by AKF and in return
receive payments many times the size of their donations from the patients'
insurance."[202] Defendants thus use the substantial profits they earn as a result of
this arrangement to fund next year's "donations" to AKF, and the process repeats
itself year after year.

221.    Although it would violate the Anti-Kickback Statute (AKS) to pay
patient premiums directly, Defendants found a workaround by having AKF serve as
their intermediary. The pass-through of Defendants' "donations" is legal according
to a 1997 OIG advisory opinion that was requested by AKF, then a small entity, and
several for-profit dialysis companies, including DaVita. But numerous interested
parties have been sounding the alarm that Defendants rigged the system to their
advantage.[203] By bankrolling AKF, Defendants were able not only to "seal off" anti-

---

[201] Erin E. Trish et al., *Congress Should End Dialysis Companies' Third-Party Games with Insurance Coverage*, STAT News (Apr. 29, 2021),
https://www.statnews.com/2021/04/29/dialysis-companies-reimbursement-gaming/.
[202] Office of Congresswoman Katie Porter, *Dying on Dialysis: Inside an Industry Putting Profits Over Patients*, at 2,
https://web.archive.org/web/20240918194848/https://porter.house.gov/uploadedfiles/dialysis_staff_report_final.pdf (last visited Sep. 12, 2025).
[203] CMS, *Medicare Program: Conditions for Coverage for End-Stage Renal Disease Facilities-Third Party Payment*, 81 Fed. Reg. 90211 (proposed Dec. 14, 2016),
https://www.regulations.gov/document/CMS-2016-0185-0002/comment (collecting public comments concerning inappropriate third-party payments to dialysis facilities and patient-steering).

kickback complaints concerning patient steering, but also to "reap the fruits of their

multiyear roll-up of competitors."[204] As a result, HHS has been urged to rescind the

opinion and scrutinize the highly profitable arrangement between DaVita,

Fresenius, and AKF.[205]

222.    An investigation by the Office of Congresswoman Katie Porter stated

there was "troubling evidence suggesting that these providers [DaVita and

Fresenius] and AKF have *collaborated* to implement practices that benefit their

bottom line at the expense of patients with kidney disease."[206]

223.    Until recent scrutiny, AKF posted its Health Insurance Premium

Program ("HIPP") Guidelines on its website, which included a section describing the

"HIPP Honor System." In that section, AKF set forth its requirement that "each

referring dialysis provider should make equitable contributions to the HIPP pool"

and that each provider should "reasonably determine its 'fair share' contribution to

the pool [i.e., the funds available for premium assistance] by considering the

number of patients it refers to HIPP." *See* Figure 27 (below).

---

[204] Roddy Boyd, *DaVita Inc.: Warren and Charlie's Excellent Insurance Gambit*, The
Foundation for Financial Journalism (Sept. 22, 2017), https://ffj-
online.org/2017/09/22/davita-inc-warren-and-charlies-excellent-insurance-gambit/ .

[205] Healio, *California lawmaker calls for OIG to rescind advisory opinion for American
Kidney Fund, to conduct probe* (July 26, 2019),
https://www.healio.com/news/nephrology/20190726/california-lawmaker-calls-for-oig-to-
rescind-advisory-opinion-for-american-kidney-fund-to-conduct-pr; Susan Morse, *AHIP asks
HHS Secretary Alex Azar to stop diversion of dialysis patients to commercial plans*,
Healthcare Finance (Apr. 18, 2018), https://www.healthcarefinancenews.com/news/ahip-
asks-hhs-secretary-alex-azar-stop-diversion-dialysis-patients-commercial-plans.
[206] Report by the Office of Congresswoman Katie Porter (CA-45), *Dying on Dialysis: Inside
an Industry Putting Profits Over Patients*, at 2
https://web.archive.org/web/20240918194848/https://porter.house.gov/uploadedfiles/dialysis_
staff_report_final.pdf. (last visited Sep. 12, 2025)

224.    AKF emphasized that all providers had an "ethical obligation to contribute their respective 'fair share' to ensure that the HIPP pool is adequately funded." And AKF instructed providers that "[i]f your company cannot make fair and equitable contributions, we respectfully request that your organization not refer patients to the HIPP program." In other words, the HIPP pool operates as a "pay-to-play" program that overwhelmingly benefits DaVita and Fresenius—by far the largest contributors. An excerpt of the AKF's guidelines is set forth below in Figure 27.

**FIGURE 27: HIPP HONOR SYSTEM GUIDELINES**

**THE HIPP HONOR SYSTEM**

In order for this program to work for patients and dialysis providers, each referring dialysis provider should make equitable contributions to the HIPP pool. A facility can reasonably determine its "fair share" contribution to the pool by considering the number of patients it refers to HIPP. Without an effort on the part of all providers to contribute equitably to the program, HIPP cannot continue to help existing and newly qualified patients who need assistance. We believe all facilities share a common ethical obligation to contribute their respective "fair share" to ensure that the HIPP pool is adequately funded. This is essential in order for AKF to have the resources to help dialysis patients who need premium assistance in order to keep in force their health insurance. We regard this as a mutual honor system. It is the only way in which HIPP can continue to help patients in need.

We know that your focus, like ours, is on assisting patients. Working together and with your company making its fair and equitable share to the HIPP pool, we can assure that patients in need continue to receive the assistance that they need to obtain and maintain health insurance. Please discuss this with your management and finance staff and contact us immediately if you require additional information.

All contributions are, of course, voluntary and there is no "earmarking" of contributions to specific patients within the HIPP pool. As you should be aware, AKF operates the HIPP program under the auspices of the Office of Inspector General's Opinion 97-1 and AKF focuses solely on patients' needs without considering the facility where they are receiving dialysis (reference the enclosed Guidelines). Nonetheless, it should be obvious to all facilities that if each one does not contribute its fair share, the HIPP pool cannot continue to help all patients who need assistance.

If your company cannot make fair and equitable contributions, we respectfully request that your organization not refer patients to the HIPP program in order that we may preserve this important program for the tens of thousands of patients nationwide who are currently enrolled in HIPP to maintain their insurance coverage.

225.    Clinics that do not donate to AKF were previously placed on a "blocked

list" by the AKF, with their needy patients unable to receive financial assistance.[207]
According to the *New York Times*, when the AKF was criticized for its use of a
"blocked list" of clinics, it changed the name to "training list." AKF "would contact
these clinics to request donations in specific amounts, calculated by looking at the
payments made to patients at these clinics."[208]

226.    Sometime after public reports emerged about this "fair share"
requirement, AKF removed the relevant language from its guidelines. Yet the
requirement continues in practice. Congresswoman Porter's report states that "the
*New York Times*, the *Los Angeles Times*, and social workers across the country
assert that AKF continues to discriminate against patients at non-donor clinics."[209]
Indeed, since removing the "fair share" language, the AKF has repeatedly faced
accusations that it only funds patients who patronize dialysis companies that
contribute to the AKF—i.e., the Defendants.

227.    The report from Congresswoman Porter stated that evidence in the
public record and its own investigation "reveals practices that may interfere with
patients' ability to receive kidney transplants, raise premiums, lead patients to
enroll in plans that include less comprehensive coverage or higher out-of-pocket

[207] Reed Abelson & Katie Thomas, *Top Kidney Charity Directed Aid to Patients at DaVita
and Fresenius Clinics, Lawsuit Claims*, N.Y. TIMES (Aug. 2, 2019),
https://www.nytimes.com/2019/08/02/health/kidney-dialysis-kickbacks.html.
[208] *Id.*
[209] Report by the Office of Congresswoman Katie Porter (CA-45), *Dying on Dialysis: Inside
an Industry Putting Profits Over Patients* (last accessed: May 8, 2025),
https://web.archive.org/web/20240918194848/https:/porter.house.gov/uploadedfiles/dialysis_
staff_report_final.pdf at 13.

costs, and destabilize the private insurance market."[210] At the same time, "patients

and clinicians at dialysis clinics owned by providers other than DaVita and

Fresenius have reported discriminatory practices by AKF."[211]

228.    The practical result of Defendants' arrangement with AKF is that

Defendants get many more private-pay patients, whereas patients of smaller and

independent competitors are much more likely to transition to Medicare, leading to

significantly reduced revenues and profit margins. Defendants then use their higher

revenues and profit margins to buy up smaller competitors, pay nephrologists

higher salaries to serve as their Medical Directors under highly restrictive

noncompete agreements, and thereby erect higher barriers to entry and foreclose

competition from non-Defendant providers. Defendants have acted in concert and

with a common purpose knowing that their coordination with AKF would allow

them to maintain and increase their control over the U.S. dialysis industry.

229.    In DaVita's 10-K regulatory filing, the company stated that it received

a Civil Investigative Demand from the Office of the Attorney General for the

District of Columbia in January 2023 that "requests information on a number of

topics, including but not limited to the company's communications with AKF,

documents relating to donations to the AKF and communications with patients,

providers and insurers regarding the AKF."[212]

---

[210] *Id.*

[211] *Id.*

[212] Dave Muoio, *DaVita, Fresenius' kidney care charity connections trigger another
investigation*, Fierce Healthcare (Feb. 24, 2023),
https://www.fiercehealthcare.com/providers/davitas-kidney-care-charity-connections-
trigger-another-investigation.

230. A separate legal disclosure listed in the filing outlines subpoenas issued by the California Department of Insurance in 2020 and 2021 seeking information including DaVita's communications with patients about insurance plans and financial assistance from AKF, as well as related information on donations and patients' insurance provider selections. DaVita said in the filing that it is continuing to cooperate with that investigation.[213]

231. Fresenius similarly disclosed in its annual 20-F filings that it had also received a subpoena from the D.C. Attorney General in January 2023 "related to the activities of the [AKF] and grounded in antitrust concerns, including *market allocation* within the District of Columbia."[214]

### 4. Defendants Coordinate Their Litigation and Lobbying Efforts.

232. Notably, although Defendants are serial litigators against others, they apparently never sue each other. According to Bloomberg Law, DaVita is listed as a plaintiff in 75 lawsuits. Fresenius is even more litigious, listed as a plaintiff in 240 lawsuits, including against competitors. Despite this history of aggressively enforcing their interests in court, a search of Bloomberg Law's docket database reveals no case in which DaVita and Fresenius have appeared as opposing

---

[213] DaVita Inc., *Annual Report (Form 10-K)*, SEC File No. 1-14106, 2022, at F-31-32, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000927066/000092706623000011/dva-20221231.htm#ib228226ec511491b87b183c6d217a21a_247.
[214] Dave Muoio, *DaVita, Fresenius' kidney care charity connections trigger another investigation*, FIERCE HEALTHCARE (Feb. 24, 2023), https://www.fiercehealthcare.com/providers/davitas-kidney-care-charity-connections-trigger-another-investigation (emphasis added).

parties.[215] This absence is striking given their dominant positions in the dialysis market and their numerous business deals with one another—again suggesting coordination to protect their common interest in the conspiracy alleged herein.

233.    Additionally, Defendants have jointly lobbied legislative bodies to preserve and codify their monopoly pricing practices. For example, in 2018, California voters had the option to vote on Prop 8, which would have effectively capped Defendants' prices by restricting dialysis clinics from charging patients more than 115 percent of what providers spend on patient care and quality improvement. If clinics exceeded that limit, they would have to provide rebates or pay penalties. According to CBS News, DaVita and Fresenius "joined forces" to kill Prop 8 and collectively spent $111 million to do so. A few months later, DaVita and Fresenius came together again and again to oppose AB 290 and then Proposition 23. Overall, DaVita and Fresenius jointly spent $212 million in California alone in these coordinated efforts over four years, compared to only $21 million from other industry actors during the same period.[216]

234.    Upon information and belief, Defendants have also jointly lobbied Congress to overturn *Marietta Memorial Hospital Employee Health Benefit Plan v. DaVita Inc.*, 596 U.S. 880 (2022) by promoting House and Senate Bill 1173,

---

[215] In fact, DaVita and Fresenius sometimes work together as co-*plaintiff*s to protect their interests. *See* Complaint, *Fresenius Medical Care Orange County, LLC et al. v. Xavier Becerra et al.*, 8:19-cv-02130 (C.D. Cal. Nov 05, 2019), Dkt. 1 (listing DaVita and Fresenius as plaintiffs).

[216] Samantha Young, *Dialysis Industry Spends Millions, Emerges as Power Player in California Politics*, KFF Health News (Dec. 10, 2020), https://kffhealthnews.org/news/article/dialysis-industry-spends-millions-emerges-as-power-player-in-california-politics/.

misleadingly titled the "Restore Protection for Dialysis Patients Act." In *Marietta*,

the Court held that a plan's uniform limitation on dialysis reimbursement did not

violate the Medicare Secondary Payer Act because it applied equally to all

participants, regardless of Medicare status, and was therefore not unlawfully

discriminatory. *Id.* at 887. The proposed legislation would effectively nullify

*Marietta* by prohibiting group health plans from excluding dialysis services in

contracts with networks and third-party administrators. It would also amend the

Social Security Act to make it illegal for health plans to "to apply a limitation on

benefits (including on network composition) that will disparately affect individuals

having end-stage renal disease."[217] Put differently, the bill would statutorily require

self-funded plans that access insurer networks to pay Defendants their

supracompetitive network prices.

235.    Trade associations controlled by Defendants—including Kidney Care

Partners—have likewise supported the bill.[218] These joint efforts by Defendants are

further evidence supporting the inference of an agreement between them to fix and

maintain prices and otherwise to restrain trade.

## VI.    DEFENDANTS HAVE HAD KNOWLEDGE OF EACH OTHER'S OPERATIONS AND MYRIAD OPPORTUNITIES TO COLLUDE.

236.    Defendants plainly had and continue to have a motive to engage in the

---

[217] *See* S. 1173, 119th Cong., *Restore Protections for Dialysis Patients Act* (2025), https://www.congress.gov/bill/119th-congress/senate-bill/1173/text.
[218] Kidney Care Partners, *Kidney Care Partners Commends 30+ Cosponsors of the Restore Protections for Dialysis Patients Act and Calls for Further Action* (Aug. 19, 2025), https://kidneycarepartners.org/press/kidney-care-partners-commends-30-cosponsors-of-the-restore-protections-for-dialysis-patients-act-and-calls-for-further-action/.

conspiracy alleged herein. Under the status quo that Defendants created over many years of concerted, mutually beneficial conduct, each now controls roughly 45% of the market by revenue and earns the same unprecedentedly large profit margins on private-pay dialysis patients. This "competitive" landscape has not only inflated the price of both Defendants' stock but also enriched its corporate executives. In fact, DaVita's Chief Executive Officer topped the list for "highest-paid medtech CEOs of 2024," taking in over $164 million that year alone.[219]

237.    Just as Defendants had motive, they also had opportunity. As detailed above, Defendants for more than a decade have had extensive business dealings as transaction counterparties with non-arm's-length terms negotiated at the highest levels of both companies, including by their CEOs. Those business dealings have included, among others, the following: DaVita's significant, long-term purchases of Fresenius's equipment, parts, and supplies; Fresenius's referrals of its Medicare patients to DaVita Rx prescription fulfillment services; DaVita's repeated purchases of Fresenius's dialysis drugs; and DaVita's purchases of Fresenius's dialysis clinics in Europe and Latin America. DaVita and Fresenius have also had ample opportunities to collude through their longstanding duopoly sponsorship of the "charitable" organization, AKF, as well as their joint lobbying efforts designed to maintain their monopoly prices on private-pay patients.

238.    Former industry participants, including a former Defendant employee, have confirmed that such opportunities to collude were not only hypothetical—they

---

[219] Conor Hale, *The Highest-Paid Medtech CEOs of 2024*, Fierce Biotech (July 28, 2025, 5:00 AM), https://www.fiercebiotech.com/special-reports/highest-paid-medtech-ceos-2024.

were real, frequent, and often embedded in Defendants' business interactions. As stated by a former DaVita employee, "There are many opportunities for collusion between DaVita and Fresenius." According to that former DaVita employee, the selling and purchasing of equipment to and from one another presented one such opportunity. Another arose any time Defendants engaged in acquisitions or divestitures of dialysis facilities, whether voluntary or forced by antitrust regulators, because those opened direct lines of communication and bargaining among senior executives. All of these touch points resulted in "many instances where they would communicate directly," according to the former DaVita employee.

239. Moreover, as detailed further below, shared knowledge of business strategies and competitively sensitive information among Defendants was practically institutionalized by virtue of management employees transferring from one Defendant to the other, as well as by both Defendants' shared control of virtually every dialysis industry organization in the United States (of which there are many).

### A.    Defendants Frequently Hire Each Other's Managers.

240. One way to gain knowledge of a competitor's business strategies and operations—as well as to align and coordinate those strategies—is to hire that competitor's management employees. If that competitor does not object to the hiring, whether through enforcement on non-competes or otherwise, and after the hiring the competitors' pre-existing course of dealing does not change, the institutional knowledge gained as a result of the hirings can become a vehicle for collusion.

241.    DaVita and Fresenius have a long history of hiring one another's managers. Setting aside the numerous nephrologists that cross over between DaVita and Fresenius, a cursory review of public profiles shows over fifty management employees with experience at both DaVita and Fresenius. These employees worked in important areas such as strategic and market intelligence; finance and revenue, operations and regional management, and market execution. Examples include the following:

- Dennis Kogod, Fresenius's former Executive Vice President of Care Delivery and former President of Fresenius Kidney Care was previously a senior executive at DaVita, including as its President of its Western Division, Chief Operating Officer of its Kidney Care division, and Chief Operating Officer of its HealthCare Partners;

- Fresenius's Senior Director of Market Development since 2012 (C.A)[220] previously worked for DaVita from 2007-2009;

- Fresenius's Business Development Manager since 2018 (E.W.) previously worked at DaVita from 2017-2018;

- Fresenius's Regional Vice President since 2021 (N.P.) previously worked for DaVita from 2015-2021;

- Fresenius's Director of Operations since 2023 (D.M.) previously worked for DaVita from 2021-2023;

- Fresenius's Healthcare Operations Leader since 2021 (M.P) previously

---

[220] Throughout this section, Plaintiffs use initials for persons not otherwise identified in other parts of the complaint for privacy reasons.

worked for DaVita from 1999-2021;

- Fresenius's Director of Operations since 2024 (A.N) previously worked for DaVita from 2009-2024;

- Fresenius's Regional Director of Operations from 2017-2018 (J.M) previously worked for DaVita from 2013-2017;

- Fresenius's Director of Operations since 2017 (L.S.) previously worked at DaVita from 2016-2017;

- Fresenius's Director of Operations since 2018 (F.R.) previously worked for DaVita until 2018;

- Fresenius's Medical Care Director of Operations since 2023 (J.L.) worked at DaVita from 2021 to 2023, and before that worked at Fresenius from 2017 to 2021;

- DaVita's Assistant Director of Procurement since 2019 (H.P.) previously worked for Fresenius from 2009-2019;

- DaVita's Regional Operations Manager since 2023 (J.H) previously worked at Fresenius from 2018-2023.

242.    The routine inter-company transfers of such executives and managers exhibits the access DaVita and Fresenius have to one another's sensitive competitive data, market strategy, operations, pricing, and expansion plans. All of these areas are sensitive to risks of coordinated and collusive market actions to maintain the non-competitive status quo.

243.    In short, not only has DaVita and Fresenius's hiring of one another's

managers presented them with yet another avenue through which to pursue their

common goals through strategic entanglement, it has enabled the transfer of inside

strategic knowledge between them and has resulted in reduced independence in

their decision-making.

244.    Noncompete agreements can frustrate entry by new competitors. Yet

the many examples of Defendants' hiring of one another's key personnel suggests

that Defendants selectively enforce noncompete provisions against other rivals, but

not against one another (or much less so). Indeed, Defendants are under FTC

investigation "over allegations they illegally thwart smaller competitors,"

specifically in their use of noncompete agreements that make it difficult for their

personnel "to leave for rivals and start new businesses."[221]

245.    The noncompete provision in DaVita's employment agreements that

have been recently made public requires noncompetition for a period of two years

following departure from DaVita.[222] Yet, based on a review of public LinkedIn

profiles, there were over 20 instances in which Defendants appear to not have

---

[221] Josh Sisco, *Feds Tackle Dialysis Giants with Antitrust Probe*, POLITICO (July 13, 2024, 7:00 AM), https://www.politico.com/news/2024/07/13/feds-dialysis-giants-antitrust-probe-00167857.

[222] *See e.g.*, Justia, *Employment Agreement between DaVita Inc. and Javier Rodriguez*, https://contracts.justia.com/companies/davita-inc-384/contract/68721/ (last visited Aug. 21, 2025) at 10 ("(b) Noncompetition. Executive agrees that during the period of Executive's employment with the Company and for a period of two years thereafter (the 'Noncompetition Period'), Executive shall not in any manner, directly or indirectly, through any person, firm or corporation, alone or as a member of a partnership or as an officer, director, stockholder, investor or employee of or consultant to any other corporation or enterprise or otherwise, engage or be engaged, or assist any other person, firm, corporation or enterprise in engaging or being engaged, in any business, in which Executive was involved or had knowledge, being conducted by, or being planned by, the Company or any of its affiliates as of the termination of Executive's employment in any geographic area in which the Company or any of its affiliates is then conducting such business.").

enforced a noncompete provision against employees moving directly from one Defendant to another, including the following:

- DaVita's Senior Revenue Operations Specialist (D.H.) began her tenure at DaVita within months after leaving Fresenius in November 2023;

- Fresenius's Regional Vice President (N.M.) began her tenure at Fresenius right after leaving DaVita in 2021;

- Fresenius's Vice President of Home Therapy Operations and Systems (C.C.) began her tenure at Fresenius right after leaving DaVita in 2017;

- DaVita's Revenue Operations Supervisor (H.C.) began her tenure at DaVita within months after leaving Fresenius in 2024;

- A Fresenius Business Development Manager (A.W.) began his tenure at Fresenius in 2018 right after leaving DaVita.

246.    These are just a few notable examples. But the amount of inter-Defendant hiring suggests Defendants do not regularly enforce noncompete provisions against one another. Their selective non-enforcement as to one another differs starkly from their aggressive enforcement of such provisions when their managers leave for non-Defendant employers.[223] Such behavior suggests tolerance of intercompany transfers between Defendants to maintain their course of dealing in furtherance of their common goals. At a minimum, it suggests that Defendants do not view inter-company management transfers as a competitive threat.

---

[223] *See, e.g., Fresenius Management Services, Inc. v. Nottingham*, 2019-cv-11965 (D. Mass Sept. 16, 2019) (Former Fresenius executive sued by Fresenius for assuming an executive role at US Renal Care directly after quitting a similar role at Fresenius); *Fresenius Kabi USA, LLC v. Tyagi*, No. 1:18-cv-01162 (N.D. Ill. Mar. 21, 2018) (similar).

B.     **Defendants' Participation in and Control of Key Trade Organizations Provides Ample Opportunities to Collude.**

247.    DaVita and Fresenius have also had ample opportunities to share competitively sensitive information ("CSI"), coordinate, and monitor compliance with their agreement through trade associations and adjacent industry organizations. Defendants participate in, and in many cases lead, many of the same industry groups, including Kidney Care Partners, Renal Physicians Association, Annual Dialysis Conferences, Kidney Care Council, California Kidney Care Alliance, California Dialysis Council, and American Society of Nephrology. Further, persons affiliated with Defendants hold board seats at companies adjacent to dialysis care, such as Diality.

1.     **Kidney Care Partners.**

248.    Defendants' involvement in Kidney Care Partners ("KCP") is illustrative. KCP describes its mission as promoting "responsible government practices through public policies that assure high quality kidney care treatment," "responsible and efficient Medicare reform relating to dialysis," and ensuring that "patients have access to quality of care."[224] Defendants have since the KCP's inception in the early 2000's taken turns leading the organization. Upon KCP's founding, Fresenius's Chief Medical Officer and Senior Executive Vice President (R.H.) co-chaired the KCP from 2003 to 2005, with DaVita's former CEO (Kent

---

[224] Kidney Care Partners, *IRS Form 990 Return of Organization Exempt from Income Tax* (2022), at 1, https://apps.irs.gov/pub/epostcard/cor/030520188_202212_990O_2023121222091155.pdf (last visited Sept. 6, 2025).

Thiry) co-chairing from 2004 to 2006.[225] DaVita's former CEO, Thiry, went on to chair the KCP again from 2008 to 2010.[226] Fresenius's Executive Vice President (R.K.) took the helm for the 2011 to 2012 term.[227] More recently, Fresenius's Global Chief Medical Officer and Management Board Member (F.M.) chaired the KCP from 2016 to 2018. Then DaVita's Chief Medical Officer (A.N.) chaired the KCP from 2018 to 2020. As of 2024, DaVita's Group Vice President of Research and Development and former International Chief Medical Officer (M.K.) chairs the KCP.

249.    Defendants also have similar opportunities to share CSI, coordinate, and monitor through the KCP's "quasi-independent sister organization," the Kidney Care Quality Alliance ("KCQA"), whose "singular purpose" is "to develop dialysis-facility level performance measures."[228]

250.    During KCQA's inaugural meeting in 2006, DaVita's CEO Kent Thiry, who was then the KCP Board of Directors Chairman, "[a]nalogiz[ed] KCP as the 'United Nations' of the kidney care community," and "described the KCP Board as the General Assembly that has considered all measures, provided feedback, and approved the quality recommendations by consensus."[229] Moreover, DaVita's Thiry

[225] Invisible Disabilities Ass'n, *2011 Healthcare Award—Kent Thiry* (2011), https://invisibledisabilities.org/award-recipients/2011awards/2011-healthcare-award-kent-thiry/ (last visited Aug. 18, 2025).
[226] *Id.*
[227] Kidney Care Partners, *Chair Announcement* (Jan. 19, 2011), https://kidneycarepartners.org/files/KCP_Chair_Announcement_1_19_11.doc (last visited Aug. 18, 2025).
[228] Kidney Care Quality Alliance, *Kidney Care Partners*, https://kidneycarepartners.org/quality-priorities/kidney-care-quality-alliance/ (last visited July 29, 2025).
[229] Kidney Care Partners, *Minutes of the Kidney Care Quality Alliance Meeting* (July 26, 2006), https://kidneycarepartners.org/quality-priorities/kidney-care-quality-alliance/kcqa-member-organizations/july-26-2006.

described the KCQA's Steering Committee as having "functioned like the Security Council, guiding the recommendations between the four Work Groups that developed them, the KCP Board, and the broader alliance."[230] Thiry's comparison of the KCP—to which DaVita and Fresenius exert outsized influence and control—to the United Nations is an apt analogy: instead of innovating independently, Defendants have worked in concert to jointly guide sector-wide decisions.

251.  As with the KCP, Defendants have since the outset enjoyed leading roles within the KCQA. For example, DaVita's Vice President of Clinical Affairs (G.A.) is the co-chair of the KCQA's Steering Committee, which "guides the process and decision-making."[231] The KCQA's Steering Committee also includes a Fresenius North America Vice President (L.D.)[232] and the American Kidney Fund's Trustee Emeritus (G.W.), who notably held a Vice President role at DaVita and multiple leadership roles at Fresenius. The KCQA's Steering Committee has in the past consisted of DaVita's former CEO, Kent Thiry, who also chaired the KCP,[233] Fresenius's Senior Vice President and Chief Medical Officer (M.L.), and AKF's Trustee Emeritus (G.W.).[234]

---

[230] *Id.*
[231] KCQA Steering Committee, *Kidney Care Partners*, https://kidneycarepartners.org/quality-priorities/kidney-care-quality-alliance/kcqa-steering-committee/ (last visited July 29, 2025).
[232] *Id.*
[233] Kidney Care Partners, *KCQI Steering Committee Minutes – July 5, 2006*, https://kidneycarepartners.org/quality-priorities/kidney-care-quality-alliance/kcqi-steering-committee-members/july-5-2006/ (last visited July 29, 2025).
[234] Kidney Care Partners, *KCQI Steering Committee Members*, https://kidneycarepartners.org/quality-priorities/kidney-care-quality-alliance/kcqi-steering-committee-members/ (last visited July 29, 2025).

252.     The KCQA has various working groups that also present opportunities for Defendants to exchange information in furtherance of their agreement and course of dealing. For example, the KCQA's Data/Testing Workgroup consists of DaVita's Senior Director of Clinical Measurement & Government Reporting (P.B.), Fresenius's Associate Chief Medical Officer (D.C.), and Fresenius's Vice President of Kidney Care Analytics (A.S.).[235] Three of the four persons in charge of the Data/Testing Workgroup are affiliated with Defendants.

253.     The KCQA's "Pay for Performance Work Group" was led by DaVita's former Chief Medical Officer (A.N.) and consisted of Fresenius's former Chief Medical Officer (R.H) and DaVita's Vice President (L.Z.).[236]

254.     For 2024, Kidney Care Partners held membership meetings on March 20, 2024, June 12, 2024, September 18, 2024, and December 11, 2024.[237] Each of these meetings lasted at least five hours. Moreover, KCP's Operations Committee, of which DaVita's Group Vice President of Growth (M.K.) is Chair Elect, and DaVita's Vice President of Federal Government Affairs (J.T.) and Fresenius personnel (S.F.) are prominent members,[238] held meetings on March 19, 2024,

---

[235] Kidney Care Quality Alliance, *KCQA Data/Testing Workgroup Roster*, https://kidneycarepartners.org/wp-content/uploads/2021/07/DTWG_Roster.pdf (last visited July 29, 2025).

[236] Kidney Care Partners, *Pay for Performance Work Group Members*, https://kidneycarepartners.org/quality-priorities/kidney-care-quality-alliance/kcqa-history/pay-for-performance-work-group-members/ (last visited July 29, 2025).

[237] Kidney Care Partners, *2024 KCP Calendar and Meetings Informational Packet*, at 1 (Nov. 2023), https://kidneycarepartners.org/wp-content/uploads/2023/11/2024-KCP-Calendar-and-Meetings-Informational-Packet.pdf.

[238] Kidney Care Partners, *KCP Operations Committee Members and Constituency Group Processes*, at 1 (Nov. 2023), https://kidneycarepartners.org/wp-content/uploads/2023/11/KCP-Operations-Committee-Members-and-Constituency-Group-Processes.pdf.

September 17, 2024, and December 10, 2024.[239] Each of these meetings lasted at least 1.5 hours. Finally, on top of meetings, the KCP regularly held video calls, including on January 8, 2024, February 5, 2024, April 1, 2024, May 6, 2024, July 8, 2024, August 5 and 19, 2024, October 7, 2024, and November 4, 2024.[240]

255.    The KCP's Operation Committee meetings and membership meetings presented Defendants and its co-conspirator AKF opportunities to meet in person. For example, the June 11, 2024 Operations Committee Meeting and the June 12, 2024 Membership Meeting were held at Top of the Hill Banquet & Conference Center in Washington, DC. The December 10, 2024 Operations Committee Meeting and the December 11, 2024, Membership Meeting were held at the Willard Intercontinental Hotel in Washington, DC. KCP even provided a list of hotels for Defendants to select for their stays, creating additional opportunities for information exchanges outside of the official meetings.

256.    Through KCP and KCQA, Defendants have shared data with one another that would otherwise be considered competitively sensitive. For example, the summary of an All-KCQA meeting held on December 16, 2021 indicates that KCQA used "data from two KCQA member Large Dialysis Organizations (LDOs), each with the capacity to provide retrospective analyses from a data repository."[241]

---

[239] Kidney Care Partners, *2024 KCP Calendar and Meetings Informational Packet*, at 1 (Nov. 2023), https://kidneycarepartners.org/wp-content/uploads/2023/11/2024-KCP-Calendar-and-Meetings-Informational-Packet.pdf.
[240] *Id.*
[241] Kidney Care Partners, *Meeting Summaries of the Kidney Care Quality Alliance (KCQA)*, at 2 (May 2022), https://kidneycarepartners.org/wp-content/uploads/2022/05/All-KCQA_MeetingSummaries_All_May2022.pdf.

The summary goes on to state, "All pertinent data from all eligible patients in all facilities of the participating organizations during the testing period . . . were included in the datasets."[242] The data shared was exhaustive: "All 5,699 facilities in the two participating LDOs were included in the analysis, comprising 296 [Hospital Referral Regions]."[243] Given the number of facilities contemplated in that data set, the "two participating LDOs" can only be Defendants. Absent an agreement or understanding between DaVita and Fresenius, it is unlikely that either would disclose extensive commercially sensitive information to its chief competitor.

257.    Finally, through the KCP and KCQA, Defendants are able to collaborate on standard-setting efforts that impact the entire industry. Standard-setting is KCQA's mission: its "singular purpose" is "to develop dialysis-facility level performance measures."[244] On April 14, 2023, KCP and KCQA sent the Centers for Medicare & Medicaid Services a letter in which they advocated for the establishment of new standards that would shape how dialysis facilities are evaluated and reimbursed.[245] Specifically, KCP sought to have the federal programs implement measures such as industry-wide benchmarks for home dialysis and transplant performance, financial incentives and accountability mechanisms tied to these measures, and a reallocation of Medicare funds towards facilities that meet

---

[242] *Id.*

[243] *Id.* at 2-3.

[244] Kidney Care Partners, *Kidney Care Quality Alliance*, https://kidneycarepartners.org/quality-priorities/kidney-care-quality-alliance/ (last visited July 29, 2025).

[245] Kidney Care Partners, *Letter to Lee A. Fleisher, M.D. & Liz Fowler, Deputy Administrator, CMS* (Apr. 14, 2023), https://kidneycarepartners.org/wp-content/uploads/2023/04/KCP-CCSQ-Measurs-Letter-April-2023-Final.pdf.

the KCP's proposed performance benchmarks.[246] The KCP thus provides

Defendants ample opportunities to collude and advance their joint purposes.

### 2. Renal Physicians Association.

258.    Another example is Renal Physicians Association ("RPA"), a "national

nephrology specialty medical association."[247] The RPA states in its Form 990 tax

filings that its mission is to "assist in the development of national policy affecting

renal physicians and their patients."[248]

259.    Defendants hold leadership positions within the RPA and are both

members of the RPA's Board of Directors. The RPA's "Executive Committee is

comprised of the President, President-Elect, Immediate Past President,

Secretary/Treasurer, and such other persons as the Board of Directors

determines."[249] The RPA's current President (K.B.) has a joint venture with

DaVita.[250] The RPA's immediate past President from 2022-2023 is Fresenius's

---

[246] *Id.*

[247] Renal Physicians Ass'n, *Who We Are*, https://www.renalmd.org/page/WhoWeAre (last visited Aug. 13, 2025).

[248] Renal Physicians Ass's, *IRS Form 990: Return of Organization Exempt From Income Tax*, at 1 (Dec. 31, 2021), https://apps.irs.gov/pub/epostcard/cor/237350948_202112_990O_2023030221003797.pdf (last visited Aug. 12, 2025).

[249] Renal Physicians Ass'n, *Board of Directors – Requirements and Expectations*, https://www.renalmd.org/page/BoardofDirectorsJobDescription (last visited Aug. 12, 2025).

[250] Renal Physicians Ass'n, *RPA Presidents*, https://www.renalmd.org/page/Presidents (last visited Aug. 13, 2025); Renal Physicians Ass'n, *IRS Form 990: Return of Organization Exempt From Income Tax* (Dec. 31, 2021), https://apps.irs.gov/pub/epostcard/cor/237350948_202112_990O_2023030221003797.pdf; Renal Physicians Ass'n, *Board of Directors 2021 Disclosures*, at 1 (May 7, 2021), https://cdn.ymaws.com/www.renalmd.org/resource/resmgr/boardofdirectors/bod_disclosures_as_of_5-7-20.pdf.

Medical Director and Corporate and Medical Advisory Board Member (T.P.).[251] The President before that (2020-2021) was DaVita's Medical Director (J.P.).[252] And the President before that (2018-2019) was DaVita's Medical Director of Integrated Care Services (M.S.). In short, each of the RPA's key decision-makers hold leadership positions with Defendants or are otherwise intimately tied to Defendants through joint ventures.

260.    Defendants also lead the RPA's Board of Directors. The President of the RPA Board of Directors is Fresenius's Physician Technology Leadership Consultant, Medical Director, and former Chairman of its South Division Medical Advisory Board (G.S.). That person also previously chaired the RPA's Education Committee. The RPA's Board disclosed him as "Speaker for Vifor,"[253] which has its own joint venture with Fresenius called Vifor Fresenius Medical Care Renal Pharma.[254]

261.    Similarly, the RPA's Board of Directors include Fresenius's National Joint Venture Council Chair (M.T.); Fresenius's Chief Medical Officer of the Integrated Care Group (T.K.); Fresenius's Medical Director (V.S.); Fresenius's

---

[251] Renal Physicians Ass'n, *IRS Form 990: Return of Organization Exempt From Income Tax*, at 13 (Dec. 31, 2021), https://apps.irs.gov/pub/epostcard/cor/237350948_202112_990O_2023030221003797.pdf.
[252] Renal Physicians Ass'n, *Board of Directors 2021 Disclosures*, at 1 (May 7, 2021), https://cdn.ymaws.com/www.renalmd.org/resource/resmgr/boardofdirectors/bod_disclosures_as_of_5-7-20.pdf.
[253] *Id.* at 2.
[254] Swiss Biotech Ass'n, *Success Story: Vifor Fresenius Medical Care Renal Pharma (VFMCRP)* (2019), https://www.swissbiotech.org/listing/success-vifor-fresenius-medical-care-renal-pharma-vfmcrp/.

Physician Practice Services personnel (S.C.);[255] DaVita's Vice President of Medical

Affairs (B.B.); DaVita's Medical Director (J.P.);[256] DaVita's former Chief Medical

Officer (A.N.); and DaVita's Vice President of Medical Affairs (D.R.).

262.    Other members of RPA's Board have had significant ties with

Defendants. For example, one RPA President and Board Member (K.B.) has a joint

venture with DaVita; another RPA Board Member (H.G.) has joint ventures with

Fresenius and DaVita; another still (K.K.) has a joint venture with Fresenius; and

an RPA Past President (T.P.) has a joint venture with Fresenius.[257] The RPA's

Board also includes someone that works with DaVita's Credentialing and Peer

Review Committee (S.I.). The RPA's past Board includes Fresenius's Chief Medical

Officer and Global Head of Clinical Affairs (J.H.), who also notably has ownership

interests in both Fresenius and DaVita.

263.    The RPA's Board of Director meetings present Defendants with regular

opportunities for in-person communication. The RPA's Board Meetings occur four

times per year and are typically held in person.[258]

264.    The RPA's annual meetings also present another opportunity for in-

person communication among Defendants' managers and executives. RPA hosts an

---

[255] Renal Physicians Ass'n, *Board of Directors 2021 Disclosures*, at 1 (May 7, 2021),
https://cdn.ymaws.com/www.renalmd.org/resource/resmgr/boardofdirectors/bod_disclosures
_as_of_5-7-20.pdf.
[256] Forum of ESRD Networks, *Meeting Agenda with Bios*, at 9 (Aug. 13, 2013),
https://media.esrdnetworks.org/documents/Meeting_Agenda_w_bios_2013_0813.pdf.
[257] Renal Physicians Ass'n, *Board of Directors 2021 Disclosures*, at 2 (May 7, 2021),
https://cdn.ymaws.com/www.renalmd.org/resource/resmgr/boardofdirectors/bod_disclosures
_as_of_5-7-20.pdf.
[258] Renal Physicians Ass'n, *Board of Directors Job Description*,
https://www.renalmd.org/page/BoardofDirectorsJobDescription (last visited Aug. 25, 2025).

annual meeting that spans multiple days. While the 2021 meeting was held

virtually from March 18-20, 2021, the 2022 meeting was held in Dallas, Texas from

March 24-27, 2022,[259] the 2023 meeting was held in New Orleans, Louisiana from

March 30 through April 2, 2023,[260] and the 2024 meeting was held in Baltimore,

Maryland from April 11-14, 2024.[261] The 2025 annual meeting took place in Las

Vegas, NV from April 3-6, 2025.[262] The next annual meeting is set for April 16-19,

2026 in Atlanta, Georgia.[263] The meeting's sponsors include Fresenius and the

AKF.[264]

265.    Records from past meetings suggest that Defendant-affiliated Board

Members have in fact met in person. For example, the RPA's Washington Advocacy

Weekend 2017 registration list includes: the RPA President and Board Member that

has a joint venture with DaVita (K.P.); DaVita's Vice President of Medical Affairs

(B.B.); Fresenius's Physician Practice Services personnel (S.C.); the RPA Board

Member who has joint ventures with both Fresenius and DaVita (H.G.); DaVita's

Chief Medical Officer and shareholder (J.G.); Fresenius's Chief Medical Officer,

---

[259] Renal Physicians Ass'n, *RPA 2022 Annual Meeting*, Wayback Machine (Mar. 15, 2022), https://web.archive.org/web/20220315000043/https://www.renalmd.org/.
[260] Renal Physicians Ass'n, *RPA 2023 Annual Meeting*, https://www.renalmd.org/events/EventDetails.aspx?id=1658128&group= (last visited Aug. 15, 2025).
[261] Renal Physicians Ass'n, *RPA 2024 Annual Meeting*, https://www.renalmd.org/events/EventDetails.aspx?id=1770283 (last visited Aug. 15, 2025).
[262] Renal Physicians Ass'n, *2025 RPA Annual Meeting*, https://rpa.users.membersuite.com/events/0ad80326-0078-c791-2cbf-0b4756aa8908/details (last visited Aug. 25, 2025).
[263] Renal Physicians Ass'n, *2025 Annual Meeting*, https://www.renalmd.org/events/EventDetails.aspx?id=1955962&group= (last visited Aug. 25, 2025).
[264] Renal Physicians Ass'n, *Sponsors*, https://www.renalmd.org/page/Sponsors (last visited Aug. 25, 2025).

Integrated Care Group (T.K.); DaVita's Medical Director (J.P.); Fresenius's

Corporate and West Division Medical Advisory Board Member who also has a joint

venture with Fresenius (T.P.); and Fresenius's Physician Technology Leadership

Consultant, Medical Director, and former Chairman of its South Division Medical

Advisory Board (G.S.).[265] Other Defendant-affiliated registrants include DaVita's

Vice President of Integrated Kidney Care (A.B.).[266]

266. The same holds for recent meetings. For example, the RPA held its

PAL 2024 Annual Forum on September 28, 2024 at the Royal Sonesta in

Washington DC, an event in part sponsored by Fresenius.[267] Attendees included the

RPA President and Board Member that has a joint venture with DaVita (K.B.);

Fresenius's Physician Practice Services personnel (S.C.); Fresenius's Physician

Technology Leadership Consultant, Medical Director, and former Chairman of its

South Division Medical Advisory Board (G.S.); and Fresenius's Senior Vice

President, Global Head of Transplant Medicine, Global Medical Office (B.H.).[268]

### 3. Annual Dialysis Conference.

267. Defendants also have multiple opportunities to collude by way of the

Annual Dialysis Conference ("ADC"), which is, according to its website, "a

multidisciplinary conference where the global community of kidney care experts

gathers to dive deep into the essentials and cutting-edge advancements in kidney

---

[265] Renal Physicians Ass'n, *Washington Advocacy Weekend 2017 Registration List*,
https://www.renalmd.org/events/RSVPlist.aspx.
[266] *Id.*
[267] Renal Physicians Ass'n, *RPA 2024 PAL Forum Agenda*,
https://www.renalmd.org/page/PALForumAgenda (last visited Aug. 12, 2025).
[268] *Id.*

disease and renal replacement therapies."[269] While the 2021 conference was held

remotely because of the pandemic, the 2022 conference was held in Kansas City,

Missouri on March 4-6, 2022,[270] the 2023 conference was held in Kansas City,

Missouri on March 3-6, 2023,[271] the 2024 conference was held in Kansas City,

Missouri on March 8-10, 2024,[272] and the 2025 ADC took place on March 13-16,

2025 at the Mandalay Bay Hotel in Las Vegas, Nevada. Defendants were each

exhibitors at the conference.[273] Upon information and belief, DaVita and Fresenius

executives regularly attend the annual conferences and have opportunities to

interact in person.

### 4.    Kidney Care Council.

268.    The Kidney Care Council ("KCC") presents yet another trade

association through which Defendants had opportunities to share CSI, coordinate,

and monitor. The KCC was founded by DaVita's former CEO, Kent Thiry, who also

chaired the organization,[274] and is comprised of "the leading kidney dialysis

provider companies in the United States" that collectively service "more than 85

---

[269] Annual Dialysis Conference, *About – Annual Dialysis Conference*,
https://www.annualdialysisconference.org/about/ (last visited Sept. 8, 2025).
[270] Annual Dialysis Conference, *Annual Dialysis Conference 2022, Events in America*,
https://eventsinamerica.com/events-conference/annual-dialysis-conference-2022/medical-
pharma/nephrology-urology/mtpldfcnvfyb2vxx (last visited Aug. 15, 2025).
[271] Annual Dialysis Conference*, Annual Dialysis Conference 2023*,
https://www.annualdialysisconference.org/adc-2023/ (last visited Aug. 15, 2025).
[272] Annual Dialysis Conference, *Annual Dialysis Conference 2024*, Hubilo,
https://events.hubilo.com/annual-dialysis-conference-2024/register?sessionId=233263 (last
visited Aug. 15, 2025).
[273] Annual Dialysis Conference, *ADC 2025 Exhibitors*,
https://www.annualdialysisconference.org/adc-2025-exhibitors/ (last visited Aug. 12, 2025).
[274] Invisible Disabilities Ass'n, *2011 Healthcare Award—Kent Thiry* (2011),
https://invisibledisabilities.org/award-recipients/2011awards/2011-healthcare-award-kent-
thiry/.

percent of the dialysis patients in the United States."[275] The KCC, in Form 990 tax filings, states that its mission is to "enhance the treatment/prevention of renal disease."[276]

269.    DaVita and Fresenius are each members of the Council.[277]According to the KCC's 2023 Form 990 filing, Fresenius's Senior Vice President, Government Affairs (C.L.) and DaVita's Vice President of Federal Government Affairs (J.T.) both serve as directors of the KCC.[278] Through the KCC, there are opportunities to coordinate and collude, especially related to competitively sensitive information among Defendants' respective Government Affairs offices.

270.    The KCC's 2019 Form 990 filing lists as directors Fresenius's Senior Vice President, Government Affairs (C.L.) and DaVita's then Group Vice President of Purchasing and Government Affairs (L.Z.).[279] That DaVita executive is touted as having been "integral to the development of DaVita's policy strategy for programs such as end-stage renal disease entitlement and Medicare Advantage"; she also "led corporate purchasing for DaVita, managing supply logistics for dialysis supplies and

---

[275] Kidney Care Council, *The Kidney Care Council Introduction*, https://kidneycarecouncil.org/the-kidney-care-council-introduction/ (last visited Aug. 1, 2025).

[276] The Kidney Care Council, Inc*., IRS Form 990, Return of Organization Exempt from Income Tax*, at 2 (Dec. 31, 2023), https://apps.irs.gov/pub/epostcard/cor/205148206_202312_990O_2024061722533794.pdf.

[277] Kidney Care Council, *KCC Members and Corporate Addresses 2016*, https://kidneycarecouncil.org/wp-content/uploads/2016/07/KCC-Members-and-Corporate-Addresses-2016.pdf (last visited Aug. 1, 2025).

[278] The Kidney Care Council, Inc., *IRS Form 990, Return of Organization Exempt from Income Tax*, at 7 (Dec. 31, 2023), https://apps.irs.gov/pub/epostcard/cor/205148206_202312_990O_2024061722533794.pdf.

[279] The Kidney Care Council, Inc., *IRS Form 990, Return of Organization Exempt from Income Tax*, at 7 (Dec. 31, 2019), https://apps.irs.gov/pub/epostcard/cor/205148206_201912_990O_2021092719044066.pdf.

products, pharmaceuticals, equipment, and other contract services for all DaVita

locations."

### 5.     California Kidney Care Alliance.

271.     The California Kidney Care Alliance ("CKCA"), a "kidney care

association offering holistic healthcare advocacy . . . exclusively dedicated to

California dialysis issues,"[280] presents another opportunity to exchange CSI,

coordinate, and monitor. DaVita noted in its July 2024 disclosure that its largest

501(c)(6) contributions for lobbying were to the CKCA.[281] Fresenius's Senior

Director of State Government Affairs (M.G.) is the current president of the CKCA.

DaVita's Group Regional Operations Director (M.H.) is the current Vice President of

the CKCA. Fresenius's Regional Vice President (G.A) is the CKCA's executive

secretary; that executive also worked for DaVita as Division Vice President from

2009 to 2022.

272.     The CKCA's other members include Fresenius's Area Team Lead

(D.B.), DaVita's Director of Government Affairs (J.G.), DaVita's Regional

Operations Director (2022-Present) and member of its Board of Directors (L.Q.),

DaVita's Senior Vice President of Operations of the Western Group (2023-Present)

and former Senior Director of Operations (2016-2018) (J.S.), and DaVita's Group

Vice President (J.H.).

---

[280] California Kidney Care Alliance, *About*, https://www.cakidneycare.org/about (last visited
Sept. 6, 2025).
[281] DaVita Inc., *Semi-Annual Report on Political Spending and Lobbying Expenditures:
January 1 – June 30, 2024*, at 5 https://davita.com/wp-content/uploads/sites/2/2025/04/july-
2024-disclosure-vf.pdf (last visited Aug. 25, 2025).

273.    The CKCA's conferences provide Defendants multiple recurrent and prolonged opportunities to meet. For example, the CKCA holds a "signature annual conference"[282] and a Fresenius-sponsored "Annual Education Conference."[283] Executives from each Defendant regularly attend CKCA's conferences.[284]

### 6.    California Dialysis Council.

274.    The California Dialysis Council ("CDC"), the legacy association of the CKCA, is another association that provided Defendants with opportunities to interact and exchange information. The CDC is a tax-exempt 's mission is "to lobby for state legislation and to provide education to aid the dialysis community."[285] The overwhelming majority of the persons listed as officers or directors of CDC in its 2022 Form 990 tax filing are associated with Defendants.[286]

275.    Four out of six CDC officers for 2022 were Defendants' personnel:[287] two Fresenius executives were President and Secretary of CDC, while two DaVita executives were Vice President and Treasurer of CDC.[288] Indeed, CDC's President is Fresenius's Senior Director State Government Affairs (M.G.). CDC's Vice President is DaVita's Group Regional Director of Operations (M.H.). Its Secretary is a

---

[282] CKCA, *About*, https://www.cakidneycare.org/about (last visited Aug. 25, 2025).
[283] CKCA, *Annual Conference*, https://www.cakidneycare.org/annualconference (last visited Aug. 25, 2025).
[284] Whova, *Looking at the Future of Renal Care in California with Industry Leaders*, https://whova.com/embedded/speaker_detail/eHFGoEi3YPhRwi995u1XEAtPMwGr-amRF8K-mWl-LmE%3D/48623205/ (last visited Aug. 26, 2025).
[285] California Dialysis Council, IRS Form 990 Return of Organization Exempt from Income Tax, at 1 (Dec. 7, 2023), https://apps.irs.gov/pub/epostcard/cor/953778604_202212_990O_2023120722083514.pdf.
[286] *Id.* at 7.
[287] *Id.*
[288] *Id.*

Fresenius Area Manager (M.B.). Finally, the CDC's Treasurer is a Medical Director of both Fresenius and DaVita (B.W.).

276. And ten of seventeen CDC Board members are Defendants' personnel.[289] On top of the four executives mentioned, six of the other CDC Board Directors work for Defendants consisting of: DaVita's Group Vice President of State Government Affairs (J.H.), Fresenius's Facility Administrator (D.B.), Fresenius's Director of Operations (V.B.), Fresenius's Director of Government Affairs (J.G.), DaVita's former Senior Director of Business Transformation (D.K.), and Fresenius's Director of Operations (S.U.).

### 7. American Society of Nephrology.

277. American Society of Nephrology ("ASN") is another organization that Defendants jointly participate in and control. ASN is a tax-exempt kidney health professional organization that, according to its Form 990 tax filing, "leads the fight against kidney diseases by educating health professionals, sharing new knowledge, advancing research, and advocating the highest quality care for patients."[290]

278. Defendants overlap on the ASN's Board of Directors. ASN's Board consists of many of Defendants' executives, including DaVita's Chief Medical Officer (J.G.) and shareholder; DaVita's former Group Vice President and Division Vice President (I.O.); DaVita's Vice President and General Manager of Clinical Research

---

[289] *Id.* at 7-8.

[290] Department of the Treasury, *Internal Revenue Service, Form 990-N: Electronic Notice (e-Postcard) for Tax-Exempt Organizations Not Required to File Form 990 or 990-EZ*, at 1 (Dec. 2016), https://apps.irs.gov/pub/epostcard/cor/237350948_201612_990O_2017101314833445.pdf (last visited Sept. 6, 2025).

(A.Y.); Fresenius's SVP, Medical Officer Home Therapies (B.S.); and Fresenius's

Chief Medical Officer and Global Head of Clinical Affairs (J.H.), who, again, has

ownership in both Fresenius and DaVita.

279.    The ASN, too, presents Defendants with ample opportunities to meet

in person. For example, the ASN hosts an annual week-long conference called the

"Kidney Week."[291] The 2024 edition of Kidney Week took place in San Diego, CA

between October 23 and27, 2024.[292] ASN also provides a list of hotels for attendees,

including Defendants' employees, to select for their stays.[293]

280.    According to ASN's Kidney Week 2024 Disclosures, there were 95

individuals that disclosed an affiliation (employment, consulting or advisory roles,

research funding or collaborations, or honoraria) with Fresenius and 12 individuals

with an affiliation with DaVita, including 6 individuals that disclosed affiliation

with both DaVita and Fresenius.[294] For ASN's Kidney Week 2023 Disclosures, there

were 87 individuals that disclosed affiliation with Fresenius and 14 with DaVita,

including 5 individuals that disclosed affiliation with both.[295] For ASN's Kidney

Week 2022 Disclosures, there were 93 individuals with affiliation to Fresenius and

---

[291] ASN, *Kidney Week*, https://www.asn-online.org/education/kidneyweek/ (last visited Aug. 12, 2025).

[292] ASN, *Kidney Week: Past Meetings*, https://www.asn-online.org/education/kidneyweek/archives/past.aspx (last visited Aug. 12, 2025).

[293] ASN, *Hotels for Kidney Week: Downtown & Galleria Hotel Map (PDF)*, https://dc.jspargo.com/download/jemsdocuments/showDocuments_647/hotelmap.pdf (last visited Aug. 12, 2025).

[294] ASN, *ASN Kidney Week 2024 Disclosures* (Oct. 14, 2024), https://www.asn-online.org/education/kidneyweek/2024/KW24_Disclosures.pdf.

[295] ASN, *ASN Kidney Week 2023 Disclosures* (Oct. 23, 2023), https://www.asn-online.org/education/kidneyweek/2023/KW23_Disclosures.pdf.

10 to DaVita, including 4 that disclosed affiliation with both.[296]

### 8. Diality.

281. Aside from trade associations and industry organizations, Defendants also overlap on the boards of companies adjacent to kidney care.

282. For example, persons affiliated with both Defendants are Board Members of Diality, a dialysis medical device company.[297] Diality obtained FDA clearance for its dialysis machine, the Moda-flx Hemodialysis System, which is a "flexible hemodialysis system."[298] In its 510(k) submission, Diality likened the Moda-flx Hemodialysis System as the substantial equivalent of "the Tablo Hemodialysis System (K222952) and Tablo Cartridge (K210782)."[299]

283. Diality's Board of Directors include Fresenius's Medical Director and Physician Technology Leadership Consultant (C.S.); a nephrologist that operates two DaVita facilities (O.K.); DaVita's former Chief Medical Officer (A.N.); and former Chairman of NxStage Medical (R.F.), the hemodialysis company acquired by Fresenius in 2019. The Director that works with two DaVita facilities is also Diality's CEO. Diality's bench is thus embedded in both Fresenius and DaVita ecosystems, presenting an opportunity coordinate.

---

[296] ASN, *ASN Kidney Week 2022 Disclosures* (Oct. 28, 2022), https://www.asn-online.org/education/kidneyweek/2022/KW22_Disclosures.pdf.

[297] Diality, *About Diality*, https://www.diality.com/about-diality (last visited Sep. 12, 2025).

[298] Charlotte Robinson, *Diality's Moda-flx Hemodialysis System Gets FDA 510(k) Clearance*, Docwire News (June 13, 2025), https://www.docwirenews.com/post/dialitys-moda-flx-hemodialysis-system-gets-fda-510k-clearance?uid=?uid=.

[299] U.S. Food & Drug Admin., *Premarket Notification: Diality Moda-flx Hemodialysis System and Cartridge (K233798)* (Aug. 2, 2024), https://www.accessdata.fda.gov/cdrh_docs/pdf23/K233798.pdf.

284.    In sum, the same cast of characters among Defendants' executives have had ample regular and recurrent opportunities to meet in person, exchange competitively sensitive information, and to monitor and confirm their course of dealing in furtherance of the conspiracy alleged herein.

## VII.  THE STRUCTURE AND CHARACTERISTICS OF THE DIALYSIS INDUSTRY ARE CONDUCIVE TO COLLUSION.

### A.  Defendants Are the Dominant Firms in a Highly Concentrated Industry.

285.    High concentration means high susceptibility to collusion and other anticompetitive practices.[300] The market for outpatient dialysis services is highly concentrated, and Defendants dominate it as a duopoly. Ownership has consolidated rapidly over the past two decades. Indeed, outpatient dialysis services is the most concentrated market in all of healthcare.

286.    Defendants operate more than 80% of the 7,500 clinics across 3,100 counties in the United States, accounting for over 90% of the industry's total net revenues. Fresenius and DaVita control 49% and 43% of the market by revenue, respectively. Collectively and individually, they far surpass the next-largest competitor, U.S. Renal Care, which has about 5% of the market by revenue.

### B.  Barriers to Entry are High.

287.    Entry by new, independent businesses is a pillar of competition.[301] A collusive arrangement that raises product prices above competitive levels would,

---

[300] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 NW. U. L. REV. 1581, 1590-91 & nn. 34-35 (2021) ("Empirically, concentrated markets are more prone to price fixing, and, thus, market concentration is a plus factor.").
[301] Chopra Dissenting Statement at 1.

under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. But when there are significant barriers to entry, new competitors are much less likely to enter because entry into established areas is slow and expensive. Market protected by high entry barriers allow for conspirators to be able "to fix a high price with less worry that new firms will come into the market and bid the price down."[302] By contrast, "firms may not bother to conspire to fix prices if interlopers cannot be excluded from the market."[303]

288.    Defendants are shielded from competition by high barriers to entry that they themselves create. The most significant, but not only, barrier to entry is locating a nephrologist with an established referral base to serve as a dialysis clinic's medical director. By law, each dialysis clinic must have a nephrologist medical director. The medical director is essential to the competitiveness of the clinic because he or she is the clinic's primary source of referrals. Per the FTC, "[l]ocating a nephrologist is difficult because clinics typically enter into exclusive contractual arrangements with a nephrologist who is paid a medical director fee."[304]

289.    The lack of available nephrologists with an established referral stream is a significant barrier to entry because Defendants have locked up the vast majority of nephrology practices through exclusive contracts and joint ventures that provide medical directors with higher compensation than smaller competitors or

---

[302] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 NW. U. L. REV. 1581, 1591 (2021).

[303] *Id.*

[304] *In re DaVita Inc. & Total Renal Care, Inc.*, FTC File No. 2110013, at 2 (Oct. 25, 2021), https://www.ftc.gov/system/files/documents/cases/davita_analysis_to_aid_public_comment.pdf.

new entrants are able to pay. Of course, these generous compensation packages are subsidized by Defendants' monopoly profits on private-pay patients. Defendants' noncompete agreements make it difficult for new competitors to enter. Defendants' use and enforcement of noncompete agreements is under investigation by the Federal Trade Commission.[305]

290.    Entrants must also expend substantial additional effort and resources before they can begin operating a dialysis clinic. They must reach an agreement with a medical director, acquire trained staff, make substantial physical improvements to property, apply for and receive all required permits/authorizations from federal and local governments, and acquire and install necessary equipment such as dialysis machines, each costing up to $30,000, and other expenditures such as chairs, computers, dialysates, and water systems. Water systems at dialysis clinics must be tested to ensure patients may be safely dialyzed.

291.    Dialysis chains, most notably Defendants', enjoy advantages over independent facilities.[306] Defendants have lower average costs not only due to their similar cost-cutting measures at the expense of quality of care, but also due to their ability to obtain volume discounts for equipment, pharmaceuticals, and centralized clinical laboratories.

292.    Regulation raises other site-specific costs associated with entry as well. All facilities must be licensed by state-level health boards and establish a

---

[305] Josh Sisco, *Feds tackle dialysis giants with antitrust probes*, POLITICO (Jul. 13, 2024), https://www.politico.com/news/2024/07/13/feds-dialysis-giants-antitrust-probe-00167857#xd_co_f=MWRiNzg0MTAtZDEzZS00YzBiLTg4MGQtZWQzZWFkNGEwNDAy~.
[306] 2020 QJE Study at 224-25.

reimbursement relationship with CMS. In some areas, providers also need to prove that the surrounding community "needs" the additional capacity provided by the facility.

293.   Compounding these barriers, Defendants control an overwhelming share of the profitable patients in part due to their control over AKF, which increases the number of private-pay patients for Defendants but not their smaller competitors even though the quality of care at Defendants' clinics is comparatively low.

### C.   Demand for Dialysis Treatment is Highly Inelastic.

294.   Economic literature recognizes that industries with inelastic demand are more susceptible to cartel behavior because consumers are less responsive to changes in price and are therefore more vulnerable to significant price increases by cartels. In describing dialysis patients, Senator Grassley famously said, "[p]eople need dialysis to survive. They have no choice."[307] Indeed, dialysis patients are "about the most captive clients imaginable."[308] As an executive of one of Defendants described to investors, "all dialysis providers have a sticky relationship with their patients," so much so that "in terms of patients moving to other providers, we would all look good in that sense."[309]

---

[307] Office of Sen. Grassley, *Grassley Works to Improve Oversight of Kidney Dialysis* (June 25, 2000), https://www.grassley.senate.gov/news/news-releases/grassley-works-improve-oversight-kidney-dialysis.
[308] Tom Mueller, *How to Make a Killing*, p. 29.
[309] DaVita Inc., *Analyst/Investor Day Transcript* (May 25, 2017), https://ffj-online.org/wp-content/uploads/2017/09/DaVita_InvestorDayTscript_Aug17.pdf.

**D.    There are Often Few, if Any, Available Substitutes.**

295.    Substitute goods or services can serve to restrain price increases and temper the effects of a price-fixing conspiracy. But absent a kidney transplant, dialysis patients must dialyze three times per week for life to stay alive. According to one expert in the dialysis industry, "[t]here's really no hope for patients to shop around and switch to a better-quality provider."[310] In other words, there are no suitable substitutes for dialysis treatment that would restrain price increases. And given Defendants' vice-grip on the industry, most patients have no choice but to attend a dialysis clinic owned by one of the Defendants.

296.    The lack of suitable alternatives is by design. Defendants use joint ventures to lock in local nephrologist such that they can only refer patients to their facilities. For example, Defendant DaVita has entered into lucrative joint ventures with independent nephrology clinics that led to nephrologists referring their patients to DaVita.[311] The Department of Justice has previously challenged the Defendants' joint ventures as violations of the Anti-Kickback Statute. Specifically, the Department of Justice alleged that DaVita gave illegal kickbacks to doctors by letting them invest in dialysis clinic joint ventures at below fair-market prices and by imposing restrictive agreements, such as non-competes, to secure patient referrals.[312] Defendant DaVita ultimately paid $400 million to settle these

[310] Tom Mueller, *How to Make a Killing*, p. 119 (quoting Prof. Ryan McDevitt).
[311] Tom Mueller, *How to Make a Killing*, p. 139.
[312] U.S. Dep't of Justice, *DaVita to Pay $350 Million to Resolve Allegations of Illegal Kickbacks* (Oct. 22, 2014), https://www.justice.gov/archives/opa/pr/davita-pay-350-million-resolve-allegations-illegal-kickbacks.

allegations.[313]

## VIII.  DEFENDANTS' HISTORY OF REPEATEDLY VIOLATING THE LAW AND COMMITTING FRAUD MAKE THE ALLEGED CONSPIRACY MORE LIKELY.

### A.    Defendants Have Repeatedly Demonstrated Disregard for the Law.

297.    Engaging in a price-fixing and market allocation conspiracy with your largest competitor poses grave legal risk, both civilly and criminally. But if a company has a history of engaging in misconduct with similar risks, it is more likely that it would be willing to take such risks again—particularly if the reward is substantial. That is the case with both Defendants.

298.    In 2000, Fresenius Medical Care pled guilty in a case brought by the Department of Justice for Medicare fraud and paid a $486 million fine. The company was accused of having ordered unnecessary tests to boost revenues.[314]

299.    In 2009, a relator filed a *qui tam* lawsuit under the False Claims Act and its state counterparts against DaVita. *See United States et al. ex rel. Barbetta v. DaVita Inc. et al.*, No. 09-cv-02175 WJM-KMT (D. Colo. 2009) ("*Barbetta*").

300.    The *Barbetta* case concerned DaVita's payment of kickbacks to physicians in exchange for referral to dialysis centers owned (at least in part) by DaVita. In *Barbetta*, the primary component of the kickback scheme was DaVita's agreement to enter into a joint venture with a physician either through (1) DaVita's

---

[313] In addition to the $350 million settlement, DaVita also agreed to a civil forfeiture in the amount of $39 million. *See id.*
[314] Eric H. Holder, Jr., *Remarks on the Announcement of Criminal Please and Civil Settlements,* U.S. DEP'T OF JUSTICE (Jan. 19, 2000),
https://www.justice.gov/archive/dag/speeches/2000/nmichaelhealthremarks.htm.

paying an inflated price to acquire an ownership interest in a dialysis center owned

by a physician or (2) DaVita's selling an ownership interest in a new or existing

dialysis center owned by DaVita to a physician at a below fair market value. In

sum, DaVita sold low or bought high to achieve the kickback.

301.    In *Barbetta*, the Department of Justice alleged that between March

2005 and February 2014:

> DaVita identified physicians or physician groups that had significant
> patient populations suffering renal disease and offered them lucrative
> opportunities to partner with DaVita by acquiring and/or selling an
> interest in dialysis clinics to which their patients would be referred for
> dialysis treatment. DaVita further ensured referrals of these patients
> to the clinics through a series of secondary agreements with the
> physicians, including entering into agreements in which the physician
> agreed not to compete with the DaVita clinic and non-disparagement
> agreements that would have prevented the physicians from referring
> their patients to other dialysis providers.[315]

302.    In October 2014, DaVita entered into a settlement agreement under

which it agreed to pay $350 million to resolve the False Claims Act lawsuit.[316]

303.    Beyond *Barbetta*, DaVita has also been the subject of other False

Claims Act lawsuits which led to substantial recoveries for the government.[317]

---

[315] Office of Public Affairs, *DaVita to Pay $350 Million to Resolve Allegations of Illegal Kickbacks*, U.S. DEP'T OF JUSTICE (Oct. 22, 2014),
https://www.justice.gov/archives/opa/pr/davita-pay-350-million-resolve-allegations-illegal-kickbacks.
[316] *Id.*
[317] Office of Public Affairs, *DaVita Rx Agrees to Pay $63.7 Million to Resolve False Claims Act Allegations*, U.S. DEP'T OF JUSTICE (Dec. 14, 2017),
https://www.justice.gov/opa/pr/davita-rx-agrees-pay-637-million-resolve-false-claims-act-allegations; Office of Public Affairs, *Medicare Advantage Provider to Pay $270 Million to Settle False Claims Act Liabilities*, U.S. DEP'T OF JUSTICE (Oct. 1, 2018),
https://www.justice.gov/opa/pr/medicare-advantage-provider-pay-270-million-settle-false-claims-act-liabilities.

304.    In 2011, Fresenius failed to send a warning letter to its competitors that it sent to its own clinics about potential medical complications from Fresenius's GranuFlo dialysis concentrate product.[318] A Massachusetts state court later found Fresenius negligent for not distributing the warning to its competitors, and Fresenius subsequently settled over 10,000 lawsuits for $250 million.[319]

305.    In July 2014, Fresenius Medical Care was sued by a whistleblower for Medicare fraud, although the case was kept under seal. Fresenius was accused of pushing unnecessary and risky procedures on patients in order to bill Medicare and increase revenues. The case was unsealed and the Department of Justice filed a civil complaint in July 2022.[320]

306.    In June 2015, DaVita paid $450 million to settle allegations that it had defrauded Medicare by billing for unnecessarily disposed drugs. A whistleblower and the Department of Justice alleged that "DaVita devised and employed dosing grids and/or protocols specifically designed to create unnecessary waste of the drugs Venofer and Zemplar."[321]

---

[318] Andrew Pollack, *Dialysis Company's Failure to Warn of Product Risk Draws Inquiry*, N.Y. TIMES (Jun. 14, 2012), https://www.nytimes.com/2012/06/15/health/fda-investigates-fresenius-for-failure-to-warn-of-risk.html.

[319] Andrew Pollack, *Dialysis Equipment Maker Settles Lawsuit for $250 Million*, N.Y. TIMES (Feb. 18, 2016), https://www.nytimes.com/2016/02/19/business/dialysis-equipment-maker-settles-lawsuit-for-250-million.html.

[320] Reed Abelson & Katie Thomas, *Top Kidney Charity Directed Aid to Patients at DaVita and Fresenius Clinics, Lawsuit Claims*, N.Y. TIMES (Aug. 2, 2019), https://www.nytimes.com/2019/08/02/health/kidney-dialysis-kickbacks.html.

[321] Office of Public Affairs, *DaVita to Pay $450 Million to Resolve Allegations That it Sought Reimbursement for Unnecessary Drug Wastage*, U.S. DEP'T OF JUSTICE (Jun. 24, 2015), https://www.justice.gov/archives/opa/pr/davita-pay-450-million-resolve-allegations-it-sought-reimbursement-unnecessary-drug-wastage#:~:text=This%20civil%20settlement%20resolves%20allegations,intended%20for%20one%2Dtime%20use.

307.    In 2016, a whistleblower filed a lawsuit accusing both DaVita and Fresenius of violating anti-kickback laws by using the American Kidney Fund (AKF) as a vehicle for generating patient referrals. The lawsuit was unsealed in 2019.[322]

308.    In July 2021, a federal grand jury indicted DaVita on charges of labor market collusion alleging participation in conspiracies with another healthcare provider, Surgical Care Affiliates, to suppress wages.[323]

309.    DaVita and Fresenius view these settlements and fines "as a cost of doing business," akin to "paying the rent or paying employees."[324]

310.    DaVita in particular is known for its toxic culture led by the CEO and other senior executives. In one skit performed at a large corporate event, a federal prosecutor, government regulator, and insurance executive were depicted as evil villains for uncovering fraud and other legal issues at the company.[325] DaVita executives in the skit proceeded to kill the federal prosecutor, the regulator, and the insurance executive.

---

[322] Bob Herman, *Whistleblower alleges DaVita, Fresenius paid kickbacks*, AXIOS (Aug. 2, 2019), https://www.axios.com/2019/08/02/whistleblower-davita-fresenius-kickbacks-charity-premiums.

[323] Office of Public Affairs, *DaVita Inc. and Former CEO Indicted in Ongoing Investigation of Labor Market Collusion in Health Care Industry*, U.S. DEP'T OF JUSTICE (Jul. 15, 2021), https://www.justice.gov/archives/opa/pr/davita-inc-and-former-ceo-indicted-ongoing-investigation-labor-market-collusion-health-care#:~:text=A%20federal%20grand%20jury%20in,on%20dialysis%20and%20kidney%20care.

[324] More Perfect Union, *A CEO Wanted to Run Healthcare Like Taco Bell. Here's How His Patients Are Doing*, YouTube (July 18, 2025), https://youtu.be/08eVXNsta4M?si=EaiDLTGTPLXtxdPr.

[325] Matt Stoller, *The Dirty Business of Clean Blood* (Feb. 3, 2024), https://www.thebignewsletter.com/p/the-dirty-business-of-clean-blood.

**B.    Government Regulators are Actively Investigating Defendants for Similar Misconduct.**

311.    In April 2020, the California Department of Insurance ("CDI") served DaVita with an investigative subpoena in connection with an ongoing inquiry. Among other things, the CDI has requested DaVita's communications with patients concerning insurance coverage and financial assistance from the AKF; analyses of the potential impact of patients switching insurance providers; and documents concerning donations or contributions to the AKF. DaVita has represented that it continues to cooperate in the investigation.[326]

312.    On January 3, 2023, Fresenius received a subpoena from the Attorney General for the District of Columbia related to its relationship with the AKF that is "grounded in anti-trust concerns, including market allocation".[327] Since then, in addition to territorial allocation and division, Defendants have been "under investigation from the District of Columbia's attorney general over relationship with and donations to the nonprofit American Kidney Fund (AKF)."[328]

313.    In July 2024, POLITICO reported that the FTC "is investigating the nation's two largest dialysis providers [i.e., Defendants] over allegations they illegally thwart smaller competitors."[329] Part of the FTC's investigation focuses on

---

[326] DaVita, *Annual Report (Form 10-K)* at F-33 (Feb. 13, 2025).
[327] Fresenius, *Annual Report (Form 20-F)*, at F-87 (Feb. 25, 2025).
[328] Dave Muoio, *DaVita, Fresenius' kidney care charity connections trigger another investigation*, FIERCE HEALTHCARE (Feb. 24, 2023), https://www.fiercehealthcare.com/providers/davitas-kidney-care-charity-connections-trigger-another-investigation.
[329] Josh Sisco, *Feds tackle dialysis giants with antitrust probe*, POLITICO (Jul. 13, 2024), https://www.politico.com/news/2024/07/13/feds-dialysis-giants-antitrust-probe-00167857.

how Defendants "make it difficult for the physicians who work in their clinics to leave for rivals and start new businesses."[330] The FTC is "investigating whether noncompete agreements the companies require doctors to sign snarl efforts by rivals that want to make it easier for dialysis patients to be treated at home."[331]

## IX.    FRAUDULENT CONCEALMENT.

314.    Upon information and belief, Defendants employed fraudulent means to conceal their unlawful price-fixing agreement. A price-fixing and market-allocation agreement is inherently self-concealing, as disclosure of such unlawful conduct would expose the participants to significant civil and criminal liability. Defendants understood that revelation of their conspiracy would risk prosecution, a fact underscored by DaVita's and its former CEO's indictment for engaging in a no-poach antitrust conspiracy.[332] This history makes clear that Defendants were well aware of the severe legal consequences of cartel behavior, and thus had every incentive to cloak their conduct in secrecy to avoid detection.

315.    One particularly important reason why Defendants' conspiracy is self-concealing is that the prices Defendants charge private payers are a closely guarded secret. Private payers such as Plaintiffs may be able to discern what one and sometimes both Defendants charge them, and usually in a limited geographic area, but they cannot know what both Defendants are charging other private payers in

---

[330] *Id.*

[331] *Id.*

[332] Dep't of Just., *DaVita Inc. and Former CEO Indicted in Ongoing Investigation of Labor Market Collusion in Health Care Industry* (July 15, 2021), https://www.justice.gov/archives/opa/pr/davita-inc-and-former-ceo-indicted-ongoing-investigation-labor-market-collusion-health-care.

other geographic areas. These prices are negotiated in private and subject to strict

confidentiality provisions.

316.    Indeed, the 2025 JAMA Study referenced above, first published in

June 2025, states the following: "Growing consolidation in the dialysis industry has

raised concerns about market power and the potential need for antitrust

enforcement, *but a lack of data previously prevented* a systematic analysis of these

issues."[333] It further states: "For the Anti-Kickback Statute and Stark Law to work

as intended, regulators must first have access to data that allow them to link

referrals to ownership shares and medical director compensation. To our knowledge,

*this work is the first* to move them closer to doing so."[334]

317.    Through the concealment of the conspiracy, Defendants affirmatively

misled Plaintiffs and others into believing that markets were divided as the result

of ordinary competition and that dialysis pricing was the product of lawful,

independent business conduct.

318.    Defendants successfully concealed the existence of the market-

allocation and price-fixing agreement from Plaintiffs.

319.    The 2025 JAMA Study was the first to reveal that Defendants' prices

for private insurance have likely moved in parallel since as early as 2005, thereby

lending strong support to the plausibility of a price-fixing conspiracy. Until the

publication of the 2025 JAMA Study, Plaintiffs—with access only to their own

data—had no means of discerning the nationwide scope or the parallel nature of

---

[333] 2025 JAMA Study at 1 (emphasis added).
[334] *Id.* at 8 (emphasis added).

Defendants' pricing practices dating back to 2005.

## X.    CLASS ACTION ALLEGATIONS.

320.    Plaintiffs bring this class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class (the "Class"):

> All persons in the United States and its territories that purchased outpatient dialysis services[335] directly from a Defendant or its affiliate during the Class Period.

321.    Excluded from the Class are Defendants and their conspirators; the officers, directors, or employees of any Defendant or conspirator; any entity in which any Defendant or conspirator has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant or coconspirator. Also excluded from the Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff. Also excluded from the Class is the United States government and its agencies and officers.

322.    The "Class Period" is the period from the date by which the anticompetitive effects of Defendants' violation of law commenced, but in no case later than four years from prior to May 9, 2025, through the date by which the anticompetitive effects of Defendants' violation of law shall have ceased, but in no case earlier than the present. Plaintiffs expressly reserve all rights to amend or modify the definition of the Class, including, but not limited to, the Class Period,

---

[335] The term "outpatient dialysis" includes all dialysis treatments performed outside of an acute or hospital setting, including in-clinic hemodialysis, in-clinic peritoneal dialysis, in-home hemodialysis, and in-home peritoneal dialysis.

upon further investigation and discovery.

323.    While Plaintiffs do not know the exact number of members of the Class, the sheer number of private payers for outpatient dialysis services means the Class size is so numerous and geographically dispersed that joinder is impracticable. Members of the Class are readily identifiable from information and records in Defendants' possession.

324.    Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, thereby making relief with respect to the Class as a whole appropriate. Such questions of law and fact common to the Class include, but are not limited to:

(a)    Whether Defendants engaged in a combination and conspiracy to fix, raise, maintain, or stabilize the prices of dialysis treatment for private payers;

(b)    Whether Defendants engaged in price fixing and territorial division;

(c)    The duration of the alleged conspiracy and the overt acts carried out by Defendants in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

(e)    Whether the conduct of Defendants, as alleged herein, caused injury to the business or property of Plaintiffs and the members of the Class;

(f)    The effect of the alleged conspiracy on the price of outpatient dialysis

services;

(g)    The appropriate injunctive and related equitable relief for Plaintiffs
and the Class; and

(h)    The appropriate class-wide measure of damages.

325.    Plaintiffs' claims are typical of the claims of the members of the Class.
Plaintiffs and all members of the Class are similarly affected by Defendants'
unlawful conduct in that they paid artificially inflated prices for outpatient dialysis
services from Defendants.

326.    Plaintiffs and undersigned counsel will fairly and adequately protect
the interests of the Class. Plaintiffs' claims arise out of the same common course of
conduct giving rise to the claims of the other members of the Class. Plaintiffs'
interests are coincident with, and not antagonistic to, those of the other members of
the Class. Plaintiffs are represented by competent counsel who are experienced in
the prosecution of antitrust and class action litigation.

327.    Questions of law and fact common to the members of the Class
predominate over any questions affecting only individual members, including legal
and factual issues relating to liability and aggregate damages.

328.    Class action treatment is a superior method for the fair and efficient
adjudication of the controversy, in that, among other things, such treatment will
permit a large number of similarly situated persons to prosecute their common
claims in a single forum simultaneously, efficiently, and without the unnecessary
duplication of evidence, effort and expense that numerous individual actions would

entail. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

329.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XI.    ANTITRUST INJURY.

330.    By reason of the alleged violations of the antitrust laws, Plaintiffs and members of the Class have suffered injury in their businesses or property, having paid higher prices for outpatient dialysis services than they would have paid in the absence of Defendants' violations of law, and have therefore suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and deter.

331.    Plaintiffs are threatened with future such injury in the absence of appropriate injunctive relief.

332.    Defendants' antitrust conspiracy had the following anticompetitive effects, among others:

a.    Price competition has been restrained or eliminated with respect to the pricing of outpatient dialysis services for private payers;

b.    The prices of outpatient dialysis services for private payers have been fixed, raised, maintained, or stabilized at artificially inflated levels;

c.    Purchasers of outpatient dialysis services have been deprived of the

145

benefits of free and open competition, such as competition on price,

quality, and innovation in dialysis treatment; and

d.  Purchasers of outpatient dialysis services paid artificially inflated

prices as direct and proximate result of Defendants' violations of law.

333.    The purpose of the conspiratorial and unlawful conduct of Defendants

was to fix, raise, stabilize, and/or maintain the price of outpatient dialysis services

for private payers.

334.    The precise amount of the overcharge impacting the prices of

outpatient dialysis services paid by Plaintiffs and members of the Class can be

measured and quantified using well-accepted economic methods.

## XII.    CLAIM FOR RELIEF.

### Violation of the Sherman Act, 15 U.S.C. §§ 1 & 3, brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26

335.    Plaintiffs incorporate and reallege, as though fully set forth herein,

each and every allegation set forth in the preceding paragraphs of this Complaint.

336.    Beginning at a time currently unknown to Plaintiffs, but at least as

early as May 9, 2021, and continuing through at least the present, Defendants

engaged in a continuing agreement, understanding, and conspiracy, either express

or implied, in restraint of trade to fix prices, allocate territories, and artificially

raise, fix, maintain, and/or stabilize prices for outpatient dialysis services in the

United States, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 &

3.

337.    The conspiracy alleged herein is a *per se* violation of Sections 1 and 3 of

the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 3.

338.    Plaintiffs and members of the Class directly purchased outpatient dialysis services from Defendants at supracompetitive prices, suffering antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

339.    Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Sections 1 and 3 of the Sherman Act, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

340.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Sections 1 and 3 of the Sherman Act, within the meaning of Section 16 of the Clayton Act, 15 U.S.C. § 26.

341.    Plaintiffs and members of the Class are entitled to recover treble damages for the injury caused by Defendants' wrongful conduct and to an injunction against Defendants, preventing and restraining the violations alleged herein.

## XIII.  REQUESTED RELIEF.

**WHEREFORE**, Plaintiffs and the Class respectfully request the following relief:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as representatives of the Class and appoint Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member

147

of the Class;

B.    The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants be adjudged to have been a *per se* violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 & 3);

C.    The Court permanently enjoin and restrain Defendants from continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.    That judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the actual damages sustained by Plaintiffs and members of the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.    That each of the Defendants be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

F.    That the Court award Plaintiffs and members of the Class such other and further relief, including structural relief, as the Court may deem just and

proper under the circumstances.

## XIV.  JURY DEMAND.

Plaintiffs demands a trial by jury, pursuant to Rule 38(b) of the Federal

Rules of Civil Procedure, of all issues so triable.


DATED: September 12, 2025

Respectfully submitted.

By: */s/ Vincent Briganti*
Vincent Briganti
Raymond P. Girnys
Roland St. Louis, III
Peter A. Barile III
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
vbriganti@lowey.com
rgirnys@lowey.com
rstlouis@lowey.com
pbarile@lowey.com

Stephen M. Tillery
stillery@koreintillery.com
Michael E. Klenov
mklenov@koreintillery.com
Carol O'Keefe
cokeefe@koreintillery.com
Andrew M. Ellis
aellis@koreintillery.com
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Tel.: (314) 241-4844

Labeat Rrahmani
lrrahmani@koreintillery.com
**KOREIN TILLERY LLC**
205 N Michigan Avenue, Suite 1950

Chicago, IL 60601
Tel.: (312) 641-9750

Eric L. Young, Esquire
**MILLER SHAW LLP**
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Tel. (866) 540-5055
eyoung@millershah.com

Joseph R. Saveri
Cadio Zirpoli
David H. Seidel
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
dseidel@saverilawfirm.com

*Counsel for Plaintiffs and Proposed
Class*